Thomas H.L. Selby (*Pro Hac Vice*)
David M. Krinsky (*Pro Hac Vice*)
Adam D. Harber (*Pro Hac Vice*)
Christopher J. Mandernach (*Pro Hac Vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & CO. LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, CA 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208

Attorneys for Defendant
DROPBOX, INC.

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SYNCHRONOSS TECHNOLOGIES, INC., | No. 3:16-cv-00119-HSG |
| Plaintiff, | **DROPBOX, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| DROPBOX, INC., | Date: April 28, 2016 |
| Defendant. | Time: 2:00pm |
| | Courtroom: 15, 18th Floor |
| | Judge: Hon. Haywood S. Gilliam, Jr. |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

NOTICE OF MOTION AND REQUESTED RELIEF ............................................... 1

ISSUES TO BE DECIDED .......................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

I.       BACKGROUND .................................................................................................. 2

II.      ARGUMENT ....................................................................................................... 3

         A.       Legal Standard. ........................................................................................ 4

         B.       The Claims of the '757 Patent are Not Patent-Eligible under
                  35 U.S.C. § 101 ......................................................................................... 6

                  1.       Claim 1 of the '757 Patent is Directed to an Abstract Idea. ....................... 6

                  2.       Claim 1 of the '757 Patent Contains No Inventive Concept. .................... 10

                  3.       Claim 1 is Representative of the '757 Patent's Remaining Claims. .......... 12

         C.       The Claims of the '446 Patent are Not Patent Eligible under
                  35 U.S.C. § 101 ....................................................................................... 14

                  1.       Claim 1 of the '446 Patent is Directed to an Abstract Idea. ..................... 14

                  2.       Claim 1 of the '446 Patent Contains No Inventive Concept. .................... 16

                  3.       Claim 1 is Representative of the '446 Patent's Remaining Claims. .......... 18

         D.       The Claims of the '696 Patent are Not Patent Eligible under
                  35 U.S.C. § 101 ....................................................................................... 19

                  1.       Claim 1 of the '696 Patent is Directed to an Abstract Idea. ..................... 19

                  2.       Claim 1 of the '696 Patent Contains No Inventive Concept. .................... 22

                  3.       Claim 1 is Representative of the '696 Patent's Remaining Claims. .......... 24

         E.       The Complaint Fails to Satisfy Fed. R. Civ. P. 8. ................................. 25

III.     CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) ...................................................................................................... *passim*

*Addiction & Detoxification Inst. L.L.C. v. Carpenter*, 620 F. App'x 934 (Fed. Cir. 2015) ....................................................................................................................25

*Alice Corp. v. CLS Bank Int'l*, --- U.S. ---, 134 S. Ct. 2347 (2014) ...................................... *passim*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................25

*Bancorp Servs. v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266 (Fed. Cir. 2012) ......................8

*Bascom Research, LLC v. LinkedIn, Inc.*, 77 F. Supp. 3d 940 (N.D. Cal. 2015) ...........................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................................25

*Bender v. LG Elecs. U.S.A., Inc.*, 2010 WL 889541 (N.D. Cal. Mar. 11, 2010) ...........................25

*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) ...........................................16

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014) ...................................................................................... *passim*

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) ..............................8

*Datatrak Int'l, Inc. v. Medidata Sols., Inc.*, 2015 WL 6870109 (N.D. Ohio Nov. 6, 2015) ...................................................................................................................11

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012) ................................................10

*Deerpoint Grp., Inc. v. Acqua Concepts, Inc.*, 2014 WL 7178210 (E.D. Cal. Dec. 16, 2014) ....................................................................................................................25

*Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, 2015 WL 5829783 (N.D. Cal. Oct. 6, 2015) ....................................................................................................11

*Gottschalk v. Benson*, 409 U.S. 63 (1972) ....................................................................4

*Hewlett Packard Co. v. ServiceNow, Inc.*, 2015 WL 1133244 (N.D. Cal. Mar. 10, 2015) ...............................................................................................................10, 17

*I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982 (Fed. Cir. 2014) .................................................5

*In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333 (Fed. Cir. 2014) ....................................................5

*In re TLI Comm's LLC Patent Litig.*, 87 F. Supp. 3d 773 (E.D. Va. 2015)..........................4, 5, 16

*Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015) ...................................................................................................................................12

*Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371 (D. Del. 2015) ................................................................................................................... *passim*

*Intellectual Ventures II, LLC v. JP Morgan Chase & Co.*, 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015)................................................................................17, 21, 23

*Inventor Holdings, LLC v. Gameloft, Inc.*, 2015 WL 5769220 (D. Del. Sept. 30, 2015) ...........................................................................................................................5

*Kinglite Holdings Inc. v. Micro-Star Int'l Co.*, 2015 WL 6437836 (C.D. Cal. Oct. 16, 2015) ........................................................................................................20, 23

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. ---, 132 S. Ct. 1289 (2012)..................................................................................................1, 4, 22

*Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, 2015 WL 436160 (D. Del. Jan. 27, 2015) ...............................................................................................14

*OpenTV, Inc. v. Apple, Inc.*, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) ...................4, 5, 12, 21

*Parus Holdings, Inc. v. Sallie Mae Bank*, 2015 WL 5886179 (D. Del. Oct. 8, 2015) ...........................................................................................................................5

*Pragmatus Telecom, LLC v. Genesys Telecomms. Labs., Inc.*, 2015 WL 4128963 (D. Del. July 9, 2015).................................................................................................5

*Priceplay.com, Inc. v. AOL Advert., Inc.*, 83 F. Supp. 3d 577 (D. Del. 2015) .......................21, 22

*Shortridge v. Found. Constr. Payroll Serv., LLC*, 2015 WL 1739256 (N.D. Cal. April 14, 2015).................................................................................................12, 21

*Synchronoss Techs., Inc. v. Asurion Mobile Applications, Inc.*, 3:11-cv-05811 (D.N.J.)..................................................................................................................12

*Synchronoss Techs., Inc. v. Carbonite*, 3:15-cv-00964 (D.N.J.) ...................................................12

*Synchronoss Techs., Inc. v. Egnyte*, 5:16-cv-00120-HRL (N.D. Cal.) .........................................12

*Synchronoss Techs., Inc. v. F-Secure*, 3:14-cv-06220 (D.N.J.)....................................................12

*Synchronoss Techs., Inc. v. Funambol*, 3:14-cv-06017 (D.N.J.) ..................................................12

*Synchronoss Techs., Inc. v. Hyperlync Techs., Inc.*, 3:15-cv-02845 (D.N.J.) ..............................12

*Synchronoss Techs., Inc. v. Newbay Software*, 3:11-cv-04947 (D.N.J.) ..............................6, 7, 12

*Synchronoss Techs., Inc. v. Vox Mobile*, 3:11-cv-06713 (D.N.J.) ..................................................12

*Tranxition, Inc. v. Lenovo (U.S.), Inc.*, 2015 WL 4203469 (D. Or. July 9, 2015)..............9, 10, 11

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014).......................................... *passim*

DROPBOX, INC.'S NOT. OF MOT. AND MOT. TO DISMISS; MEM. IN SUPPORT
CASE NO. 16-CV-00119-HSG

1

## OTHER AUTHORITIES

2

35 U.S.C. § 101 ................................................................................................................. *passim*

3

Fed. R. Civ. P. 8 ....................................................................................................................2, 25

4

Federal Rule of Civil Procedure 12(b)(6) ....................................................................................1, 3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND REQUESTED RELIEF

### TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on April 28, 2016, at 2:00pm, in Courtroom 15 of the United States District Court, San Francisco Courthouse, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Dropbox Inc. will, and hereby does, move, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an order dismissing with prejudice Plaintiff Synchronoss Technologies, Inc.'s claims for relief, as set forth in its Complaint (ECF 1).

Defendant moves for dismissal on the grounds that (a) Plaintiff's infringement claims fail as a matter of law because the claims of the patents-in-suit are invalid under 35 U.S.C. § 101, and (b) Plaintiff's claims, as alleged, fail to meet the pleading standard of Fed. R. Civ. P. 8(a).

### ISSUES TO BE DECIDED

1.     Whether the claims of the patents-in-suit are invalid under 35 U.S.C. § 101.

2.     Whether the Complaint fails to satisfy the pleading standard of Fed. R. Civ. P. 8.

### MEMORANDUM OF POINTS AND AUTHORITIES

This patent infringement case concerns one of the most basic concepts in information processing: synchronization. Plaintiff Synchronoss Technologies, Inc. asserts that Dropbox, Inc.'s industry-leading technology that allows its users—more than 400 million across more than 150 countries—to easily and seamlessly collect, store, and share their documents across multiple electronic devices, infringes U.S. Patent Nos. 6,671,757 (the "'757 patent"), 7,587,446 (the "'446 patent"), and 6,757,696 (the "'696 patent") (collectively, the "patents-in-suit").

Before Synchronoss can even attempt to enforce these patents, however, this Court must make a threshold determination: Do the asserted patents claim patentable subject matter under 35 U.S.C. § 101? *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. ---, 132 S. Ct. 1289 (2012); *Alice Corp. v. CLS Bank Int'l*, --- U.S. ---, 134 S. Ct. 2347 (2014). Specifically, under *Alice*, a district court must determine, as a pure question of law, whether the patents improperly attempt to claim an "abstract idea." Since *Alice*, courts have dismissed scores of infringement cases, particularly in the Internet and computer contexts, because the asserted patents claimed nothing more than abstract ideas imported into a technological context.

That is the situation here.  The patents-in-suit purport to claim and monopolize the abstract idea of synchronization using "difference information"—in layman's terms, updating one set of information to reflect changes made in a second set of the same information.  That kind of synchronization happens anytime someone updates a desk calendar to reflect an appointment previously recorded in a pocket calendar, or updates a hard-copy legal treatise by inserting a "pocket part" to reflect new cases.  The patents-in-suit implement this abstract idea using computers, but the underlying idea existed long before the digital age.

Under *Alice*, "abstract ideas" like the use of difference information to perform synchronization are not patentable inventions unless the claims also contain an "inventive concept" that "transform[s]" the abstract idea into a patent-eligible invention.  134 S. Ct. at 2355.  Implementation of an abstract idea using known or generic hardware and software does not qualify as such an inventive concept.  Yet that is all the patents-in-suit do.  The asserted patent claims are each directed to a combination of components—such as "management server[s]," "sync engine[s]," and "data interface[s]"—which, behind their labels, are just generic computer components, defined solely in terms of the function they perform.  In essence, the patents-in-suit purport to claim the idea of synchronization using the differences between data sets over networks and on computers.  That is exactly what section 101 forbids.  This Court should therefore dismiss the Complaint for failure to state a claim.

Although the District of New Jersey denied a similar motion based a perceived need to address claim construction first, there is no reason to do so here.  Motions to dismiss under section 101 are routinely decided before *Markman* proceedings, and in any case, there is no claim construction dispute here—for this Motion, Dropbox adopts the claim constructions Synchronoss has previously advanced in its other litigations involving the patents-in-suit.

This Court should also dismiss the Complaint for the independent reason that its threadbare and conclusory infringement allegations fail to provide the detail required by Fed. R. Civ. P. 8(a).

## I.     BACKGROUND

The patents-in-suit all relate to the concept of synchronization using the changes or

updates made to one copy of a file, which the patents call "difference information."[1]

The '757 patent, entitled Data Transfer and Synchronization System, contains twenty-nine claims, three of which are independent (claims 1, 16, 24).  The specification of the '757 patent concedes, as it must, that synchronization was well known before the priority date of the patent, but asserts that prior art synchronization schemes were "generally relatively inefficient" because they required transferring entire documents to be synchronized.  Col. 2:45–48; *see generally* Col. 1:55–2:8; 2:31–3:20.  The purportedly novel solution to this perceived problem is to transfer only "difference information"—that is, "only the changes" to data "and the instructions for implementing those changes."  *See e.g.*, Col. 3:25-55; 6:8-11.

The '446 patent, entitled Acquisition and Synchronization of Digital Medial to a Personal Information Space, contains twenty claims, two of which are independent (claims 1 and 11).  The claims in the '446 patent are directed to either a method or system for maintaining personal digital media data—like music and photo files—and synchronizing those files using difference information across a user's multiple Internet-connected devices.  *See* '446 Patent, Col. 3:45-62.

The '696 patent, entitled Management Server for Synchronization System, contains twenty-five claims, four of which are independent (claims 1, 9, 16, 24).  Like the '757 and '446 patents, the '696 patent claims systems or components for data synchronization.  As the '696 patent describes, the purported invention "includes a system . . . for transferring data between two devices which require information to be shared between them."  '696 Patent, Col. 4:25–28.  As part of such systems, the '696 patent also claims an "authentication module" for "associating the user data with a particular user" and controlling access to that data.  *Id.* at Col. 3:46–50.

## II.   ARGUMENT

The patents-in-suit are invalid under 35 U.S.C. § 101.  All three patents claim the abstract idea of synchronizing two files using just the changes or updates, and none of the claims supply an inventive concept sufficient to transform the abstract ideas into a patentable invention.  The Complaint should therefore be dismissed under Federal Rule of Civil Procedure 12(b)(6).  *See*

---

[1] The patents-in-suit are Exhibits A-C to Plaintiff's Complaint.  *See* ECF 1.

*OpenTV, Inc. v. Apple, Inc.*, 2015 WL 1535328, at *2 (N.D. Cal. Apr. 6, 2015) (Gilliam, J.).

**A.     Legal Standard.**

Section 101 of the Patent Act addresses the threshold issue of whether a purported invention is the type of subject matter that can be patented.  An invention is patent-eligible if it claims a "new and useful process, machine, manufacture, or composition of matter."  35 U.S.C. § 101.  The broad categories that section 101 sets forth, however, have limits.  The Supreme Court has "long interpreted" section 101 to forbid the issuance of patents directed to "laws of nature, natural phenomena, and abstract ideas," *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1346 (Fed. Cir. 2014), because such concepts are the "building blocks of human ingenuity," *Alice*, 134 S. Ct. at 2354.  And for good reason:  Allowing monopolization of these matters would impede innovation, thereby "thwarting the primary object of the patent laws."  *Alice*, 134 S. Ct. at 2354.

The Supreme Court has set forth a two-step framework for determining whether a claim falls within the "abstract idea" exception to patent eligibility.  *Mayo*, 132 S. Ct. at 1293–94; *Alice*, 134 S. Ct. at 2355.  First, this Court must determine whether a claim is directed to a patent-ineligible abstract idea.  In so doing, it must "avoid allowing the typically convoluted claim language—'patent-ese'—to obfuscate the general purpose and real essence of software patent claims."  *In re TLI Comm's LLC Patent Litig.*, 87 F. Supp. 3d 773, 783 (E.D. Va. 2015).

Second, if a patent is directed to an abstract idea, the Court must then consider the elements of the claim to assess whether they "transform the nature of the claim into a patent-eligible application of the abstract idea."  *Content Extraction*, 776 F.3d at 1347.  The law is clear that neither "generic computer implementation . . . of an abstract idea" nor the inclusion of claim components described in "purely functional and generic" language will impart patent eligibility. *Alice*, 134 S. Ct. at 2357, 2360 (finding no inventive concept in claims to a "data processing system," which included a "communications controller" and a "data storage unit").  Such broad and expansive claims place no meaningful limitation on the abstract idea, and effectively preempt and monopolize the field.  *See, e.g.*, *id*. at 2357; *Gottschalk v. Benson*, 409 U.S. 63, 72

(1972).[2]  Finally, mere efficiency or performance improvements over the prior art do not render a claim patent eligible.  *See, e.g.*, *Pragmatus Telecom, LLC v. Genesys Telecomms. Labs., Inc.*, 2015 WL 4128963, at *7 (D. Del. July 9, 2015) ("Faster, simpler, automatic or more successful [results] . . . do not save the claims from being directed to the abstract idea . . . . ").

In conducting its analysis under *Alice*, the Court need not analyze every claim of every asserted patent.  Instead, so long as "all the claims are 'substantially similar and linked to the same abstract idea,'" the Court may identify and analyze representative claims.  *Content Extraction*, 776 F.3d at 1348 (citation omitted); *see also Alice*, 134 S. Ct. at 2359 (analyzing "representative" method claims); *In re TLI*, 87 F. Supp. 3d at 785–86 ("[W]here, as here, all of the claims are directed to the same abstract idea, the Federal Circuit teaches that addressing each claim of the asserted patents is unnecessary." (internal quotation omitted)).

Patent validity under section 101 is a pure question of law.  *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014).  Courts routinely address this threshold question at the motion to dismiss stage, and regularly grant (and affirm) Rule 12(b)(6) motions to dismiss based on invalidity under section 101.  *See, e.g.*, *Content Extraction*, 776 F.3d at 1349; *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014).  Addressing a patent's validity under section 101 at the outset of a case can "spare both litigants and courts years of needless litigation."  *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (per curiam) (Mayer, J., concurring) (noting "clear advantages" to addressing section 101 "at the outset").

A decision on this Motion should not wait for claim construction.  *See Content Extraction*, 776 F.3d at 1349 ("claim construction is not an inviolable prerequisite to a validity determination under § 101"); *OpenTV*, 2015 WL 1535328 at *2 (citing cases).  Validity under section 101 is a pure question of law, and Synchronoss has never "proffer[ed] a construction which would affect the analysis of patent eligibility" in this or any prior case.  *Parus Holdings, Inc. v. Sallie Mae Bank*, 2015 WL 5886179, at *7 (D. Del. Oct. 8, 2015).  In any case, there is no

---

[2] A claim need not cover "every application of the abstract idea" in order to trigger preemption concerns.  As *Alice* makes clear, the concern arises when a claim "disproportionately t[ies] up the use of the underlying ideas."  134 S. Ct. at 2354 (internal quotation marks omitted); *see Inventor Holdings, LLC v. Gameloft, Inc.*, 2015 WL 5769220, at *12 (D. Del. Sept. 30, 2015).

claim construction dispute here, because, for this Motion only, Dropbox applies Synchronoss's past constructions, including its contentions that no construction of certain terms is needed. *See, e.g.*, Plaintiff Synchronoss Tech. Inc.'s Opening *Markman* Brief, *Synchronoss Techs. Inc. v. NewBay Software, Inc.*, No. 11-cv-04947-FLW-TJB, Dkt. No. 65 (D.N.J. Nov. 28, 2012).[3]

### B.    The Claims of the '757 Patent are Not Patent-Eligible under 35 U.S.C. § 101.

Though cloaked in technical jargon, the '757 patent's claims are directed to the abstract idea of synchronizing files over a network using information about the changes or updates to one version of the file, and are implemented using generic hardware and software components that are defined by the function they perform.  They are therefore invalid under section 101.

### 1.    Claim 1 of the '757 Patent is Directed to an Abstract Idea.

The first step of determining whether a claim is eligible for protection under section 101 is to assess whether it is "directed to a patent-ineligible concept," *i.e.*, an "abstract idea."  *Alice*, 134 S. Ct. at 2355.  The claims of the '757 patent are directed to such an idea.

Claim 1, which is representative of the other claims in the patent, reads:

1.  A system for synchronizing data between a first system and a second system, comprising:
a first sync engine on the first system interfacing with data on the first system to provide difference information in a difference transaction;
a data store coupled to the network and in communication with the first and second systems; and
a second sync engine on the second system coupled to receive the difference information in the difference transaction from the data store via the network, and interfacing with data on the second system to update said data on the second system with said difference information;
wherein each said sync engine comprises a data interface, a copy of a previous state of said data, and a difference transaction generator.

Stripped of jargon, the idea underlying claim 1 is plainly abstract:  changes to information in one location (the "first system") are communicated to another location (the "second system") and used to update the data in the second location to match the first.  This idea has existed for as long as people have been keeping track of dynamic information, and applies to

---

[3] Dropbox reserves its right to advance its own constructions at the appropriate time under the Local Rules and any scheduling Order in this case.

collections of information as diverse as calendars, accounting entries, and case law reporters. Here, the abstract idea is implemented on a computer: data on one electronic device such as a laptop computer (the "first system") is synchronized with that found on a separate device (the "second system") by way of a networked server or data storage location (the "data store") which is in communication with both devices. A so-called "sync engine" on the first device determines whether a document has been changed by comparing it to "a previous state of said data" (*i.e.*, a previous copy of the document) and then communicates the changes ("difference information") to the intermediate "data store," which sends them to the second device.[4] The concept is illustrated simply in Figure 3 of the patent below, which shows System A determining changes and then sending them through the data store to System B, which receives said changes:



Figure 3

The '757 patent, however, does not claim *how* the sync engine determines and communicates differences other than at a level so general that it could be applied without any computer at all. Consider, for example, a system for an executive (Jane) to "synchronize" her calendar with a copy maintained by her assistant (John):[5]

| ELEMENTS OF CLAIM 1 | CORRESPONDING STEP USING A TRADITIONAL CALENDAR |
|---|---|
| a first sync engine on the first system interfacing with data on the first system to provide difference information in a difference transaction; | Jane reviews her office calendar to identify new calendar entries. |

---

[4]  There is no dispute over the claim construction of "sync engine" because, for purposes of this Motion, Dropbox assumes the construction that Synchronoss has advanced in prior litigations: "a software application that can analyze a data set and modifications to that data set, transmit/generate a representation of modifications to a data set, receive a representation of modifications to a data set, and modify a data set." *See Synchronoss Techs. Inc. v. NewBay Software, Inc.*, No. 11-cv-04947-FLW-TJB, Dkt. No. 65, at 9 (D.N.J. Nov. 28, 2012).

[5]  The '757 patent uses calendar data as one example of the type of information amenable to synchronization. *See, e.g.*, '757 Patent, Col. 1:38–44; 2:30–32.

| | |
|---|---|
| a data store coupled to the network and in communication with the first and second systems; and | Jane lists the new calendar entries on a piece of paper (*i.e.*, a "data store"). |
| a second sync engine on the second system coupled to receive the difference information in the difference transaction from the data store via the network, and interfacing with data on the second system to update said data on the second system with said difference information; | John takes the piece of paper listing the new calendar entries and updates his copy of Jane's calendar, "synchronizing" his copy of Jane's calendar with Jane's own copy. |
| wherein each said sync engine comprises a data interface, a copy of a previous state of said data, and a difference transaction generator. | Both Jane and John are able to interface with their respective versions of Jane's calendar and determine what entries have changed—thereby serving as the "difference transaction generator." |

Where, as here, a claim "can be performed in the human mind, or by a human using a pen and paper," the claim is directed to "unpatentable mental processes." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011); *see also Bancorp Servs. v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1277 (Fed. Cir. 2012).

In that regard, courts have routinely concluded that concepts similar to those in claim 1 of the '757 patent are abstract ideas, even when the claims are limited to the computer-network field and couched in technical or patent jargon. In *Content Extraction*, for example, the Federal Circuit affirmed the dismissal of a complaint based on a finding that the asserted patents were invalid under section 101. Notwithstanding that the claims recited a method for "receiving output representing a diversity of types of hard copy documents from an automated digitizing unit," storing that information in "a memory," recognizing portions of the documents "corresponding to a first data field," and then storing that information "corresponding to said first data field into memory locations for first said data field," the court found that the asserted

claims amounted to little more than "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." *Content Extraction*, 776 F.3d at 1345, 1347. Such a method, the court reasoned, merely described an abstract idea—"data collection, recognition, and storage"—which "is undisputedly well-known" and has always been performed by humans. *Id.* at 1347.[6] The same is true here.

Likewise, in *Tranxition, Inc. v. Lenovo (U.S.), Inc.*, the court invalidated two patents directed to an automated method for transferring configuration settings from one computer to another—in other words, synchronizing configuration settings between two computers. 2015 WL 4203469, at *1–2, *6–7 (D. Or. July 9, 2015). Although the claims included "dense language" describing seemingly-complicated technical steps like "extracting the active configuration settings," "retrieving the extracted configuration settings," and "transitioning one or more of the retrieved configuration settings," the court found them to be "a sweeping general description of the migration process . . . devoid of any detail describing how [the] claimed invention works." *Id.* at *7. "In plain terms, this claim describes the steps any user would take to perform the abstract idea of 'migrating' settings between computers." *Id.* Claim 1 of the '757 patent, also directed to data manipulation, transmission and migration, is similarly abstract.

As these cases illustrate, dressing up patent claims in technical jargon or employing generic computer components does not make the underlying idea any less abstract. *See, e.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 383 (D. Del. 2015) (invalidating claims "directed to receiving information related to a file . . . from a querying computer, characterizing the file based on the identifier and other stored identifiers, and communicating a result of the characterization back to a querying computer"); *Bascom Research, LLC v. LinkedIn, Inc.*, 77 F. Supp. 3d 940, 949 (N.D. Cal. 2015).

---

[6] It is of no moment that the claims of the '757 are directed to a "system" that, to the extent it includes at least some computer hardware, qualifies as a "machine," while the claims in cases like *Content Extraction* were to a method (a "process" under section 101). In *Alice*, the Supreme Court dismissed as irrelevant what particular statutory category a claim is directed to, and warned "against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art." 134 S. Ct. at 2359 (internal quotations and brackets omitted).

9

### 2.     Claim 1 of the '757 Patent Contains No Inventive Concept.

The second step of the *Alice* inquiry requires the Court to "search for an inventive concept" sufficient to "transform the nature of the claim into a patent-eligible" invention. *Content Extraction*, 776 F.3d at 1347.  Importantly, this analysis focuses solely on the level of detail in the claims, "not the additional detail set forth in the specification." *Tranxition*, 2015 WL 4203469, at *17; *see also Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012) ("In considering patent eligibility under § 101, one must focus on the claims.").  Claim 1 of the '757 patent contains no such inventive concept.

In *Alice*, the Supreme Court made clear that hardware and software components— regardless of their labels—provide no inventive concept when they are "purely functional and generic" in nature.  134 S. Ct. at 2360 (finding no inventive concept in claims to a "data processing system" which included a "communications controller" and a "data storage unit").  Reciting generic computer components that are defined by the function they perform to implement an abstract idea "is no different than adding [the words] 'instructions for' in front of the abstract idea; in either case, any and all implementations of the abstract idea are being claimed, which is essentially equivalent to claiming the abstract idea itself." *Hewlett Packard Co. v. ServiceNow, Inc.*, 2015 WL 1133244, at *6 (N.D. Cal. Mar. 10, 2015) (declining to find an inventive concept in a claim reciting components of a "monitoring server," "database," and "help desk client," all of which were defined in terms of their respective functions).

Like the "communications controller" and "data storage unit" in *Alice*, and the "monitoring server" and "help desk client" in *Hewlett Packard*, the hardware and software components in claim 1 of the '757 patent are generic and functionally defined.  The hardware components of the claim—the "first system," "second system," "network," and "data store"—are thoroughly generic.  And the software components—the first and second "sync engine[s]" and "difference transaction generator"—are entirely defined by the function they perform in the claim.  In other words, as used in the claims, a "difference transaction generator" is just a software tool—examples of which the patent acknowledges are in the art—that can determine edits to a document, and a "sync engine" is just a generic piece of software that receives or

transmits those edits.[7]   The patent does not describe or claim any unique design of a "difference transaction generator" to determine changes to a document based on the prior version, or a "sync engine" to transmit or apply those changes.

The problem with functionally-defined claim limitations like those in the '757 patent is that they are "entirely devoid of any detail about *how* the invention works." *Tranxition*, 2015 WL 4203469, at *12 (emphasis added).  The '757 patent claims provide no detail about how the claim elements perform their recited functions—*e.g.*, *how* the sync engine "interface[es] with data" to generate difference information, *how* the sync engine "provide[s] difference information" in a "difference transaction," or *how* the second sync engine "interface[es]" and "update[s]" data on the second system.   And because the patent does not claim *how* the components perform the steps claimed in the patent, the claims "lack the 'additional features' required for patent-eligibility." *Datatrak Int'l, Inc. v. Medidata Sols., Inc.*, 2015 WL 6870109, at *7 (N.D. Ohio Nov. 6, 2015); *see also Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, 2015 WL 5829783, at *7 (N.D. Cal. Oct. 6, 2015).

The Federal Circuit has repeatedly concluded that claims containing purely functional and generic elements like those in the '757 patent do not supply the requisite inventive concept. In *Content Extraction*, the court concluded that there was no inventive concept in the use of "a generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry." *Content Extraction*, 776 F.3d at 1348.  Similarly, in *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, the court concluded that claims reciting "generalized software components arranged to implement an abstract concept on a computer" were unpatentable under section 101.  728 F.3d 1336, 1344–45 (Fed. Cir. 2013).  Like the components of the '757 patent claims, the components in *Accenture* were all generic and functionally-defined, including a "'data component that stores, retrieves and manipulates data' and a client component that 'transmits and receives data to/from the data component,'" a "business component that 'serves as a data cache and includes logic for manipulating the data,'"

---

[7] Plaintiff has admitted as much, based on its prior construction of "sync engine." *See supra* p. 7 n.4.

and a "controller component to handle program events and an adapter component to interface with a data repository." *Id.* at 1338.  The Federal Circuit reached the same conclusion in *Intellectual Ventures I LLC v. Capital One Bank (USA)*, affirming the invalidity of a claim that "simply describes a generic web server with attendant software, tasked with providing web pages to and communicating with the user's computer," because merely using "conventional computer components . . . operating in a conventional manner" does not confer patent eligibility.  792 F.3d 1363, 1370-71 (Fed. Cir. 2015) (citation omitted).

This Court, too, has invalided generic claims with elements "described solely in terms of their functions," *OpenTV*, 2015 WL 1535328, at *6 ("[T]he 'broadcasting,' 'receiving,' 'storing,' 'assembling,' 'associating,' and 'transmitting' functions performed by those components boil down to electronic communication and recordkeeping, two of the 'most basic functions of' generic computer technology.'"), as have other courts in this District, *see, e.g.*, *Shortridge v. Found. Constr. Payroll Serv., LLC*, 2015 WL 1739256 (N.D. Cal. April 14, 2015) (patent-ineligible system included a "computer processor, or a networked plurality of computer processors," "at least one data base application," "at least one user interface," and "an augmentation and supporting engine" for various purposes).

To sanction generic, overbroad limitations like those in claim 1 of the '757 patent "risk[s] disproportionately tying up the use of the underlying idea[]" itself, which is exactly what section 101 is designed to prevent.  *Alice*, 134 S. Ct. at 2354.  That Synchronoss has already sued at least *eight* unrelated companies for infringing the '757 patent illustrates the very concern the Supreme Court intended to address in *Alice*.[8]  Because the limitations of claim 1 of the '757 patent fail to provide an inventive concept, the claim is invalid as unpatentable under section 101.

### 3.   Claim 1 is Representative of the '757 Patent's Remaining Claims.

The remaining claims of the '757 patent are "substantially similar and linked to the same

---

[8] *See Synchronoss Techs., Inc. v. Egnyte*, 5:16-cv-00120-HRL (N.D. Cal.); *Synchronoss Techs., Inc. v. Asurion Mobile Applications, Inc.*, 3:11-cv-05811 (D.N.J.); *Synchronoss Techs., Inc. v. Carbonite*, 3:15-cv-00964 (D.N.J.); *Synchronoss Techs., Inc. v. F-Secure*, 3:14-cv-06220 (D.N.J.); *Synchronoss Techs., Inc. v. Funambol*, 3:14-cv-06017 (D.N.J.); *Synchronoss Techs., Inc. v. Newbay Software*, 3:11-cv-04947 (D.N.J.); *Synchronoss Techs., Inc. v. Vox Mobile*, 3:11-cv-06713 (D.N.J.); *Synchronoss Techs., Inc. v. Hyperlync Techs., Inc.*, 3:15-cv-02845 (D.N.J.).

1   abstract idea" as claim 1.  *Content Extraction*, 776 F.3d at 1348 (citation omitted).  Because they,

2   too, fail to add any inventive concept, they are likewise invalid under section 101.  *See id.*

3   In particular, the '757 patent contains two additional independent claims—both of which

4   are directed to the same abstract idea of synchronization using difference information, and

5   neither of which adds a sufficiently inventive concept for patent eligibility.  Like claim 1, claim

6   16 is directed to a system that connects a "first device," which contains at least a "data file" and

7   "differencing code," to a "data store," which is connected in turn to a "second device," with its

8   own "differencing code," to receive the "change transactions."  Just as in claim 1, a "sync

9   engine" is included to perform the synchronization.  Unlike claim 1, however, claim 16

10   contemplates that the difference information can move in two directions—that is, the first device

11   can send *and* receive "change transactions" from the second device, as can the second device.

12   Claim 16 adds nothing to claim 1 that makes it patent-eligible under section 101.  It is directed to

13   the same abstract idea, and its limitations are purely functional and generic in nature.

14   The final independent claim, claim 24, generally replicates the system described in claim

15   16 using similar components, except that it expressly requires that the data store be a "server"

16   and that it, and the two devices, have a connection to the Internet.  A generic hardware

17   component like a "server" is akin to a generic computer or scanner, and is not transformative.

18   *See supra* p. 11.  Nor does an Internet connection transform the claim into a patentable invention.

19   *See Ultramercial*, 772 F.3d at 716 ("[I]nvocation of the Internet . . . adds no inventive concept.").

20   The dependent claims likewise fail to add any inventive concept that transforms them

21   into patentable inventions.  They broadly fall into the following categories.  Claims 2, 3, and 17

22   specify the generic type of network used in the claimed system—such as a "private network"

23   (claim 2) or an "Internet connection" (claim 3).  Claims 4, 5, 6, 7, 15, and 18 specify by what

24   pathway or when the difference information is transmitted.  *See, e.g.*, Claim 4 (specifying

25   transmittal from the first sync engine to the second through the data store); Claim 15 (specifying

26   a plurality of synch engines on a plurality of systems).  Claims 19 and 27 reiterate aspects of the

27   abstract idea that are present in claim 1—claim 19 requires using "change transactions" to update

28   a data file, and claim 27 requires transferring "difference transactions."  Claims 13, 14, 26, and

28 specify the format of communication between components at a broad and non-inventive level. For example, claim 26 specifies that such communications are "encoded and compressed," and claim 13 recites that the difference information is encoded in an unspecified "universal format." Claims 8, 9, 10, 11, 12, 20, 21, 22, 23, 25, and 29 recite additional functionally described components that may be added to the claimed system, such as a common "sync server" (claim 12), a "management server" (claim 25), or a wholly generic "device" (claim 11).

Simply increasing the number of generic and functional limitations in a claim otherwise directed to an abstract idea, however, does not make it patentable under *Alice*. *See Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, 2015 WL 436160, at \*4 (D. Del. Jan. 27, 2015) ("dependent claims [that] ostensibly narrow the scope of the claims" are not patent-eligible where "the limitations cannot be considered inventive"). The remaining claims of the '757 patent, like claim 1, are invalid under section 101.

### C.   The Claims of the '446 Patent are Not Patent Eligible under 35 U.S.C. § 101.

The '446 patent, like the '757 patent, claims synchronization using difference information—only here it is applied in the context of media files, like digital pictures or music files. Because the '446 patent claims this abstract idea using generic, functionally-defined components on a common computer network, its claims, too, are invalid under section 101.

### 1.   Claim 1 of the '446 Patent is Directed to an Abstract Idea.

The claims of the '446 patent are directed to both a method and system for transferring digital media data—like music or photo files—to an electronic device, such as a laptop or desktop computer. Claim 1, which is representative of the other claims in the patent, reads:

> 1. A method of transferring media data to a network coupled apparatus, comprising:
> (a) maintaining a personal information space identified with a user including media data comprising a directory of digital media files, the personal information space being coupled to a server and a network;
> (b) generating a first version of the media data in the personal information space;
> (c) generating a digital media file, in response to an input from the user, comprising a second version of the media data in a same format as the first version in the personal information space, the second version including an update not included in the first version;
> (d) obtaining difference information comprising differences between the first version of the media data and the second version of the media data; and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(e) transferring a digital media file over the network containing the difference information from the personal information space to the network coupled apparatus in response to a sync request made from a web browser at the network-coupled apparatus by the user.

At a general level, the purported invention includes steps to synchronize media files housed on a network-connected digital storage space (a "personal information space identified with a user") with a laptop, PC, or other similar device (the "network coupled apparatus"). Two versions of the media data are created (a "first version" and a "second version"), where the "second version" contains updates to the first. The "difference information" reflecting these updates is collected, and, in response to a user-initiated "sync request" made from a web browser on the device to be synchronized, transmitted to the device.

The abstract idea behind claim 1 of the '446 patent is the same as that described in the context of the '757 patent.[9] The principal differences are that this idea is applied to media files and the synchronization is requested from a web browser. The claimed invention takes changes made to one version of a user's media data and applies those changes to another version of the data maintained on another device. *See, e.g.*, '446 Patent, Col. 3:22-24. That activity, at its core, is synchronization with so-called "difference information," and for the reasons already described above in the context of the '757 patent, it is an abstract idea. *See supra* pp. 6-9.

While claim 1 of the '446 patent appears to add some elements to the synchronization described in the '757 patent, those additional elements do not make the essence of claim 1 any less of an abstract idea. Claim 1, for example, is directed expressly to a particular type of files— "media data." *See, e.g.*, '446 Patent, Col. 1:43-45. But the type of file being synchronized— whether a music file or a calendar entry, as in the '757 patent—does not change whether synchronization itself is an abstract idea. *Cf. Accenture*, 728 F.3d at 1345 (holding that "attempts to limit the abstract concept . . . to a specific industry . . . do[es] not provide additional substantive limitations to avoid preempting the abstract idea").

---

[9] The '446 patent incorporates by reference the '757 patent. *See* '446 Patent, Col. 1:10-11.

1    Claim 1 also requires "a personal information space identified with the user," which is

2    connected to "a server and a network."  As the specification notes, a "personal information

3    space" is a "data store of information customized by, and on behalf of the user which contains

4    both public data the user puts into their personal space, private events in the space, and other data

5    objects such as text files or data files which belong to the user." '446 Patent, Col. 2:23-27; *see*

6    *id.* Col. 1:50-55.  This limitation describes something already contemplated in synchronization—

7    claim 1 of the '757 patent, for example, recites a "data store coupled to the network and in

8    communication with the first and second systems."  The fact that the data store recited in claim 1

9    of the '446 patent is "personal" does not elevate the claims above the level of an abstract idea.

10    Like the "organizing, classifying, and storing" of information found to be an abstract idea in *TLI*,

11    the organization of media information on a personal level is something that can be done, and has

12    been done, without the use of computers.  *See In re TLI*, 87 F. Supp. 3d at 785.  And while claim

13    1 requires the personal information space be connected to a server and network, that common

14    feature is one that courts have repeatedly held does not make otherwise unpatentable subject

15    matter patentable.  *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014)

16    ("That a computer receives and sends the information over a network—with no further

17    specification—is not even arguably inventive."); *Intellectual Ventures I*, 100 F. Supp. 3d at 385.

18    Finally, claim 1 expressly contemplates that the synchronization is user initiated—*i.e.*,

19    that the data transfer is made "in response to a sync request made from a web browser at the

20    network-coupled apparatus by the user."  But this, too, does not make claim 1 any less abstract.

21    *See, e.g.*, *Ultramercial*, 772 F.3d at 715 (invalidating claim with element to take steps after

22    "receiving a request . . . from the consumer"); *In re TLI*, 87 F. Supp. 3d at 790 (manipulating

23    data based on user inputs is a "'conventional computer task,' and therefore an abstract idea").

### 2.    Claim 1 of the '446 Patent Contains No Inventive Concept.

25    Claim 1 also lacks the "inventive concept" needed to "transform the nature of the claim

26    into a patent-eligible application."  *Content Extraction*, 776 F.3d at 1347.

27    The claim merely recites "routine" and "conventional steps, specified at a high level of

28    generality," devoid of any explanation or description of how the particular function is to be

performed. *Ultramercial*, 772 F.3d at 716. There is no limitation on how "generating a first version of the media data," "generating a digital media file," or "obtaining difference information" is to be accomplished. Nor is there any limitation on what (if any) components are needed to perform these steps. The descriptions are merely functional recitations of tasks to be accomplished by software modules, and they provide no inventive concept. *See Intellectual Ventures II, LLC v. JP Morgan Chase & Co.*, 2015 WL 1941331, at *11 (S.D.N.Y. Apr. 28, 2015) (finding no inventive concept; claim fails to specify how software element performs its recited function); *Hewlett Packard*, 2015 WL 1133244, at *8 (same).

Courts have repeatedly found that elements analogous to those included in claim 1 of the '446 patent fail to provide a transformative concept. In *buySAFE*, for example, the Federal Circuit rejected attempts to patent a method for guaranteeing a party's performance of its online transaction that included steps directed to [1] "receiving, by at least one computer application program . . . a request from a first party" for a "performance guarantee for an 'online commercial transaction," [2] "processing, by at least one computer application program" the request, and [3] "offer[ing], via a computer network," the performance guarantee. 765 F.3d at 1351–52. Like the claims rejected in *buySAFE*, the method of claim 1 of the '446 patent involves the application receiving a request from the user to generate a digital media file; processing the request and generating difference information, and transferring it to other devices via a network.

Likewise, in *Intellectual Ventures I*, the court rejected as unpatentable claims directed to a method for identifying spam and virus-containing emails. 100 F. Supp. 3d at 387–88. The claims included elements directed to "receiving . . . file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm," "determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers," and "outputting . . . an indication of the characteristic of the data file based on said step of determining." *Id.* at 381. Because the patent "disclose[d] no specialized machine or programming"—other than generic hardware and software—"that would play a significant part

in permitting the claimed method to be performed," the claims contained no inventive concept. *Id.* at 387. The same is true of the '446 patent.

### 3. Claim 1 is Representative of the '446 Patent's Remaining Claims.

Because all of the claims are "substantially similar and linked to the same abstract idea," claim 1 is representative of the other claims in the '446 patent, which are unpatentable under section 101 for the same reason. *Content Extraction*, 776 F.3d at 1348.

The only other independent claim in the patent, claim 11, is directed to a system that allows the media data transfers described in the method of claim 1. As in claim 1, the system comprises a "personal information store" to store digital media files, and a component to obtain the "difference information" between multiple versions of the media files and then transfer that information to a network-coupled device in response to a user-initiated sync request. As in *Alice*, where "computer system" claims were unpatentable because they were "no different from the method claims in substance," 134 S. Ct. at 2360, claim 11 adds no inventive concept to the unpatentable method of claim 1. Because the system claim of claim 11 and the method claim of claim 1 contain only "'minor differences in terminology" and "require performance of the same basic process," they "should rise or fall together." *Accenture*, 728 F.3d at 1344.

As with the '757 patent, the claims that depend on the two independent claims add little detail or depth to the concepts set forth in the independent claims. Claims 2, 3, 5, 8, 9, and 10 specify, at an entirely generic level, how data is transmitted or maintained in the claimed method. *See, e.g.*, Claim 2 (reciting "receiving information into the personal information space" before "maintaining a personal information space"). Claims 4 and 6 specify the type of network-coupled apparatus—*i.e.*, an "automotive computer" (claim 4)—or the type of media data—*i.e.*, a "directory of media files." Claims 7, 12, 13, and 14 specify generic software or hardware components used in relation to the "personal information space" in the claimed method or system. *See, e.g.*, Claim 12 ("the personal information store is provided on a server"); Claim 13 ("the server is coupled to the Internet"). For the same reasons described above, *see supra* pp. 16-18, such claims add no inventive concept and are invalid for the same reason as claim 1.

**D.     The Claims of the '696 Patent are Not Patent Eligible under 35 U.S.C. § 101.**

The claims of the '696 patent, the final patent-in-suit, are also invalid under section 101. At most, the '696 patent adds to the idea of synchronization two additional, equally abstract ideas—version control and "authentication," *i.e.*, identifying users.[10]  That addition does nothing to make the claim any less abstract.  And like the claims of the other patents, the claims of the '696 patent do nothing more than describe the implementation of these abstract ideas using generic, functionally-defined components on a ubiquitous computer network.  They therefore fail to transform the abstract idea into a patent-eligible invention.

**1.     Claim 1 of the '696 Patent is Directed to an Abstract Idea.**

Claim 1 of the '696 patent, which is representative of the other claims, relates to the synchronization of data within a networked system.  It reads: [11]

1. A controller for a synchronization system, comprising:

a user identifier module;
an authentication module identifying a user coupled to the synchronization system;
a synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device;
a transaction identifier module assigning a universally unique identifier to each user of transaction objects in said data store;
and a current table of universally unique identifier values and versioning information, generated by versioning modules on said devices associating a transaction identifier with each transaction object, providing a root structure for understanding the data package files.

Whereas claim 1 of the '757 patent claims "[a] system for synchronizing data," claim 1 of the '696 patent recites "[a] controller for a synchronization system."  This so-called "controller" includes a component to determine the users present in the system (a "user identifier module") and one to "authenticat[e]" these users.  In other words, one component determines the presence of a user in the system, and the other determines who that user is.  The controller also includes a component to control the flow of data between the users (a "synchronization manager").  Finally,

---

[10] That the two patents share a common idea is unsurprising:  much of '446 patent's specification is identical to that of the '757 patent, and all 17 figures in both patents are exactly the same.

[11] The '696 patent claims were markedly revised by way of multiple certificates of correction. Defendant includes these changes in the claim language for purposes of this motion only, but reserves the right to challenge the propriety of any changes made through the correction process.

the controller includes a component (a "transaction identifier module") that assigns an individual number to each of the changes to be made between the document versions ("a universally unique identifier"), and a "current table" maintaining these individual version numbers.

Underneath this jargon is the same abstract idea at the heart of the '757 patent. The essence of the synchronization described in the '696 patent is the same as that claimed in the '757 patent: applying the changes made to one version of a file to another version of the same file on a different device. *See, e.g.*, '696 Patent, Col. 3:20-23 ("The invention . . . comprises a controller for a synchronization system . . . useful for maintaining matching records and data for a user across multiple network coupled devices."). For the reasons described above in the context of the '757 patent, such synchronization is an abstract idea. *See supra* pp. 6-9.

That claim 1 of the '696 patent also includes limitations related to authentication and version tracking does not make it any less abstract. Authentication, as used here, is merely determining who a user is, and associating data with a particular user. *See, e.g.*, '696 Patent, Col. 3:24-25 (describing function of "authentication module" for "identifying a user coupled to the synchronization system"); Col. 3:47-51 (describing "authentication module" for, *inter alia*, "associating the user data with a particular user" and "identifying the user agent as associated with a user having access to the user data"). The idea of identifying an individual and then associating information with that individual is neither concrete nor novel. Going back to the example described above in which "Jane" synchronizes changes to her a version of her calendar maintained by "John," such an "authentication" is performed if John maintains calendars for multiple executives, and confirms who he is speaking to before accepting the changes to a particular executive's calendar and applying them. *See supra* pp. 7-8. It also happens any time a bank teller asks for a driver's license before accessing a customer's account. That such authentication is routinely performed by humans without the use of computers confirms that the claim is directed to an abstract idea. *See supra* pp. 7-8.

Unsurprisingly, a number of courts—including this one—have found that claims relating to authentication to be abstract ideas under section 101. In *Kinglite Holdings Inc. v. Micro-Star Int'l Co.*, the court found expressly that "claims reciting a method of authentication for security

purposes are directed to an abstract idea."  2015 WL 6437836, at *8 (C.D. Cal. Oct. 16, 2015).

Similarly, in *OpenTV*, this Court found claims "related to the transmission and verification of

information, including 'user identifiers' and 'other user information'"—in other words,

authentication—to be directed to an abstract idea.  2015 WL 1535328, at *2, *4.  In *Intellectual*

*Ventures II*, the court invalidated three patents under section 101, one of which was directed to

an allegedly new way of "filtering packetized information received by a network's firewall," and

another of which was directed to a system and method for controlling access to "digital

property."  2015 WL 1941331, at *1–*2.  In the first patent, the court noted that access through

the firewall was based upon "who sent the packet and who is to receive it . . . as well as the

message being sent," *id.* at *8—in other words, regulating access based upon identity.  In the

second patent, the court found that "the process of controlling access to decrypted portions of

distributed data"—*i.e.*, authentication—was "nothing more than an abstraction."  *Id.* at *12.

The concept of version tracking in claim 1 of the '696 patent likewise fails to elevate the

claim above that of an abstract idea.  Such version tracking is little more than maintaining a

record of the changes made.  The real-world, pen-and-paper examples of version tracking are

numerous—including a record of changes in a treatise or other publication to record basic

information about versions and changes.  Because humans easily and routinely engage in this

practice without a computer at all, it is considered an abstract idea.  *See supra* pp. 7-8.  In

*Ultramercial*, for example, the patent at issue included an element directed to "recording the

transaction event to the activity log."  772 F.3d at 712.  The Federal Circuit nonetheless found

that the claim embodied only an abstract idea.  *Id.* at 715.

Combining the abstract ideas of authentication and version tracking with synchronization

does not make the claim any less abstract.  *See Shortridge*, 2015 WL 1739256, at *11 ("The

Court is aware of no case holding that merely combining two or three abstract ideas brings a

patent within the scope of § 101, and the available authority tends to suggest the contrary.");

*Priceplay.com, Inc. v. AOL Advert., Inc.*, 83 F. Supp. 3d 577, 582 (D. Del. 2015) (invalidating

claims because the "claimed invention merely combines . . . abstract ideas found to be patent-

ineligible"), *aff'd*, 2016 WL 80002 (Fed. Cir. Jan. 7, 2016).  That is certainly the case here,

1  where authentication and version tracking fit together so naturally.  Incorporating either concept

2  in the calendar synchronization example described above, for example, would not change the

3  abstract idea of synchronization.  Identifying or "authenticating" Jane as the person whose

4  calendar is being edited before receiving or applying any of her changes, or requiring John to

5  track the particular versions of the changes made to his copy of Jane's calendar does not change

6  the abstract nature of the synchronization taking place.

7      Claim 1 of the '696 patent is therefore directed to an abstract idea.

8          **2.    Claim 1 of the '696 Patent Contains No Inventive Concept.**

9      Like the claims of the '757 patent, claim 1 of the '696 patent lacks an inventive concept

10  sufficient to transform it into a patent-eligible invention.  As an initial matter, the combination of

11  synchronization and authentication in one claim is not an inventive concept; "merely

12  combin[ing] . . . abstract ideas found to be patent-ineligible" does not give rise to a

13  transformative inventive concept under *Alice* step two.  *Priceplay.com*, 83 F. Supp. 3d at 582;

14  *see also Mayo*, 132 S. Ct. at 1298.  And beyond the abstract idea, the claims of the '696 patent

15  include only generic hardware and software components that are defined purely in terms of the

16  function they perform.  This is insufficient to confer patent-eligibility.  *See supra* pp. 10-12.

17      Each of the components of claim 1 is described purely in terms of its high-level function.

18  Claim 1 includes two modules for authentication:  the "user identifier module" and the

19  "authentication module."  The "authentication module" is described only in that it "identif[ies]"

20  users of the system; the "user identification module" has no description at all.  Claim 1 also

21  includes a module for synchronization—the "synchronization manager"—which, according to

22  the claim, "control[s] data migration" between devices.  Finally, claim 1 includes two modules

23  for version tracking:  a "transaction identifier module" and a "versioning module[]."  The only

24  description of the "transaction identifier module" is that it "assign[s] a universally unique

25  identifier" to each user.  For the "versioning module," the description is similarly vague and

26  functional, stating only that it generically associates a "transaction identifier" with a "transaction

27  object" to generate a table showing the version changes.  The '696 patent nowhere purports to

28

have invented a novel way of performing any of these function—whether authenticating users or tracking versions of a file.

In essence, the claim is simply a combination of generic "components" or "modules" for executing the abstract ideas the claim embodies. Even if this combination appears complex, "the complexity of the implementing software . . . does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Accenture*, 728 F.3d at 1345.

In fact, the generic and functional limitations in claim 1 parallel numerous limitations that courts have found not to impart any inventive concept. The court in *Kinglite*, for example, invalided claims directed to authentication, rejecting the patent owner's assertions that "authentication through the use of digital signatures" or the use of a "cryptographic key pair, as opposed to other authentication methods," provided a sufficient inventive concept. 2015 WL 6437836, at *9. Likewise, in *Intellectual Ventures I*, the court invalidated a claim that included a so-called "uniqueness limitation," which described "receiving, on a second computer, a digital content identifier created using a mathematical algorithm unique to the message content from at least two of a plurality of first computers having digital content ID generator agents." 100 F. Supp. 3d at 381, 86. The court rejected the patent owner assertion that this unique identification process involved "hashing," and was part of an "innovative combination of limitations." *Id.* at 386. Similarly, in *Intellectual Ventures II*, the court found that a limitation requiring the use of a general "access mechanism" to enforce access rules did not provide an inventive concept. 2015 WL 1941331, at *14. It was "nothing more than programming conventional software or hardware to apply rules governing access—a routine, conventional practice." *Id.* The generic authentication modules of claim 1 of the '696 patent are no different—they are merely undefined software modules consisting of mathematical algorithms to identify users. Without any description of the algorithms at issue, they are "nothing more than programming conventional software . . . to apply rules governing access." *Id.*

The same is true for the generic and unconstrained version tracking limitations in claim 1. The court in *Ultramercial* held that "updating an activity log" was merely a "routine, conventional activity" that failed to provide any innovative concept. 772 F.3d at 715–16. And

23

1    in *Accenture*, the Federal Circuit affirmed the invalidation of claims that included various

2    software components which performed functions akin to the version tracking modules here,

3    including a "data component that . . . retrieves and manipulates data," a "client component that

4    transmits and receives data to/from the data component," a "business component that serves as a

5    data cache and includes logic for manipulating the data," and a "controller component to handle

6    program events and an adapter component to interface with a data repository."  728 F.3d at 1338

7    (internal quotations omitted).  Together, these cases make clear that elements reciting the broad

8    strokes of version tracking and management are not inventive without description or detail on

9    how the generic modules operate.  The elements of claim 1 of the '696 patent are no different.

10   Thus, claim 1 of the '696 patent fails to provide an inventive concept required to

11   transform the otherwise unpatentable abstract idea into a patentable invention.

12   **3.   Claim 1 is Representative of the '696 Patent's Remaining Claims.**

13   The remaining claims of the '696 patent are invalid under section 101 for the same reason

14   as claim 1.  Those claims are "substantially similar [to claim 1] and linked to the same abstract

15   idea."  *Content Extraction*, 776 F.3d at 1348.  Like claim 1, the other independent claims are

16   directed to systems, or components in systems, for synchronizing data.  Claim 9 claims a "data

17   synchronization system" for "synchronizing data between network coupled devices," reciting

18   many of the same elements in claim 1, including a "user identifier module," a "transaction

19   identifier module," and a "current table" maintaining the version and change information.  The

20   only additional limitations are a generic "storage server" and "management server," which fail to

21   elevate the claim above the generic and functional components that were invalid for claim 1.  *See*

22   *supra* pp. 10-12.  Similarly, claims 16 and 24 are directed to a "synchronization agent

23   management server" and a "synchronization controller," respectively, and both rely on many of

24   the same generic and functional components identified in claims 1 and 9.  Claim 16 adds a

25   generic "user login authenticator" and "user data flow controller," but it fails to give any content

26   to these limitations other than the function they perform.  The same is true for claim 24, which

27   adds only a generic "communication interface coupled to the network."  These limitations are

28   insufficient to elevate the abstract ideas into patentable inventions.  *See supra* pp. 10-12.

Nor do the dependent claims of the '696 patent add sufficient detail or depth to the concepts set forth in the independent claims to render them patentable. Claims 2, 3, 10, 11, 12, 17, 18, 19, 23, and 25 specify additional generic and non-novel features of the claimed system— for example, by indicating the authentication module determines a user's identity through a wholly generic "login procedure" (claim 3), or that such "login is a username and password" (claim 18). Claims 4, 5, and 16 specify the particular configuration of the generic, non-novel components. *See, e.g.*, Claim 16 (specifying a plurality of synchronization agents). Claims 6, 7, 8, 13, 14, 15, 20, 21, and 22 generically specify how data flows between components—for example, a data flow that "comprises downloading transactions from the data store" to the "network-coupled device" (claim 13), or a flow that "comprises uploading transactions" from the "network-coupled device" to the "data store" (claim 14). These claims are therefore invalid.

### E.      The Complaint Fails to Satisfy Fed. R. Civ. P. 8.

Independent of the patents' Section 101 deficiencies, the Complaint must also be dismissed because it does not meet the Federal Rule of Civil Procedure 8(a) pleading standard, in light of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Addiction & Detoxification Inst. L.L.C. v. Carpenter*, 620 F. App'x 934, 936 (Fed. Cir. 2015) (applying *Twombly* and *Iqbal*). Mere "conclusory statements without any factual allegations to support them" do not satisfy Rule 8. *Deerpoint Grp., Inc. v. Acqua Concepts, Inc.*, 2014 WL 7178210, at *4 (E.D. Cal. Dec. 16, 2014); *see also Bender v. LG Elecs. U.S.A., Inc.*, 2010 WL 889541, at *6 (N.D. Cal. Mar. 11, 2010) (plaintiff "must do more than allege conclusorily the means by which Defendants are infringing on his [patent] and provide fair notice to Defendants of the specific infringements alleged"). Yet, Synchronoss's four-page, bare-bones Complaint contains nothing more. It merely identifies the patents and an open-ended list of Dropbox products that allegedly infringe them. There are no allegations of *how* the products infringe the claims, or even what claims Synchronoss is asserting. Such conclusory, threadbare allegations fail to satisfy Rule 8, and the Complaint should be dismissed accordingly.

### III.      CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

1

2    Dated: March 10, 2016                    Respectfully submitted,

3                                             By: /s/ Thomas H.L. Selby
                                              Thomas H.L. Selby (*Pro Hac Vice*)
4                                             David M. Krinsky (*Pro Hac Vice*)
                                              Adam D. Harber (*Pro Hac Vice*)
5                                             Christopher J. Mandernach (*Pro Hac Vice*)
                                              WILLIAMS & CONNOLLY LLP
6
                                              Stephen E. Taylor (SBN 058452)
7                                             Jonathan A. Patchen (SBN 237346)
                                              TAYLOR & CO. LAW OFFICES, LLP
8
                                              Attorneys for Defendant DROPBOX, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DROPBOX, INC.'S NOT. OF MOT. AND MOT. TO DISMISS; MEM. IN SUPPORT
CASE NO. 16-CV-00119-HSG