UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SYNCHRONOSS TECHNOLOGIES, INC.,
    Plaintiff,

v.

DROPBOX INC., et al.,
    Defendants.

Case No. 16-cv-00119-HSG

**ORDER DENYING MOTION TO DISMISS**

Re: Dkt. No. 81

## I. INTRODUCTION

Pending before the Court is Defendant Dropbox, Inc.'s motion to dismiss. Defendant argues that United States Patent Nos. 6,671,757 ("the '757 Patent"), 7,587,446 ("the '446 Patent") and 6,757,696 ("the '696 Patent") are invalid because their claims are directed to patent-ineligible subject matter. As a result, Defendant contends that the Court should dismiss Plaintiff Synchronoss Technologies, Inc.'s complaint for failure to state a claim. For the reasons explained below, the Court **DENIES** the motion.

## II. BACKGROUND

Plaintiff filed this action on March 27, 2015 in the Northern District of New Jersey, alleging infringement of the '757, '446, and '696 Patents. Dkt. No. 1. On December 30, 2015, Defendant's motion to transfer the case to the Northern District of California was granted. Dkt. Nos. 24, 35. On March 10, 2016, Defendant filed the pending motion to dismiss. Dkt. No. 81.

### A. '757 Patent

The '757 Patent is titled "Data Transfer and Synchronization." '757 Patent. The specification describes a system and method for "efficiently, quickly, and easily synchronizing

devices which can couple to the Internet, or any network." *See* '757 Patent at 3:23-25.[1]

Independent claim 1 describes:
> 1. A **system** for synchronizing data between a first system and a second system, comprising:
> a first sync engine on the first system interfacing with data on the first system to provide difference information in a difference transaction;
> a data store coupled to the network and in communication with the first and second systems; and
> a second sync engine on the second system coupled to receive the difference information in the difference transaction from the data store via the network, and interfacing with data on the second system to update said data on the second system with said difference information;
> wherein each said sync engine comprises a data interface, a copy of a previous state of said data, and a difference transaction generator.

*Id.* at 46:57-47:7.

Fourteen claims depend from Claim 1 and add further limitations such as: (1) where the "first system and second system are coupled to the server via a private network," Claim 2; (2) where the apparatus of Claim 1 includes a "management server coupled to the network and in communication with the first sync engine, the second sync engine and the data store," Claim 8; and (3) where the "data on said first system comprises application data having a plurality of application specific formats, and said difference information is provided for each of said formats in a universal format to said data store," Claim 14. *See id.* at 47:8-54.

Additionally, the '757 Patent contains two other independent claims, Claims 16 and 24, which include similar limitations to Claim 1. Claim 16 describes:
> A **system**, comprising:
> a first device including at least a first data file and first differencing code, the first device having an input and an output coupled to a network to receive first device data change transactions from, and provide change transactions generated by the first differencing code based on said at least one data file to, said network;
> a data store coupled to the network having at least one data structure coupled to store change transactions; and
> a second device including at least a second data file and second differencing code, the second device having an input and an output coupled to the network to receive said first device data change transactions from, and provide second change transactions generated

---

[1] On September 4, 2013, the United States Patent and Trademark Office ("USPTO") issued an Inter Partes Reexamination Certificate regarding the '757 Patent following *inter partes* review. *See* Dkt. No. 1-1 at 42-43. The USPTO confirmed the patentability of claims 1, 3, 11, 24, 25 and 27. *Id.* at 43. The USPTO did not reexamine claims 2, 4-10, 12-23, 26, 28 and 29. *Id.*

> by the second differencing code based on said at least second data file to, said data store;
> wherein said first differencing code includes a first sync engine having a first data interface, a first copy of a previous state of said data, and a first difference transaction generator, and said second differencing code includes a second sync engine having a second data interface, a second copy of a previous state of said data, and a second difference transaction generator.

*Id.* at 48:1-24. Claim 16 has six dependent claims. *See id.* at 48:25-50.

Claim 24 describes:
> An Internet synchronization **system**, comprising:
> a storage server having an Internet connection;
> a first device coupled to the Internet and including a first device sync engine interfacing with data on the first device, the first device in communication with at least the storage server; and
> a second device coupled to the Internet and including a second device sync engine interfacing with data on the second device, the second device in communication with at least the storage server;
> wherein each said device sync engine comprises a data interface, a copy of a previous state of said data, and a difference transaction generator.

*Id.* at 48:51-64. Claim 24 has five dependent claims. *See id.* at 48:65-50:9.

**B.    '446 Patent**

The '446 Patent incorporates the '757 Patent in its entirety, and is titled "Acquisition and Synchronization of Digital Media to a Personal Information Space." The invention "comprises a method for acquiring and maintaining a digital music store in personal information space, comprising: maintaining a personal information space identified with a user including data capable of being used on a client device, and transferring at least a portion of the data from the personal information space to an Internet-coupled device in response to a user request." '446 Patent at 3:45-51.[2]  Independent claim 1 provides:
> 1. A **method** of transferring media data to a network coupled apparatus, comprising:
> (a) maintaining a personal information space identified with a user including media data comprising a directory of digital media files, the personal information space being coupled to a server and a network;
> (b) generating a first version of the media data in the personal

---

[2] On September 26, 2013, the United States Patent and Trademark Office ("USPTO") issued an Inter Partes Reexamination Certificate regarding the '446 Patent following *inter partes* review. *See* Dkt. No. 1-3 at 19-20. The USPTO confirmed the patentability of claims 1, 2 and 6. *Id.* at 20. Claims 15 to 20 were added and determined to be patentable. *Id.* The USPTO did not reexamine claims 3-5 and 7-14. *Id.*

> information space;
> (c) generating a digital media file, in response to an input from the user, comprising a second version of the media data in a same format as the first version in the personal information space, the second version including an update not included in the first version;
> (d) obtaining difference information comprising differences between the first version of the media data and the second version of the media data; and
> (e) transferring a digital media file over the network containing the difference information from the personal information space to the network coupled apparatus in response to a sync request made from a web browser at the network-coupled apparatus by the user.

'466 Patent at 13:46-14:2.  There are nine dependent claims that add narrowing limitations such as (1) "including the step, prior to step (a), of receiving information into the personal information space," Claim 2; (2) using an automotive computer as the network coupled apparatus, Claim 4; and (3) including a directory of digital media files to comprise the media date, Claim 6.  *See id*. at 14:3-34.

Additionally, Claim 11 is independent and describes:
> 11. A **system** for transferring digital media between a plurality of network coupled devices, comprising:
> a personal information store identified with a user containing digital media comprising a directory of digital media files readable by an application program; and a processing device, a server and a network coupled with the personal information store, the processing device including:
> an application data store holding a version of the digital media in the personal information store, and a device engine to: a) generate a digital media file, in response to an input from the user, comprising a second version of the media data in a same format as the first version in the personal information store, the second version including an update not included in the first version; (b) obtain difference information comprising differences between the first version of the media data and the second version of the media data; and (c) transfer a digital media file over the network containing the difference information from the personal information space to the network coupled apparatus in response to a sync request made from a web browser at the network-coupled apparatus by the user.

*Id.* at 14:35-57.  Claim 11 has three dependent claims.  *See id.* at 14:58-64.

**C.    '696 Patent**

The '696 Patent is titled "Management Server for Synchronization System."  '696 Patent. The specification describes an invention that "includes a system and method for transferring data between two devices which require information to be shared between them."  *Id.* at 4:25-27. Independent claim 1 provides:

4

> A controller for a synchronization system, comprising:
> an authentication module identifying a user coupled to the synchronization system; and
> a synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device.

*Id.* at 45:11-18.  Seven claims depend from Claim 1.  *See id.* at 45:19-48.

### III.   LEGAL STANDARD

Section 101 of the Patent Act describes the scope of patentable subject matter as encompassing "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101.  It is well settled that laws of nature, natural phenomena, and abstract ideas are excluded from the universe of patentable subject matter. *See Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014).  These categories are not patent-eligible because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none."  *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1293 (2012) (citations omitted).  Allowing patent claims for laws of nature, natural phenomena, and abstract ideas would "tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." *Id.* at 1293. However, the Supreme Court has also recognized the need to "tread carefully in construing this exclusionary principle, lest it swallow all of patent law." *Alice Corp.*, 134 S. Ct. at 2354.

The Supreme Court and Federal Circuit have articulated a two-part test for determining whether a claim's subject matter is patent-eligible.  First, a court "determine[s] whether a claim is 'directed to' a patent-ineligible abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank*, *Nat'l Ass'n*, 776 F.3d 1343, 1346-47 (Fed. Cir. 2014) (citing *Mayo Collaborative Servs.*, 132 S. Ct. at 1296-97).  If so, the Court then "consider[s] the elements of the claim—both individually and as an ordered combination—to assess whether the additional elements transform the nature of the claim into a patent-eligible application of the abstract idea." *Id.* at 1347.  "This is the search for an 'inventive concept'—something sufficient to ensure that the claim amounts to 'significantly more' than the abstract idea itself." *Id.* (quoting *Mayo Collaborative Servs.*, 132 S. Ct. at 1294).

The issue of invalidity under Section 101 presents a question of law.  *See DDR Holdings,*

*LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).  The Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion."  *FairWarning IP v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016) (citation omitted).

## IV. ANALYSIS

### A. The Enfish Standard

Earlier this year, the Federal Circuit elaborated on the application of the *Mayo/Alice* standard in two cases involving claimed improvements to computer-related technology.  *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607 (Fed. Cir. 2016). [3]

*Enfish* held that it is "relevant to ask whether the claims are directed to an improvement in computer functionality versus being directed to an abstract idea, even at the first step of the *Alice* analysis."  822 F.3d at 1335.  "[T]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'"  *Id.*  at 1335 (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).  *Enfish* teaches that claims are not directed to an abstract idea if their "plain focus . . . is on an improvement to computer functionality" or computer capabilities.  *Id.* at 1336.

Published less than a week after *Enfish*, *TLI* emphasizes that claims are drawn to an abstract idea if they are directed to "the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two."  823 F.3d at 612.  Thus, claims that describe "a new telephone, a new server, or a new physical combination of the two" are not abstract, but claims that describe a system and methods in "purely functional terms" without "any technical details for the tangible components" are abstract.  *Id.*

---

[3] Because *Enfish* was decided after the oral argument on Defendant's motion to dismiss, the Court ordered the parties to submit supplemental briefing addressing the import of that decision for the pending motion.  Dkt. No. 105.  Each party timely submitted its supplemental brief.  *See* Dkt. Nos. 107-108.

Following the decisions in *Enfish* and *TLI*, the Federal Circuit has characterized the key inquiry as requiring a court to "look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016); *see also Tranxition, Inc. v. Lenovo (U.S.) Inc.*, 2016 WL 6775967, at *2 (Fed. Cir. Nov. 16, 2016) ("For claims solely implemented on a computer, we have previously found it 'relevant to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" (quoting *Enfish*, 822 F.3d at 1335)). In performing this analysis, the court "must focus on the language of the asserted claims themselves," and "complex details from the specification cannot save a claim directed to an abstract idea that recites generic computer parts." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016).

Post-*Enfish/TLI*, the Federal Circuit has applied the *Mayo/Alice* framework in a number of cases involving § 101 challenges to computer or software patents. In *McRO*, 837 F.3d at 1311-16, the court found that the challenged patent was not directed to an abstract idea and thus denied the motion to dismiss at Step One of the *Mayo/Alice* test. In several other cases, the Federal Circuit has found patents directed to an abstract idea at Step One, and found no inventive concept sufficient to establish patentable subject matter at Step Two. *See Synopsys*, 839 F.3d at 1146-52; *FairWarning IP, LLC*, 839 F.3d at 1093-97; *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1312-22 (Fed. Cir. 2016); *Tranxition*, 2016 WL 6775967, at *2-4. And in two cases, the Federal Circuit found (or assumed) that a patent was directed to an abstract idea at Step One, but found a sufficiently inventive concept to establish patentable subject matter at Step Two. *See Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1299-1307 (Fed. Cir. 2016) (assuming without deciding that patent was directed to an abstract idea at Step One); *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1347-52 (Fed. Cir. 2016).

This Court agrees with those judges who have observed that even post-*Enfish*, the *Mayo/Alice* test provides limited practical guidance for distinguishing software and computer patents that are valid under § 101 from those that are not. *See Amdocs*, 2016 WL 6440387, at *4

("[A] search for a single test or definition [of what an 'abstract idea' encompasses] in the decided cases concerning § 101 from this court, and indeed from the Supreme Court, reveals that at present there is no such single, succinct, usable definition or test."); *Intellectual Ventures I LLC*, 838 F.3d at 1329 (describing the "semantic gymnastics" entailed in applying the *Mayo/Alice* test to software patents) (Mayer, J., concurring); *BASCOM Glob. Internet Servs.*, 827 F.3d at 1352, 1354 ("I have come upon no guide to when a claim crosses the boundary between unacceptable abstractness and acceptable specificity.") (Newman, J., concurring); *Device Enhancement LLC v. Amazon.com, Inc.*, 2016 WL 2899246, at * 7 (D. Del. May 17, 2016) (discussing the "still difficult-to-discern requirements of the *Alice* analysis," and the resulting "difficult exercise" under § 101). Instead, the Court is directed "to examine earlier cases in which a similar or parallel descriptive nature can be seen—what prior cases were about, and which way they were decided." *Amdocs*, 2016 WL 6440387, at *4. While the Court is of the view that a more concrete standard for identifying abstract ideas would improve predictability and enable more efficient use of judicial and party resources, it will do its best to apply the current guidance.

### B. The Challenged Claims are Directed to an Improvement in Computer Capabilities

The Court finds that *Enfish* compels the conclusion that the challenged claims, viewed in light of their respective specifications, are not directed to an abstract idea, and thus cover patentable subject matter. The claims, like those in *Enfish* and *McRO*, are directed on their face to an improvement to computer functionality: a more-efficient mechanism for synchronizing data between systems connected to a network by updating only changed data (or "difference information"), rather than recopying all information. *See Enfish*, 822 F.3d at 1339 (structure recited in claims was "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory"); *McRO*, 837 F.3d at 1313 (claims were "limited to rules with specific characteristics," and focused on "a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type"). By contrast, the *BASCOM* court identified patent-ineligible claims as those which "claim an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using

generic computer concepts in a conventional way." 827 F.3d at 1352. Here, the Court finds that the challenged claims, viewed as an ordered combination, impose specific limitations sufficient under *Enfish* and *McRO* to survive at the motion to dismiss stage.

The specifications bolster this conclusion. *See Enfish*, 822 F.3d at 1337 ("Moreover, our conclusion that the claims are directed to an improvement of an existing technology is bolstered by the specification's teachings that the claimed invention achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements."). As the specifications explain, the claims are directed to improving the manner in which computers synchronize data between devices connected to a network, by making that process faster, reducing the amount of bandwidth and storage space used, enabling synchronization across different data formats, and enabling synchronization without requiring devices to be physically connected. For example, the specifications explain that:

- "Until now, synchronization between both documents and personal information managers has occurred through direct connection between the devices, and generally directly between applications such as a personal information manager in one device and a personal information manager in another device or using an intermediary sync-mapping program." '757 Patent at 1:48-54; '696 Patent at 1:47-53.
- "In a technical sense, synchronization in this manner is generally accomplished by the copying of full records between systems." '757 Patent at 2:1-22; '696 Patent at 2:20-22.
- "Such synchronization schemes are generally relatively inefficient since they require full band-width of the document or binary file to be transferred via the synchronization link. In addition, at some level the synchronization programs require interaction by the user to map certain fields between different programs." '757 Patent at 2:45-50; '696 Patent at 2:45-50.
- "The same objectives . . . lend themselves to furthering applications requiring data between other types of devices, on differing platforms. These objectives include speed, low bandwidth, accuracy, and platform independence." '757 Patent at 3:4-10; '696 Patent at 3:3-9.
- "[I]t will be readily understood that the transmission of data compromising only the

9

differences in data between two systems via routines which extract the data and reassemble data on the various systems, represents a significant advancement in the efficient transmission of data. The present invention allows for optimization in terms of a reduction in the bandwidth utilized to transmit data between two systems, since only changes to data are transferred. This consequently increases the speed at which such transactions can take place since the data which needs to be transmitted is substantially smaller than it would be were entire files transferred between the systems." '757 Patent at 8:22-38; '696 Patent at 7:41-57.

- "Conventionally, synchronization of documents and personal information between different devices typically occurs through direct connection between the devices." '446 Patent at 2:41-43.
- "In one aspect, the system . . . comprises a series of device engines which can be utilized on or in conjunction with any personal information manager application or device, on servers, or both, which can connect via a communications network, such as the Internet, to transfer information in the form of differenced data between respective applications and respective devices. In essence, the system . . . creates a personal information space or personal information store . . . which is unique to an individual user or identifier." '446 Patent at 2:52-3:2.
- "Users would benefit from a mechanism allowing them to select individual files, or all or a portion of a directory of files, and move them to different devices in the personal information space effectively and efficiently. An effective means allowing users to move digital media files around the personal information space would be a great advantage in the continued development of personal information spaces and the Internet." '446 Patent at 3:34-41.
- "Once inserted into the private information space, the data can be synchronized to any number of different devices . . . ." '446 Patent at 6:24-29.

The express focus in the claims on improvements to the process of data synchronization on

devices connected to computer networks distinguishes them from post-*Enfish* software and computer-related claims found by the Federal Circuit to be directed to abstract ideas. *Cf. TLI*, 823 F.3d at 612 (claims were "not directed to a specific improvement to computer functionality"); *Tranxition*, 2016 WL 6775967, at *3 (claim was not directed to an improvement in computer functionality: "There is nothing in the claim to suggest that, once settings have been transitioned, the target computer will be any more efficient"); *FairWarning*, 839 F.3d at 1095 (claims were "not directed to an improvement in the way computers operate": "[w]hile the claimed system and method certainly purport to accelerate the process of analyzing audit log data, the speed increase comes from the capabilities of a general-purpose computer, rather than the patented method itself"); *Synopsys*, 839 F.3d at 1150 (on their face and under district court's unchallenged constructions, claims did not involve the use of a computer in any way, and thus "cannot be characterized as an improvement in computer technology"); *Intellectual Ventures I*, 838 F.3d at 1315 (steps of asserted claims did not improve the functioning of the computer itself, and patent contained no "specific or limiting recitation of improved computer technology").

Whether the challenged claims satisfy the various requirements for patentability (for example, nonobviousness) is a question for another day. But the Court reads *Enfish* and the Federal Circuit cases applying it to require denial of Defendant's motion to dismiss.

## V. CONCLUSION

Defendant's motion to dismiss is **DENIED**. The Court **SETS** a case management conference for January 3, 2017 at 2:00 p.m. to set a schedule for the remainder of the case.

**IT IS SO ORDERED.**

Dated: 12/22/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge