**IN THE UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| SYNCHRONOSS TECHNOLOGIES, INC., | Case No.: 4:16-cv-00119-HSG |
| Plaintiff, | **DECLARATION OF MICHAEL J. FREEDMAN, PH.D.** |
| v. | |
| DROPBOX, INC., | Hon. Haywood S. Gilliam, Jr. |
| Defendant. | |

<u>**DECLARATION OF MICHAEL J. FREEDMAN**</u>

1.     I have been retained by Defendant Dropbox, Inc. to provide expert opinions in the above-captioned litigation.  This Declaration sets forth my opinions on the proper construction of certain terms that are found in United States Patent No. 6,671,757 (the "'757 patent"), U.S. Patent No. 6,757,696 (the "'696 patent"), and U.S. Patent No. 7,587,446 (the "'446 patent," and collectively with the '757 patent and '696 patent, the "Patents in Suit"), as well as the bases for my opinions.

**I.     BACKGROUND AND QUALIFICATIONS**

2.     I am a trained computer scientist and engineer.  I began programming online services in 1995, and received a Bachelor's degree in 2001 and a Master's degree in 2002 from the Massachusetts Institute of Technology, both in Computer Science and Engineering. I subsequently received a Ph.D. in Computer Science from New York University in 2007.  From 2005 through 2007, I spent my doctoral studies as a research scholar at Stanford University.  Since 2007, I have been a professor of computer science at Princeton University, initially as an Assistant Professor (2007-2013), then as a tenured Associate Professor (2013-2015), and most recently as a Full Professor.  I am also currently the co-founder and CTO of Timescale, a startup company building a scalable SQL database for time-series data.  My curriculum vitae is attached as Appendix A.

3.     My research interests and experience primarily focus on Internet services, distributed systems, networking, and security.  Since the year 2000, I have published 80 peer-reviewed journal, conference, and workshop papers on these topics.  According to my recent review of Google Scholar, these peer-reviewed papers have been cited more than 10,500 times.  A list of my publications is included in Appendix A.  Of particular note here, I have published multiple papers concerning distributed and cloud-based storage systems, peer-to-peer storage and caching systems, client-side caching for network file systems, data and file synchronization protocols and systems, and the use of hash functions and rolling fingerprint algorithms as part of the data synchronization and validation protocols.

4.     At Princeton, I teach graduate courses in computer systems and computer networking, as well as undergraduate courses in distributed systems and networking.  These courses have included materials on distributed storage systems; network file systems; distributed consistency protocols; data and file synchronizations protocols; the use of hash functions in content storage, synchronization, and delivery protocols; HTTP, web servers, and web proxies; content delivery and CDNs; Internet applications and services; and other information storage and management applications.

5.     I have been on the technical program committee for numerous conferences with peer-reviewed proceedings, including the main academic computer science venues for distributed systems (NSDI—Networked Systems Design and Implementation, OSDI—Operating Systems Design and Implementation, and SOSP—Symposium on Operating Systems Principles), networking (SIGCOMM—ACM Special Interest Group on Data Communications), and security (IEEE Security and Privacy, CCS—ACM Conference on Computer and Communications Security).  I have been the technical program chair of multiple conferences, including the ACM Symposium on Cloud Computing (SOCC).  I have served as a reviewer for numerous leading journals, including Communications of the ACM, Transactions on Computer Systems (TOCS), Transactions on Networking (TON), and Journal of Computer Security.

6.      I have also served as a consultant and advisor to Netflix, Cloudflare, Blockstack Labs, the Institute for Defense Analyses, Intelligent Automation, and Quova.

7.      I am the named inventor on U.S. Patents No. 8,204,982 and 8,463,904, which deal with methods to detect network middleboxes and proxies (which are applications or systems that interpose on network traffic), including through the behavior of HTTP protocols.

8.      I have received numerous national awards for my work. Of particular note, I received the Presidential Early Career Award for Scientists and Engineers (PECASE), given by the White House's Office of Science and Technology Policy.  In receiving this award, I was one of 20 individuals nominated by the National Science Foundation.  I have also been awarded National Science Foundation's CAREER Award, the Office of Naval Research's Young Investigator Award, an Alfred P. Sloan Research Fellowship, membership in the Computer Science Study Group of the U.S. Department of Defense's Defense Advanced Research Projects Agency (DARPA), the ACM SIGCOMM "Test of Time" Award for work on software-defined networking, the Casper Bowden Award for Outstanding Research in Privacy Enhancing Technologies, and multiple "Best Research Paper"-type awards from leading international conferences and symposia.

9.      My research and development has also led to deployed systems and industrial impact in Web and Internet services.  For example, I designed, built, and operated an open Web content delivery system, CoralCDN, that had been publicly available between 2004 and 2015, serving millions of unique users per day.   DONAR solved locality- and load-aware cost optimizations for server selection, providing DNS- and HTTP-based name resolution for services on the Measurement Lab testbed from 2009-2013, including those powering the Federal Communications Commission's Consumer Broadband Test.  My research on IP geolocation and intelligence for Web services led me to co-found Illuminics Systems, which was acquired by Quova (now part of Neustar) in 2006.  My work on programmable enterprise networking helped form the basis for the OpenFlow/software-defined networking (SDN) architecture that was

1   standardized by the Open Networking Foundation (an organization comprised of most major

2   telecommunications companies, networking vendors, and Internet and Online Service Providers).

3        10.    My research has touched on topics related to issues discussed in the patents-in-suit.

4   For example, the Shark system ("Shark: Scaling File Servers via Cooperative Caching", published

5   in NSDI 2005) allowed network-file-system clients to cooperatively download portions of files

6   from one another in a peer-to-peer fashion, using file chunking algorithms (namely, Rabin

7   fingerprints) and hash functions defined over those chunks to both validate the integrity of those

8   chunks and determine which chunks need to be transferred in order to synchronize a client's state

9   with its server.  Other systems and protocols I have built (e.g., "On-the-Fly Verification of Erasure-

10  Encoded File Transfers", published in ISW 2003 and IEEE Security and Privacy 2004) also used

11  block-based and hash-identified file transfers.

12       11.    As can be seen from the above outline of my educational background and

13  employment history, I have extensive experience in the fields of distributed storage systems,

14  network file systems, client-server and peer-to-peer storage architectures, data and file

15  synchronization protocols, HTTP and content delivery, Internet applications and services, and

16  information storage and management applications.  I deal frequently with the issues that are

17  discussed in the Patents in Suit.

18       12.    I have previously testified as an expert witness in a deposition or at trial in the

19  following cases:

20            i)    *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, IPR2017-00249,

21  IPR2017-00349, IPR2016-01711, & IPR2016-01894 (P.T.A.B.)

22            ii)    *Williamson v. Google Inc.*, No. 3:15-cv-00966-BLF (N.D. Cal.)

23            iii)    *Akamai Technologies Inc. and MIT v. Limelight Networks, Inc.*, No.

24  3:15cv720-JAG (E.D. Va.)

25            iv)    *DocsCorp v. Litera Technologies*,  IPR2016-00541 & IPR2016-00542

26  (P.T.A.B.)

27            v)    *Finjan Inc. v. Proofpoint Inc. et al.*, No. 3:13-cv-05808 (N.D. Cal.)

28

1        vi)    *Uniloc USA, Inc. et al v. Electronic Arts, Inc.*, No. 6:13-cv-00259 (E.D.

2    Tex.)

3        13.    I am being compensated for my time at my customary rate for such matters.  My

4    compensation does not depend on the outcome of this litigation.

5        14.    In formulating the opinions contained in this Declaration, I have considered my

6    training and experience as well as the materials cited herein.  In addition to the opinions and bases

7    set forth in this report, my testimony may include responses to facts, arguments, allegations, or

8    references raised by Synchronoss or its experts relating to this litigation.  I reserve the right to

9    supplement my conclusions if additional information is provided to me, or if additional research

10    leads me to conclude that supplementation is necessary.

11   **II.    LEGAL STANDARDS APPLIED**

12       15.    Although I am not an attorney and do not expect to offer any opinions regarding

13    the law, I have been informed of certain legal principles that I relied upon in forming the opinions

14    set forth in this declaration.

15       **A.    Person of Ordinary Skill in the Art**

16       16.    I have been informed that the person of ordinary skill in the art ("person of ordinary

17    skill in the art") is a hypothetical person who is presumed to have known all of the relevant art at

18    the time of the invention.  I have been informed that a person of ordinary skill in the art may

19    possess the education, skills, and experience of multiple actual people who would work together

20    as a team to solve a problem in the field.  I have been informed that factors that may be considered

21    in determining the level of ordinary skill in the art may include: (1) the educational level of the

22    inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4)

23    rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational

24    level of active workers in the field.

25       17.    On the basis of my consideration of these factors as well as my experience with,

26    and research related to, the fields of networking and distributed systems, I have been asked to

27    opine as to the person of ordinary skill in the art to which the claims of the Patents in Suit are

28

directed.  In my opinion, such a person of ordinary skill in the art should have at least a bachelor's degree in Computer Science or equivalent experience.  Such a person would have experience working with and programming networked computer systems, including familiarity with the underlying principles of data transfer, synchronization, authentication, and content sharing across networks.

### B.   Claim Construction

18.     I understand that, in interpreting a claim term, the words of the patent's claims and the context in which the term is used in the claims can be highly instructive as to the meaning of that term.  I further understand that the terms of a claim are to be interpreted in the context of the entire patent, including the patent's specification.  Indeed, I understand that in many cases the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the alleged invention, and that the claims must be construed so as to be consistent with the specification.  I understand that a patentee may provide a definition for a claim term in the specification that differs from the ordinary and customary meaning it would otherwise have, in which case, the inventor's definition governs.  Further, I understand that a patent's prosecution history may often provide helpful evidence about how the Patent and Trademark Office ("PTO") and the inventor understood the patent and its claim terms.  Consequently, I understand that claim terms should, in addition to the claims themselves and the patent specification, also be construed in light of the patent's prosecution history.

19.     In addition to the above sources that are key to interpreting claim terms, which collectively constitute "intrinsic evidence," I understand that certain "extrinsic evidence," such as expert and inventor testimony, dictionaries, and learned treatises, may also shed useful light on the relevant art and the way in which a person of ordinary skill in the art might use the claim term.  I further understand that such extrinsic evidence must always be considered in the context of intrinsic evidence in understanding the meaning of a claim term.

### C.     Means-Plus-Function Claiming

20.     In addition to claim terms construed according to the principles discussed above, I understand that patent claims may include "means-plus-function" terms.  That is, I understand that the patent laws allow elements of a claim for a combination to be expressed as a means for performing a specified function without reciting structure for performing that function.  When this technique is used, I further understand that the claim term expressing such a means-plus-function does not cover every conceivable means for performing the specified function, but rather is construed to cover the corresponding structure described in the patent specification and equivalents thereof.  This, I understand, is to avoid claims that are expressed in purely functional terms and are unbounded by any reference to structure in the specification.

21.     I understand that although a means-plus-function claim term typically includes the word "means," and there is a presumption against means-plus-function claiming in the absence of such a term, a claim limitation lacking the word "means" may also constitute a mean-plus-function term if the claim fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function.  Thus, if a person of ordinary skill in the art understands the words of the claim as lacking a sufficiently definite meaning as a name for structure, the term is a means-plus-function claim term and it must be construed to cover the corresponding structure described in the patent specification.  For instance, I understand that generic terms such as "module," "mechanism," "element," "device," are words, referred to as "nonce" words, that can, depending on the circumstances, operate as substitutes for "means" in a means-plus-function claim because they typically do not denote sufficiently definite structure for the claimed function.  Thus, in construing claim terms, I understand that a threshold question is whether the term is a means-plus-function term.  Using the traditional tools of claim construction I discussed above—including considering the use of the term, if any, in the specification and prosecution history—I understand that one must inquire as to whether a claim term that is potentially a "nonce" word denotes a definite structure in the particular context of the claim.  If it does so, then the term is not a means-plus-function term.

22.     If, on the other hand, a claim term is determined to be a means-plus-function term, I understand that it must be construed through a further two-step process.  First, the claimed function must be identified.  Next, it must be determined what structure, if any, is disclosed in the specification to perform the claimed function.  I understand that structure disclosed in the specification qualifies as "corresponding structure" to a means-plus-function claim term if the intrinsic evidence clearly links or associates that structure to the function recited in the claim.  I further understand that even if the specification discloses corresponding structure, the disclosure must be of "adequate" corresponding structure to achieve the claimed function.  I understand that if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim, a means-plus-function claim term is indefinite.

## III.     THE CLAIM TERMS OF THE '696 PATENT

23.     The '696 patent is titled "Management Server for Synchronization System," and it is directed to systems for synchronizing and transferring data between devices, for example between two computers, through an intermediate server.  *See* '696 Patent at 4:25-44.  As used here, "synchronizing" data refers simply to the process of making sure that if a file is modified on Computer #1, the changes to that file are propagated, or "synchronized" to Computer #2, so that the most recent version of the file (containing any and all modifications) will appear on Computer #2.  The management server that is an aspect of the invention described in the '696 patent purportedly controls data migration between each computer and a network storage device, and it includes "modules" that purportedly perform the functions of identifying and authenticating users.  *See* '696 Patent at ABSTRACT.  The application for the '696 patent was filed on January 2, 2001, and the '696 patent issued June 29, 2004.  *See* '696 Patent at p. 1.  The '696 patent claims priority to Application No. 09/490,550, which was filed on January 25, 2000.  *See* '696 Patent at p. 1.  For purposes of my opinions here, I have been asked to assume that this latter date, January 25, 2000, is the priority date for purposes of the knowledge of a person of ordinary skill in the art.

24.     I have been asked to address how, in the context of the '696 patent, a person of ordinary skill in the art as of the priority date would understand the claim term "universally unique identifier," which is found in asserted claim 1, and therefore incorporated into the asserted claims that depend therefrom:  claims 3, 4, 5 and 6.

25.     I have also been asked to address whether, in the context of the '696 patent, a person of ordinary skill in the art would understand the following claim terms as having a sufficiently definite meaning as the name of structure, or, alternatively, if the person of ordinary skill would understand the terms as reciting function without reciting sufficient structure for performing that function:

   i)     "user identifier module," found in asserted claims 1, 9, and 16, and incorporated into asserted claims 3, 5, 6, 10, 11, 12, 13, 14, 17, 18, 19, and 20, which depend from claims 1, 9, and 16.

   ii)    "authentication module identifying a user coupled to the synchronization system," found in asserted claim 1, and incorporated into asserted claims 3, 4, and 6, which depend from claim 1.

   iii)   "user authenticator module," found in asserted claim 9, and incorporated into asserted claims 10, 11, 12, 13, and 14, which depend from claim 9.

   iv)    "user login authenticator," found in asserted claim 16, and incorporated into asserted claims 17, 18, 19, and 20, which depend from claim 16.

   v)     "user data flow controller," found in asserted claim 16, and incorporated into asserted claims 17, 18, 19 and 20, which depend from claim 16.

   vi)    "transaction identifier module," found in asserted claims 1, 9, and 16, and incorporated into asserted claims 3, 5, 6, 10, 11, 12, 13, 14, 17, 18, 19, and 20, which depend from claims 1, 9, and 16.

   vii)   "versioning modules," found in asserted claims 1, 9, and 16, and incorporated into asserted claims 3, 5, 6, 10, 11, 12, 13, 14, 17, 18, 19, and 20, which depend from claims 1, 9, and 16.

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG

viii)   "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device," found in asserted claim 1, and incorporated into asserted claims 3, 4, 5 and 6, which depend from claim 1.

ix)   "synchronization agent," found in asserted claim 16, and incorporated into asserted claims 17, 18, 19 and 20, which depend from claim 16.

26.   A summary of my opinions as to the construction of these terms of the '696 patent is provided in the chart below:

| CLAIM TERM | ASSERTED CLAIMS | CONSTRUCTION |
|---|---|---|
| "universally unique identifier" | 1, 3, 5, 6 | 128-bit value consisting of 16 octets that guarantees uniqueness across space and time and is standardized by the Open Software Foundation |
| "user identifier module" | 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20 | This is a means-plus-function term. Claimed Function:  Identifying users. Corresponding Structure:  None identified in the specification.  The term is indefinite. |
| "authentication module identifying a user coupled to the synchronization system" | 1, 3, 5, 6 | This is a means-plus-function term. Claimed Function:  Identifying and authenticating a user coupled to the synchronization system. Corresponding Structure:  None identified in the specification.  The term is indefinite. |
| "user authenticator module" | 9, 10, 11, 12, 13, 14 | This is a means-plus-function term. Claimed Function:  Authenticating users. Corresponding Structure:  None identified in the specification.  The term is indefinite. |
| "user login authenticator" | 16, 17, 18, 19, 20 | This is a means-plus-function term. Claimed Function:  Authenticating user logins. Corresponding Structure:  None identified in the specification.  The term is indefinite. |
| "user data flow controller" | 16, 17, 18, 19, 20 | This is a means-plus-function term. |

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG

| | | |
|---|---|---|
| | | <u>Claimed Function</u>:  Controlling the flow of user data in the synchronization system. |
| | | <u>Corresponding Structure</u>:  None identified in the specification.  The term is indefinite. |
| "transaction identifier module" | 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20 | This is a means-plus-function term.<br><br><u>Claimed Function</u>:  Identifying transactions in the synchronization system.<br><br><u>Corresponding Structure</u>:  None identified in the specification.  The term is indefinite. |
| "versioning modules" | 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20 | This is a means-plus-function term.<br><br><u>Claimed Function</u>:  Applying a version number per object in the data package.<br><br><u>Corresponding Structure</u>:  "A hardware or software component configured to identify a DataPack file using specific rules based on the file name. The file name is of the form 'UUID.VER' where UUID is the identifier for the specific object and VER is the transaction version number. The version number is of the form 'D0001' with additional digits used for large version numbers. The 'D000' value may be reserved for the base version for the object." '696 patent at 38:49-54. |
| "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" | 1, 3, 5, 6 | This is a means-plus-function term.<br><br><u>Claimed Function</u>:  Controlling data migration between a first network couple device and a second network coupled device.<br><br><u>Corresponding Structure</u>:  A hardware or software component configured to perform the algorithm set forth in Figures 15 and 16 of the '696 patent and the corresponding text.  '696 patent at 33:32-36:24. |
| "synchronization agent" | 16, 17, 18, 19, 20 | This is a means-plus-function term.<br><br><u>Claimed Function</u>:  Controlling the flow of user data in the synchronization system.<br><br><u>Corresponding Structure</u>:  A hardware or software component configured to perform the algorithm set forth in Figures 15 and 16 of the '696 patent and the corresponding text.  '696 patent at 33:32-36:24. |

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG

1

2

**A.      "[U]niversally unique identifier" (claims 1, 3, 4, 5, 6)**

3

27.      In my opinion, "universally unique identifier" means a 128-bit value consisting of

4

16 octets that guarantees uniqueness across space and time and is standardized by the Open

5

Software Foundation.

6

28.      I understand that the parties disagree as to the meaning of the phrase "universally

7

unique identifier" in the '696 patent.  In particular, Dropbox has proposed that a person of ordinary

8

skill would understand the phrase as referring to a specific "128-bit value consisting of 16 octets

9

that can guarantee uniqueness across space and time and is standardized by the Open Software

10

Foundation" that was commonly used in the art at the time of the priority date to identify

11

information.  Synchronoss, in contrast, has proposed that it refers to any "value used to uniquely

12

identify an object or user."

13

29.      Claim 1 is directed to a "controller for a synchronization system," which includes

14

a "transaction identifier module assigning a universally unique identifier to each user of transaction

15

objects" in a data store.  Contrary to Synchronoss's proposed construction, the term "universally

16

unique identifier," or "UUID," is a well-understood term of art in computer science and

17

engineering.  It does not simply mean any identifier that is used for unique identification.  Rather,

18

it refers specifically to an identifier that is in one of a number of closely-related formats that are

19

designed to facilitate the generation of universally unique values and thus help to ensure their

20

uniqueness.

21

30.      Specifically, the term refers to a 128-bit identifier consisting of 16 octets (*i.e.*, eight-

22

bit values, also known as "bytes").  UUIDs were originally used in the Apollo Network Computing

23

System and later in the Open Software Foundation's (OSF) Distributed Computing Environment

24

(DCE), and then in Microsoft Windows platforms. Well before the priority date, UUIDs were

25

standardized by the OSF as part of DCE.  *See* Leach, et al., "A UUID URN Namespace," RFC

26

4122, https://tools.ietf.org/html/rfc4122 (Jul. 2005).  In the DCE specification, particular octets in

27

a UUID were derived from the precise time at which the UUID was allocated, while others were

28

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG

1  indicative of the specific machine that created the UUID.  Part of one of the octets also specified

2  a "version" of the UUID standard, so alternative methods of creating a UUID also exist.  (Some

3  of these alternate "versions" have come into common usage since the priority date; an Internet

4  standards document known as RFC 4122 further codified the UUID standard in 2005, although

5  the term "UUID" was widely understood and had been in common use for many years, back to

6  well before the priority date.)  Regardless of the version, UUIDs all use the same general 128-bit

7  format with a well-defined set of bits specifying the version; the version, in turn, determines how

8  the other bits are to be generated so as to guarantee (or at least render highly probable) the

9  uniqueness of UUIDs, even though the generation of UUIDs does not require that a registration

10  authority be contacted for each identifier.  The uniqueness of UUIDs, in turn, enables them to

11  uniquely specify objects, such as files, across space and time and across computer systems.  A

12  UUID can be used for multiple purposes, from tagging objects with an extremely short lifetime, to

13  reliably identifying very persistent objects across a network.  The specific definition of UUID that

14  I have just outlined was the term's plain and ordinary meaning to a person of ordinary skill in the

15  art as of the priority date (and continues to be today).

16      31.    The use of "UUID" and "universally unique identifier" in the specification and in

17  the prosecution history of the '696 patent is consistent with this meaning.

18      32.    As an initial matter, note that the specification of the '696 patent equates the terms

19  "universally unique identifier" and "UUID" by placing the latter term in parentheses after the

20  former: "Each piece of content is referred to as an object and is uniquely represented with a

21  Universally Unique Identifier (UUID)."  '696 patent at 38:11-12; *see also id.* at 12:12-13 ("[E]ach

22  object in the data package is assigned a universally unique ID (UUID).").  This usage supports my

23  opinion that when the claims use the term "universally unique identifier" they do not simply mean

24  any identifier that is universally unique, but rather are referring to the specific concept of a 128-

25  bit UUID.

26      33.    The patent specification further explains that the Universally Unique Identifier or a

27  UUID is a "128-bit UUID as defined by standard."  '696 Patent at 41:7-9; *see also id.* at 43:41-42

28

1   ("FieldType UniqueID is a sequence of bytes as defined by the Universally Unique Identifier

2   (UUID) standard."); *id.* at 38:34-35 ("Each UUID has a unique 128 bit value which may be

3   assigned by the system provider.").  A person of ordinary skill in the art would understand this

4   reference to a "UUID standard" to mean the standardized format I described above.  After all, the

5   patent itself speaks in terms of a "standard" 128-bit UUID and not just any generic identifier.

6        34.    Likewise, the specification explicitly distinguishes the standard UUID from a

7   generic identifier value.  In the code for the "Variant" object data structure, for example, several

8   "data field type[s]" are listed.  '696 Patent at 19:39-20:29.  As one of ordinary skill would know,

9   a "data type" in computer science or programming commonly defines the syntax and

10  representation of data, e.g., numerical values, strings, Booleans (i.e., "true" or "false").  For

11  numerical values, the data type typically specifies its length, e.g., a "short integer" or "word" was

12  commonly 16 bits long at the time of the patent's priority date (where 16 bits can store a maximum

13  value of 65,535), a "long integer" or "double word" was 32 bits long (or a maximum of about 4

14  billion), and an "int64" or "quadruple word" was 64 bits long.  Indeed, the specification of the

15  '696 Patent lists these various numerical data types expressly: "short int", "LONG", "DWORD",

16  "unsigned_int64" and further specifies that these types correspond to "eFieldType_WORD",

17  "eFieldType_LONG", "eFieldType_DWORD", and "eFieldType_QWORD", respectively.  It also

18  specifies "UUID" as having a separate type "eFieldType_UUID". '696 Patent at 19:54-19:58. All

19  of these types take a form that is well known and standard to one of ordinary skill.  Indeed, the

20  patent expressly discloses the actual syntax and representation of its datatypes: "clShort" is a "16-

21  bit value", "clDword" is a "32-bit value", "clQword" is a "64-bit value", and "clUuid" is a "16

22  byte uuid" (where 16 bytes correspond to 128 bits, as 1 byte of data is comprised of 8 bits of data).

23  '696 Patent at 41:43-49.

24       35.    A person or ordinary skill would understand this to be confirming the general

25  knowledge of a person of ordinary skill that UUID in the context of the patent is used in the

26  ordinary way it appears in the art: to refer to the UUID standard, not any generic identifier value

27  that one may claim is "universal."

28

14

36.     Likewise, such understanding would have been confirmed by the claims themselves, which distinguish "universally unique identifier value" (as used in claim 1 and its dependent claims) from a mere "unique transaction identifier" (used in claims 9 and 16, and their dependent claims), which is more akin to Synchronoss's proposal.

37.     As is clear from the discussion above, the term "universally unique identifier value" in the '696 patent would have been understood by a person of ordinary skill to be a reference to the specific identifier with the specific format described in the DCE specification, *i.e.* a 128-bit globally unique value with 16 octets.  Particularly where the patent refers to the UUID "standard," I disagree with Synchronoss's suggestion that it may nevertheless mean any "value that may be used to uniquely identify an object or user."  If that were true, the patent would not have used a term of art that had a specific meaning for a person of ordinary skill as of the priority date or referenced a "standard" instead of providing its own alternative description of UUID.  For all these reasons, a person of ordinary skill would understand the patent as referencing the UUID format that was widely known as of the priority date.

**B.     "[U]ser identifier module" (claims 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20)**

38.     In my opinion, "user identifier module" is a means-plus-function term that is indefinite because it has no corresponding structure in the specification.

39.     I understand that the parties disagree as to the meaning of the term "user identifier module" in the '696 patent, and in particular, as to whether the person of ordinary skill would understand that phrase as reciting means for performing a specific function without reciting structure for performing that function.  In my opinion, the person of ordinary skill in the art would understand the term "user identifier module" as only reciting a function—identifying users—but providing no structure for the purported "module" that performs that function.  It is thus a means-plus-function term.  As I discuss below, the specification of the '696 patent provides no corresponding structure to the function of identifying users.  Accordingly, the term is indefinite.

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG

40.     As an initial matter, the term "user identifier module" would not have been understood by the person of ordinary skill as a known term of art, nor does the '696 patent suggest a definition of the term that refers to any particular structure.  The term does not have any well understood structural meaning in the field of computer systems and technology.  To the contrary, the person of ordinary skill in the art would understand the word "module" to simply be a generic description for software or hardware that performs a specified function.  The use of the modifier "user identifier" would not be understood to impart any structural significance or meaning to the term "module."  The term "user identifier module" effectively connotes a black box for identifying users.

41.     Claim 1 is directed to a "controller for a synchronization system," which includes, among other things, a "user identifier module."  I reviewed both the specification and the prosecution history of the '696 patent, and I was unable to find any reference to that claim term, apart from instances wherein the claim language is itself recited substantively verbatim in the specification and/or prosecution history.

42.     The person of ordinary skill would understand there are many ways in which a software or hardware component could be structured and/or configured to identify users, and the claims do not specify any particular structure to be used in the alleged invention.  There are many ways in which a system could perform user identification, each with its own distinct structure.  For instance, captive portal/web authentication involves user identification without the need for an agent on the user device.  Similar to what you would find at a hotel or wireless hotspot, this option forces enabled users to identify themselves prior to accessing the network.  Alternatively, a user agent may be installed on the device that acts on behalf of the user, and the user agent may identify itself by submitting a characteristic identification string to other devices on the network, including servers that are tasked with the user identification.  Users may also be uniquely identified using the MAC address of the user's computer system, or its Internet Protocol ("IP") address.  Similarly, users may be authenticated, and thus identified, in a multitude of different ways, and each of these has its own corresponding structure.  Systems may utilize passwords or passphrases, salted

passwords, PIN codes, one-time passwords, physical biometrics, public-key cryptography, X.509 digital certificates, symmetric-key cryptography, digital knowledge proofs, smart cards, multi-factor authentication, or chip-and-pin authentication.  Users may be required to authenticate, and thus identify, themselves while utilizing the secure sockets layer protocol, Kerberos, virtual private networks (VPNs), IPSec (via the IP authentication header), or HTTP or HTTPS (using either the Authorization header, Cookies, or some type of application login).  Authentication or user identifier information can be stored in the local file system either in plaintext, encrypted, or salted with additional information, in a local database, in a network file system or network-attached database, or via a special networked authentication service/database such as LDAP (Lightweight Directory Access Protocol), Active Directory (AD), AAA servers such as Radius or TACACS, among other approaches.  Without specifying any of these or multiple other structural mechanisms for performing user identification and/or authentication, the term recites only a structure-less function.

43.    I understand that Synchronoss has suggested that "user identifier module" simply means "hardware or software that identifies a user."  While I disagree that this is an appropriate construction of the term, it is consistent with and supports my view that the term itself adds no structure to the corresponding function of identifying users.

44.    Without any further explanation of the term in the language of the claims themselves or in the patent specification or prosecution history, the person of ordinary skill would understand "user identifier module" as broadly reciting the function of identifying users, but that the claim term does not itself denote any particular structure for doing so.  The term "user identifier module" is thus, in my opinion, a means-plus-function term.  The function it recites is identifying users.

45.    Once I concluded that the term "user identifier module" is a means-plus-function term, I reviewed the patent specification to determine what structure, if any, a person of ordinary skill might understand to be disclosed therein that is associated with the function of identifying users.  I was unable to find any such structure disclosed in the specification.  As discussed above,

17

the references to the term itself in the patent specification are minimal, and those references either quote the language of the claims verbatim or themselves recite only function without providing any insight whatsoever about the corresponding structure.  *See*, *e.g.*, '696 patent at 3:46-49 ("The controller includes an authentication module specifically associating the user data with a particular user, identifying the user agent as associated with a user having access to the user data . . . ."); *id.* at 31:37-38 ("Each device engine is uniquely identified and tracked by the management server."). Nowhere in the specification is there any algorithmic structure for implementing user identification—no formula, prose, flow chart or pseudocode.  Nor is there any other structural guidance.  The person of ordinary skill would, therefore, be unable to recognize the structure in the specification and associate it with the corresponding function of identifying users.

46.     Because there is no disclosure in the specification of such a structure, the term is indefinite.

**C.      "[A]uthentication module identifying a user coupled to the synchronization system" (claims 1, 3, 5, 6)**

47.     In my opinion, "authentication module identifying a user coupled to the synchronization system" is a means-plus-function term that is indefinite because it has no corresponding structure in the specification.

48.     I understand that the parties disagree as to the meaning of the term "authentication module identifying a user coupled to the synchronization system," in the '696 patent, and in particular, as to whether a person of ordinary skill would understand that phrase as reciting means for performing a specific function without reciting structure for performing that function.  In my opinion, a person of ordinary skill in the art would understand the term "authentication module identifying a user coupled to the synchronization system" as only reciting a function—"identifying and authenticating a user coupled to the synchronization system"—but providing no structure for the purported "module" that performs that function.  It is thus a means-plus-function term.  As I discuss below, the specification of the '696 patent provides no corresponding structure to the

1  function of identifying a user coupled to the synchronization system.  Accordingly, the term is

2  indefinite.

3       49.    As an initial matter, the term "authentication module identifying a user coupled to

4  the synchronization system" would not have been understood by the person of ordinary skill as a

5  known term of art, nor does the '696 patent suggest a definition of the term that refers to any

6  particular structure.  The term does not have any well understood structural meaning in the field

7  of computer systems and technology.  To the contrary, the person of ordinary skill in the art would

8  understand the word "module" to simply be a generic description for software or hardware that

9  performs a specified function.  The use of the modifier "authentication" would not be understood

10 to impart any structural significance or meaning to the term "module."  The term "authentication

11 module identifying a user coupled to the synchronization system" effectively connotes a black box

12 for identifying and authenticating a user coupled to the synchronization system.

13      50.    Claim 1 is directed to a "controller for a synchronization module," which includes,

14 among other things, an "authentication module identifying a user coupled to the synchronization

15 system." I reviewed both the specification and the prosecution history of the '696 patent, and most

16 references to that claim term I was able to find were those wherein the claim language is itself

17 recited substantively verbatim in the specification and/or prosecution history; I also found a

18 fleeting reference which does not provide any structural specificity.  *See* '696 Patent at 32:19-22.

19      51.    A person of ordinary skill would understand there are many ways in which a

20 software or hardware component could be structured and/or configured to identify and authenticate

21 a user coupled to the synchronization system, and the claims do not specify any particular structure

22 to be used in the alleged invention.  There are many ways in which a system could perform user

23 identification/authentication, each with its own distinct structure.  For instance, captive portal/web

24 authentication involves user authentication or identification without the need for an agent on the

25 user device.  Similar to what you would find at a hotel or wireless hotspot, this option forces

26 enabled users to authenticate or identify themselves prior to accessing the network.  Alternatively,

27 a user agent may be installed on the device that acts on behalf of the user, and the user agent may

28

1  authenticate itself by submitting a characteristic identification string to other devices on the

2  network, including servers that are tasked with the user authentication or identification.  Users may

3  also be uniquely identified using the MAC address of the user's computer system, or its Internet

4  Protocol ("IP") address.  Similarly, users may be authenticated, and thus identified, in a multitude

5  of different ways, and each of these has its own corresponding structure.  Systems may utilize

6  passwords or passphrases, salted passwords, PIN codes, one-time passwords, physical biometrics,

7  public-key cryptography, X.509 digital certificates, symmetric-key cryptography, digital

8  knowledge proofs, smart cards, multi-factor authentication, or chip-and-pin authentication.  Users

9  may be required to authenticate themselves while utilizing the secure sockets layer protocol,

10  Kerberos, virtual private networks (VPNs), IPSec (via the IP authentication header), or HTTP or

11  HTTPS (using either the Authorization header, Cookies, or some type of application login).

12  Authentication or user identifier information can be stored in the local file system either in

13  plaintext, encrypted, or salted with additional information, in a local database, in a network file

14  system or network-attached database, or via a special networked authentication service/database

15  such as LDAP (Lightweight Directory Access Protocol), Active Directory (AD), or AAA servers

16  such as Radius or TACACS, among other approaches.  Without specifying any of these or multiple

17  other structural mechanisms for performing user authentication, the term recites only a structure-

18  less function.

19      52.    I understand that Synchronoss has suggested that "authentication module

20  identifying a user coupled to the synchronization system" simply means "software that verifies a

21  user's access to the synchronization system."  While I disagree that this is an appropriate

22  construction of the term, it is consistent with and supports my view that the term itself adds no

23  structure to the corresponding function of authenticating or identifying a user coupled to the

24  synchronization system.

25      53.    Without any further explanation of the term in the language of the claims

26  themselves or in the patent specification or prosecution history, the person of ordinary skill would

27  understand "authentication module identifying a user coupled to the synchronization system" as

28

broadly reciting the function of identifying and authenticating a user coupled to the synchronization system, but that the claim term does not itself denote any particular structure for doing so. The term is thus, in my opinion, a means-plus-function term. The function it recites is identifying and authenticating a user coupled to the synchronization system.

54.    Once I concluded that the term "authentication module identifying a user coupled to the synchronization system" is a means-plus-function term, I reviewed the patent specification to determine what structure, if any, a person of ordinary skill might understand to be disclosed therein that is associated with the function of identifying and authenticating a user coupled to the synchronization system. I was unable to find any such structure disclosed in the specification. As discussed above, the references to the term itself in the patent specification are minimal, and those references mostly quote the language of the claims verbatim. Other indirect references to user authentication generally recite only functions without providing any insight whatsoever about the corresponding structure. *See*, *e.g.*, '696 patent at 3:46-49 ("The controller includes an authentication module specifically associating the user data with a particular user, identifying the user agent as associated with a user having access to the user data . . . ."); *id.* at 31:37-38 ("Each device engine is uniquely identified and tracked by the management server."). Nowhere in the specification is there any algorithmic structure for implementing user authentication—no formula, prose, flow chart or pseudocode. Nor is there any other structural guidance. The person of ordinary skill would, therefore, be unable to recognize the structure in the specification and associate it with the corresponding function of identifying and authenticating a user coupled to the synchronization system.

55.    Because there is no disclosure in the specification of such a structure, the term is indefinite.

**D.    "[U]ser authenticator module" (claims 9, 10, 11, 12, 13, 14)**

56.    In my opinion, "user authenticator module" is a means-plus-function term that is indefinite because it has no corresponding structure in the specification.

57.     I understand that the parties disagree as to the meaning of the term "user authenticator module," in the '696 patent, and in particular, as to whether a person of ordinary skill would understand that phrase as reciting means for performing a specific function without reciting structure for performing that function.  In my opinion, a person of ordinary skill in the art would understand the term "user authenticator module" as only reciting a function—authenticating users—but providing no structure for the purported "module" that performs that function.  It is thus a means-plus-function term.  As I discuss below, the specification of the '696 patent provides no corresponding structure to the function of authenticating users.  Accordingly, the term is indefinite.

58.     As an initial matter, the term "user authenticator module" would not have been understood by the person of ordinary skill as a known term of art, nor does the '696 patent suggest a definition of the term that refers to any particular structure.  The term does not have any well understood structural meaning in the field of computer systems and technology.  To the contrary, the person of ordinary skill in the art would understand the word "module" to simply be a generic description for software or hardware that performs a specified function.  The use of the modifier "user authenticator" would not be understood to impart any structural significance or meaning to the term "module."  The term "user authenticator module" effectively connotes a black box for authenticating users.

59.     Claim 9 is directed to a "data synchronization system," which includes, among other things, a "user authenticator module."  I reviewed both the specification and the prosecution history of the '696 patent, and the only references to that claim term I was able to find were those wherein the claim language is itself recited substantively verbatim in the specification and/or prosecution history.

60.     A person of ordinary skill would understand there are many ways in which a software or hardware component could be structured and/or configured to authenticate a user, and the claims do not specify any particular structure to be used in the alleged invention.  There are many ways in which a system could perform user authentication, each with its own distinct

structure.  For instance, captive portal/web authentication involves user authentication or identification without the need for an agent on the user device.  Similar to what you would find at a hotel or wireless hotspot, this option forces enabled users to authenticate themselves prior to accessing the network.  Alternatively, a user agent may be installed on the device that acts on behalf of the user, and the user agent may authenticate itself by submitting a characteristic identification string to other devices on the network, including servers that are tasked with the user authentication or identification.  Users may also be uniquely identified using the MAC address of the user's computer system, or its Internet Protocol ("IP") address.  Similarly, users may be authenticated in a multitude of different ways, and each of these has its own corresponding structure.  Systems may utilize passwords or passphrases, salted passwords, PIN codes, one-time passwords, physical biometrics, public-key cryptography, X.509 digital certificates, symmetric-key cryptography, digital knowledge proofs, smart cards, multi-factor authentication, or chip-and-pin authentication.  Users may be required to authenticate themselves while utilizing the secure sockets layer protocol, Kerberos, virtual private networks (VPNs), IPSec (via the IP authentication header), or HTTP or HTTPS (using either the Authorization header, Cookies, or some type of application login).  Authentication information can be stored in the local file system either in plaintext, encrypted, or salted with additional information, in a local database, in a network file system or network-attached database, or via a special networked authentication service/database such as LDAP (Lightweight Directory Access Protocol), Active Directory (AD), or AAA servers such as Radius or TACACS, among other approaches.  Without specifying any of these or multiple other structural mechanisms for performing user authentication, the term recites only a structure-less function.

61.    I understand that Synchronoss has suggested that "user authenticator module" simply means "software that verifies the authenticity of a user."  While I disagree that this is an appropriate construction of the term, it is consistent with and supports my view that the term itself adds no structure to the corresponding function of authenticating users.

62.     Without any further explanation of the term in the language of the claims themselves or in the patent specification or prosecution history, the person of ordinary skill would understand "user authenticator module" as broadly reciting the function of authenticating a user, but that the claim term does not itself denote any particular structure for doing so.  The term is thus, in my opinion, a means-plus-function term.  The function it recites is authenticating users.

63.     Once I concluded that the term "user authenticator module" is a means-plus-function term, I reviewed the patent specification to determine what structure, if any, a person of ordinary skill might understand to be disclosed therein that is associated with the function of authenticating users.  I was unable to find any such structure disclosed in the specification.  As discussed above, the references to the term itself in the patent specification are minimal, and those all quote the language of the claims verbatim.  Other indirect references to user authentication generally themselves recite only functions without providing any insight whatsoever about the corresponding structure.  *See*, *e.g.*, '696 patent at 3:46-49 ("The controller includes an authentication module specifically associating the user data with a particular user, identifying the user agent as associated with a user having access to the user data . . . ."); *id.* at 31:37-38 ("Each device engine is uniquely identified and tracked by the management server.").

64.     Nowhere in the specification is there any algorithmic structure for implementing user authentication—no formula, prose, flow chart or pseudocode.  Nor is there any other structural guidance.  The person of ordinary skill would, therefore, be unable to recognize the structure in the specification and associate it with the corresponding function of authenticating users.

65.     Because there is no disclosure in the specification of such a structure, the term is indefinite.

**E.     "[U]ser login authenticator" (claims 16, 17, 18, 19, 20)**

66.     In my opinion, "user login authenticator" is a means-plus-function term that is indefinite because it has no corresponding structure in the specification.

67.     I understand that the parties disagree as to the meaning of the term "user login authenticator," in the '696 patent, and in particular, as to whether a person of ordinary skill would

1  understand that phrase as reciting means for performing a specific function without reciting

2  structure for performing that function.  In my opinion, a person of ordinary skill in the art would

3  understand the term "user login authenticator" as only reciting a function—authenticating user

4  logins—but providing no structure for the purported software or hardware that performs that

5  function.  It is thus a means-plus-function term.  As I discuss below, the specification of the '696

6  patent provides no corresponding structure to the function of authenticating user logins.

7  Accordingly, the term is indefinite.

8        68.    As an initial matter, the term "user login authenticator" would not have been

9  understood by the person of ordinary skill as a known term of art, nor does the '696 patent suggest

10  a definition of the term that refers to any particular structure.  The term does not have any well

11  understood structural meaning in the field of computer systems and technology.  To the contrary,

12  the person of ordinary skill in the art would understand the term to simply be a generic description

13  for software or hardware that performs a specified function.  The term "user login authenticator"

14  effectively connotes a black box for authenticating user logins.

15        69.    Claim 16 is directed to a "synchronization agent management server," which

16  includes, among other things, a "user login authenticator."  I reviewed both the specification and

17  the prosecution history of the '696 patent, and the only references to that claim term I was able to

18  find were those wherein the claim language is itself recited substantively verbatim in the

19  specification and/or prosecution history.

20        70.    A person of ordinary skill would understand there are many ways in which a

21  software or hardware component could be structured and/or configured to authenticate user logins,

22  and the claims do not specify any particular structure to be used in the alleged invention.  There

23  are many ways in which a system could perform user login authentication, each with its own

24  distinct structure.  For instance, captive portal/web authentication involves user identification

25  without the need for an agent on the user device.  Similar to what you would find at a hotel or

26  wireless hotspot, this option forces enabled users to login or identify themselves prior to accessing

27  the network.  Alternatively, a user agent may be installed on the device that acts on behalf of the

28

1  user, and the user agent may authenticate itself by submitting a characteristic login or identification

2  string to other devices on the network, including servers that are tasked with the user login

3  authentication.  Users may also be uniquely authenticated using the MAC address of the user's

4  computer system, or its Internet Protocol ("IP") address.  Similarly, users may be authenticated

5  via login, and thus identified, in a multitude of different ways, and each of these has its own

6  corresponding structure.  Systems may utilize passwords or passphrases, salted passwords, PIN

7  codes, one-time passwords, physical biometrics, public-key cryptography, X.509 digital

8  certificates, symmetric-key cryptography, digital knowledge proofs, smart cards, multi-factor

9  authentication, or chip-and-pin authentication.  Users may be required to authenticate via login

10  themselves while utilizing the secure sockets layer protocol, Kerberos, virtual private networks

11  (VPNs), IPSec (via the IP authentication header), or HTTP or HTTPS (using either the

12  Authorization header, Cookies, or some type of application login).  Authentication or user

13  identifier information can be stored in the local file system either in plaintext, encrypted, or salted

14  with additional information, in a local database, in a network file system or network-attached

15  database, or via a special networked authentication service/database such as LDAP (Lightweight

16  Directory Access Protocol), Active Directory (AD), or AAA servers such as Radius or TACACS,

17  among other approaches.  Without specifying any of these or multiple other structural mechanisms

18  for performing authentication of user logins, the term recites only a structure-less function.

19       71.     I understand that Synchronoss has suggested that "user login authenticator"

20  simply means "software that authenticates a user's log-in."  While I disagree that this is an

21  appropriate construction of the term, it is consistent with and supports my view that the term itself

22  adds no structure to the corresponding function of authenticating user logins.

23       72.     Without any further explanation of the term in the language of the claims

24  themselves or in the patent specification or prosecution history, the person of ordinary skill would

25  understand "user login authenticator" as broadly reciting the function of authenticating user logins,

26  but that the claim term does not itself denote any particular structure for doing so.  The term is

27

28

1  thus, in my opinion, a means-plus-function term.  The function it recites is authenticating user

2  logins.

3          73.     Once I concluded that the term "user login authenticator" is a means-plus-function

4  term, I reviewed the patent specification to determine what structure, if any, a person of ordinary

5  skill might understand to be disclosed therein that is associated with the function of authenticating

6  user logins.  I was unable to find any such structure disclosed in the specification.  As discussed

7  above, the references to the term itself in the patent specification are minimal, and those all quote

8  the language of the claims verbatim.  Other indirect references to user authentication generally

9  themselves recite only functions without providing any insight whatsoever about the

10  corresponding structure.  *See*, *e.g.*, '696 patent at 3:46-49 ("The controller includes an

11  authentication module specifically associating the user data with a particular user, identifying the

12  user agent as associated with a user having access to the user data . . . ."); *id.* at 31:37-38 ("Each

13  device engine is uniquely identified and tracked by the management server.").

14          74.     Nowhere in the specification is there any algorithmic structure for implementing

15  user login authentication—no formula, prose, flow chart or pseudocode.  Nor is there any other

16  structural guidance.  The person of ordinary skill would, therefore, be unable to recognize the

17  structure in the specification and associate it with the corresponding function of authenticating

18  user logins.

19          75.     Because there is no disclosure in the specification of such a structure, the term is

20  indefinite.

21     **F.     "[U]ser data flow controller" (claims 16, 17, 18, 19, 20)**

22          76.     In my opinion, "user data flow controller" is a means-plus-function term that is

23  indefinite because it has no corresponding structure in the specification.

24          77.     I understand that the parties disagree as to the meaning of "user data flow

25  controller" in the '696 patent, and in particular, as to whether a person of ordinary skill would

26  understand the phrase as reciting a means for performing a specific function without reciting

27  structure for performing that function.  In my opinion, the person of ordinary skill in the art would

28

understand the term "user data flow controller" as only reciting a function—"controlling the flow of user data in the synchronization system"—but providing no structure for the purported "controller" that performs that function.  It is thus a means-plus-function term.  As I discuss below, the specification of the '696 patent provides no corresponding structure to the function of controlling the flow of user data in the synchronization system.  Accordingly, the term is indefinite.

78.     As an initial matter, the term "user data flow controller" would not have been understood by the person of ordinary skill as a known term of art, nor does the '696 patent suggest a definition of the term that refers to any particular structure.  The term does not have any well understood structural meaning in the field of computer systems and technology.  To the contrary, the person of ordinary skill in the art would understand the word "controller" to simply be a generic description for software or hardware that performs a specified function, or directs or regulates something.  The use of the modifier "user data flow" would not be understood to impart any structural significance or meaning to the term "controller."  The term "user data flow controller" effectively connotes a black box for identifying users.

79.     Claim 16 is directed to a "synchronization agent management server," which includes, among other things, a "user data flow controller."  I reviewed both the specification and the prosecution history of the '696 patent, and I was unable to find any reference to a "user data flow controller," apart from instances wherein the claim language is itself recited substantively verbatim in the specification and/or prosecution history.

80.     The person of ordinary skill would understand there are many ways in which a software or hardware component could be structured and/or configured to control the flow of user data in the synchronization system, and the claims do not specify any particular structure to be used in the alleged invention.  There are many ways in which a system could control the flow of user data, each with its own distinct structure.  In fact, the very function of controlling data flow is not standardized in the field of computer technology.  Thus, a person of ordinary skill would not be able to discern any structure from the mere reference to a "user data flow controller" and would instead expect the patentee to provide some guidance.  For instance, a user data flow controller

1  may be implemented all within a single computer process and mostly involve logic to dispatch

2  data between code modules within the same program.  It could manage user data by storing the

3  data on filesystems or within databases as its flow is controlled through the system. It could involve

4  a network service that queues and dispatches data between distinct programs or network services

5  that process the data.  It could involve a load balancer that additional selects between instances of

6  these programs for greater scalability.  It may be implemented using a locking mechanism to

7  prevent multiple users from accessing and modifying the same data at the same time.  A user data

8  flow controller may also include an authentication component to identify and authenticate a user

9  before permitting the user to download and update data to a server.  There is a multitude of different

10  ways in which a software or hardware component tasked with controlling the flow of user data

11  could be structured.  Without proving structural guidance, the term recites only a structure-less

12  function.

13        81.    I understand that Synchronoss has suggested that "user data flow controller"

14  means "software that controls the transmission or reception of change transactions."  That

15  construction suffers from two deficiencies.  First, nowhere in the claims, the specification, or the

16  prosecution history of the '696 patent is there any suggestion that the user data flow controller

17  controls the flow of *change transactions*—a term the patentee readily used when applicable, but

18  chose not to use here, opting instead for "user data," which a person of ordinary skill in the art

19  would understand to be something different.  More importantly, however, that proposed

20  construction is consistent with and supports my view that the term itself adds no structure to the

21  corresponding function of controlling the flow of user data.

22        82.    Without any further explanation of the term in the language of the claims

23  themselves or in the patent specification or prosecution history, the person of ordinary skill would

24  understand "user data flow controller" as broadly reciting the function of controlling the flow of

25  user data in the synchronization system, but that the claim term does not itself denote any particular

26  structure for doing so.  The term "user data flow controller" is thus, in my opinion, a means-plus-

27

28

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG

1   function term.  The function it recites is controlling the flow of user data in the synchronization

2   system.

3       83.    Once I concluded that "user data flow controller" is a means-plus-function term, I

4   reviewed the patent specification to determine what structure, if any, a person of ordinary skill

5   might understand to be disclosed therein that is associated with the function of controlling the flow

6   of user data.  I was unable to find any such structure disclosed in the specification.  As discussed

7   above, the references to the terms themselves in the patent specification are minimal, and those

8   references either recite the language of the claims verbatim or themselves recite only functions

9   without providing any insight whatsoever regarding the corresponding structure.  Nowhere in the

10  specification is there any algorithmic structure for implementing the function of controlling the

11  flow of user data—no formula, prose, flow chart or pseudocode.  Nor is there any other structural

12  guidance.   Although Figures 15 and 16 depict the overall processes of push and pull

13  synchronization, there is no specific depiction or description of the structure of a "user data flow

14  controller," or any indication as to what parts of those Figures relate to the function of controlling

15  the flow of user data.  Indeed, the term "user data flow controller" is not even mentioned anywhere

16  in, or in connection with, those Figures.  And to the extent the specification describes Figures 15-

17  17 as depicting data flow in the system to and from the management server, those Figures still fail

18  to provide a corresponding structure for controlling the flow of user data because:  (a) the

19  specification itself notes that the figures do no more than provide a "functional specification of the

20  management server," *see* '696 patent at 32:6-8, and (b) the figures relate to the general

21  functionality of the system and the management server, which includes several claimed

22  components, and they fail to isolate in any meaningful way the structure of a component that might

23  control the flow of user data.  The person of ordinary skill would, therefore, be unable to recognize

24  the structure in the specification and associate it with the corresponding function of controlling the

25  flow of user data.

26      84.    Because there is no disclosure in the specification of such a structure, the term is

27  indefinite.

28

30

1

2

G.      "[T]ransaction identifier module" (claims 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16,
        17, 18, 19, 20)

3       85.     In my opinion, "transaction identifier module" is a means-plus-function term that

4   is indefinite because it has no corresponding structure in the specification.

5       86.     I understand that the parties disagree as to the meaning of "transaction identifier

6   module" in the '696 patent, and in particular, as to whether a person of ordinary skill would

7   understand the phrase as reciting a means for performing a specific function without reciting

8   structure for performing that function.  In my opinion, the person of ordinary skill in the art would

9   understand the term "transaction identifier module" as only reciting a function—identifying

10  transactions in the synchronization system—but providing no structure for the purported "module"

11  that performs that function.  It is thus a means-plus-function term.  As I discuss below, the

12  specification of the '696 patent provides no corresponding structure to the function of identifying

13  transactions in the synchronization system.  Accordingly, the term is indefinite.

14      87.     As an initial matter, the term "transaction identifier module" would not have been

15  understood by the person of ordinary skill as a known term of art, nor does the '696 patent suggest

16  a definition of the term that refers to any particular structure.  The term does not have any well

17  understood structural meaning in the field of computer systems and technology.  To the contrary,

18  the person of ordinary skill in the art would understand the word "module" to simply be a generic

19  description for software or hardware that performs a specified function.  The use of the modifier

20  "transaction identifier" would not be understood to impart any structural significance or meaning

21  to the term "module."  The term "user identifier module" effectively connotes a black box for of

22  identifying transactions in the synchronization system.

23      88.     Claim 1 is directed to a "controller for a synchronization system," which includes,

24  among other things, a "transaction identifier module."  Claim 9 is directed to a "management

25  server," which includes, among other things, a "transaction identifier module."  Claim 16 is

26  directed to a "synchronization agent management server," which includes, among other things, a

27  "transaction identifier module."  I reviewed the specification of the '696 patent, and found that the

28

1    term "transaction identifier" only appears once, and in that sole mention, the claim language is

2    quoted substantively verbatim without any further content or explanation.  *See* '696 patent at 3:33.

3    I also reviewed the prosecution history of the patent, and found no mention of "transaction

4    identifier" apart from the references contained in the language of the proposed claims.

5         89.    The person of ordinary skill would understand there are many ways in which a

6    software or hardware component could be structured and/or configured to identify transactions,

7    and the claims do not specify any particular structure to be used in the alleged invention.  There

8    are many ways in which a system could identify transactions, each with its own distinct structure.

9    In fact, the very function of identifying transactions is not standardized in the field of computer

10   technology.  Thus, a person of ordinary skill would not be able to discern any structure from the

11   mere reference to a "transaction identifier module" and would instead expect the patentee to

12   provide some guidance.  For example, a transaction identifier module may generate transaction

13   identifiers using a monotonically increasing value unique to the machine (e.g., a 32-bit values),

14   then assign this identifier to each transaction in the synchronization system.  Others may use a

15   much longer value to ensure greater uniqueness (a number that is 32 bits long can only take a little

16   over 4 billion unique values, thus runs the risk of "wrapping around" and starting again at zero

17   after this number of transactions have been executed).  Others may generate or export a transaction

18   identifier by adding some prefix or suffix to this shorter value, such as a time epoch or a server

19   identifier, to ensure greater uniqueness.  Still other transaction identifier modules may generate

20   transaction identifiers in the standard UUID format using the appropriate algorithm.  Alternatively,

21   the transaction identifier may be represented by a combination of a globally unique identifier and

22   one or more other identifiers, such as a user identifier or session identifier.  Relatedly, the module

23   would also need a structure to identify transactions using the identifiers they were previously

24   assigned.  Thus, there is a multitude of different ways in which a software or hardware component

25   tasked with identifying transactions could be structured, including through the use of hashtables,

26   search trees, or other indexing data structures stored in memory, or through information stored in

27   a database or filesystem.  Similarly, this transaction identifier module could operate on a single

28

1  server for many servers involved in a data synchronization transaction, or the module could be

2  structured as a distributed system that ensures the uniqueness of allocated transaction identifiers

3  in a variety of ways (e.g., disjoint identifier spaces, process-specific identifiers, or locks and other

4  methods for concurrency control).  Without specifying any of those structural mechanisms, the

5  term recites only a structure-less function.

6        90.   I understand that Synchronoss has suggested that "transaction identifier module"

7  means "software for identifying a transaction."  While I disagree that this is an appropriate

8  construction of the term, it is consistent with and supports my view that the term itself adds no

9  structure to the corresponding function of identifying transaction in the synchronization system.

10        91.   Without any further explanation of the term in the language of the claims

11  themselves or in the patent specification or prosecution history, the person of ordinary skill would

12  understand "transaction identifier module" terms as broadly reciting the function of identifying

13  transactions in the synchronization system, but that the claim term does not itself denote any

14  particular structure for doing so.  The term "transaction identifier module" is thus, in my opinion,

15  a means-plus-function term.  The function it recites is identifying transactions.

16        92.   Once I concluded that "transaction identifier module" recites function without

17  structure, I reviewed the patent specification to determine what structure, if any, a person of

18  ordinary skill might understand to be disclosed therein that is associated with the function of

19  identifying transactions.  I was unable to find any such structure disclosed in the specification.  As

20  discussed above, there is no reference to a "transaction identifier module" in the specification and

21  only one cursory reference to "transaction identifier."  Nowhere in the specification is there any

22  algorithmic structure for implementing the function of identifying transactions—no formula,

23  prose, flow chart or pseudocode.  Nor is there any other structural guidance.  The specification

24  does discuss transactions in the context of data package files, *see* '696 patent at 37:62-38:46, but

25  it does not explain how those transactions are assigned identifiers or how they are identified within

26  the synchronization system.  Furthermore, the specification discloses that "UUID for the user

27  account is generated by the Management Server (MS)," *id.* at 38:55-56, but it does not provide a

28

1   corresponding structure for the "transaction identifier module" that is purportedly a component of

2   the management server.  The person of ordinary skill would, therefore, be unable to recognize the

3   structure in the specification and associate it with the corresponding function of identifying

4   transactions in the synchronization system.

5       93.     Because there is no disclosure in the specification of such a structure, the term is

6   indefinite.

7

8       **H.      "[V]ersioning modules" (claims 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20)**

9       94.     In my opinion, "versioning modules" is a means-plus-function term that refers to

10  the structure recited at '696 patent at 38:49-54.

11      95.     I understand that the parties disagree as to the meaning of "versioning modules" in

12  the '696 patent, and in particular, as to whether a person of ordinary skill would understand the

13  phrase as reciting a means for performing a specific function without reciting structure for

14  performing that function.  In my opinion, the person of ordinary skill in the art would understand

15  the term "versioning modules" as only reciting a function—applying a version number per object

16  in the data package—but providing no structure for the purported "module" that performs that

17  function.  It is thus a means-plus-function term.  As I discuss below, my review of the patent

18  specification indicates that the specification discloses a corresponding structure for "versioning

19  modules."  A person of ordinary skill in the art would be able recognize that structure in the

20  specification and associate it with the corresponding function claimed by "versioning modules."

21      96.     As an initial matter, the term "versioning module" would not have been understood

22  by the person of ordinary skill as a known term of art, nor does the '696 patent suggest a definition

23  of the term that refers to any particular structure.  The term does not have any well understood

24  structural meaning in the field of computer systems and technology.  To the contrary, the person

25  of ordinary skill in the art would understand the word "module" to simply be a generic description

26  for software or hardware that performs a specified function.  The use of the modifier "versioning"

27  would not be understood to impart any structural significance or meaning to the term "module."

28

The term "versioning module" effectively connotes a black box for applying a version number per object in the data package.

97.     Claim 1 is directed to a "controller for a synchronization system," which includes, among other things, "versioning modules" that "generate[]" "versioning information."  Claim 9 is directed to a "management server," which includes, among other things, "versioning modules" that "generate[]" "versioning information."  Claim 16 is directed to a "synchronization agent management server," which includes, among other things, "versioning modules" that "generate[]" "versioning information."  The specification of the '696 patent further explains that the versioning module is a part of each device engine, and that it "applies a version number per object in the data package."  '696 patent at 12:10-13.  That, therefore, is the claimed function performed by the versioning module.  I also reviewed the prosecution history of the patent, and found no mention of "versioning module" apart from the references contained in the language of the proposed claims.

98.     The person of ordinary skill would understand there are many ways in which a software or hardware component could be structured and/or configured to apply a version number per object in the data package, and the claims do not specify any particular structure to be used in the alleged invention.  There are many ways in which a system could apply version numbers to objects in a computer system, each with its own corresponding structure.  A person of ordinary skill would not be able to discern any structure from the mere reference to a "versioning module" and would instead expect the patentee to provide some guidance.  For instance, version numbers may be generated and assigned in sequential order.  Alternatively, they may be generated in some more randomized fashion, e.g., through the use of a randomized number generator.  Version numbers may also be unique only to the scope of a user, object, file, or directory (e.g., different users may have different data objects with the same version number), or they may be globally unique within the system.  Versioning information may be assigned in a linear fashion, or it may track the same tree structure of the shared data.  Version "numbers" may not actually be numerical values at all, and may instead be strings, hexadecimal values, or some other data types, including arrays of multiple values (e.g., "version vectors").  These can also be assigned in a variety of ways,

1   including sequentially, randomly, or as a function of the actual data (e.g., by taking a cryptographic

2   hash function like MD5 or SHA-1 over the data).  Thus, there are a number of different ways in

3   which a software or hardware component tasked with assigning version numbers to objects could

4   be structured.  Without specifying one of those structural mechanisms, the term recites only a

5   structure-less function.

6       99.   I understand that Synchronoss has suggested that "versioning module" means

7   "software that applies version information to objects in a change transaction."  While I disagree

8   that this is an appropriate construction of the term, it is consistent with and supports my view that

9   the term itself adds no structure to the corresponding function of applying a version number per

10  object in the data package.

11      100.  Without any further explanation of the term in the language of the claims

12  themselves or in the patent specification or prosecution history, the person of ordinary skill would

13  understand "versioning module" terms as broadly reciting the function of applying a version

14  numbers to objects in the data package, but that the claim term does not itself denote any particular

15  structure for doing so.  The term "versioning module" is thus, in my opinion, a means-plus-function

16  term.  The function it recites is applying a version number per object in the data package.

17      101.  Once I concluded that "versioning module" is a means-plus-function term, I

18  reviewed the patent specification to determine what structure, if any, a person of ordinary skill

19  might understand to be disclosed therein that is associated with the function of applying version

20  number.  I found that the specification does disclose the format for naming a data package file,

21  including a format for the version number for the object.  The specification discloses that "[t]he

22  file name is of the form 'UUID.VER' where UUID is the identifier for the specific object and VER

23  is the transaction version number. The version number is of the form 'DOOO1' with additional

24  digits used for large version numbers.  The 'DOOO' value may be reserved for the base version

25  for the object."  '696 patent at 38:49-54.  This description provides a structure that corresponds to

26  the claimed function of applying version numbers, because it describes the format of the version

27  numbers that are assigned to each object.  The person of ordinary skill would recognize this

28

structure and associate it with the corresponding function of applying a version number per object in the data package.

### I. "[S]ynchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" (claims 1, 3, 5, 6)

102.    In my opinion, "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" is a means-plus-function term that refers to the structure depicted in Figures 15 and 16 and the text associated with those figures, *i.e.* '696 patent at 33:32-36:24.

103.    I understand that the parties disagree as to the meaning of the term "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" in the '696 patent, and in particular, as to whether a person of ordinary skill would understand that phrase as reciting means for performing a specific function without reciting structure for performing that function. In my opinion, the person of ordinary skill in the art would understand the term as only reciting a function—controlling data migration between a first network coupled device and a second network coupled device—but providing no structure for performing that function. It is thus a means-plus-function term. As I discuss below, my review of the patent specification indicates that the specification discloses a corresponding structure for the term. A person of ordinary skill in the art would be able recognize that structure in the specification and associate it with the corresponding function claimed by a "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device."

104.    As an initial matter, the term "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" would not have been understood by the person of ordinary skill as a known term of art, nor does the '696 patent suggest a definition of the term that refers to any particular structure. The term does not have any well understood structural meaning in the field of computer

1  systems and technology.  To the contrary, the person of ordinary skill in the art would understand

2  the words "agent" and "manager" to simply be generic descriptors for software or hardware that

3  perform a specified function, or manage something, respectively.   The use of the modifiers

4  "synchronization" or "interactive" does not impart any structural significance or meaning to the

5  terms "agent" or "manager."  Rather, the term effectively connotes a black box for performing the

6  claimed function of controlling data migration between a first network coupled device and a second

7  network coupled device.

8       105.    Claim 1 is directed to a "controller for a synchronization system," which includes,

9  among other things, a "synchronization manager communicating with at least one interactive agent

10  to control data migration between a first network coupled device and a second network device."  I

11  reviewed both the specification and the prosecution history of the '696 patent, and I was unable to

12  find any reference to "synchronization manager communicating with at least one interactive agent

13  to control data migration between a first network coupled device and a second network device"

14  apart from instances wherein the claim language is itself quoted substantively verbatim in the

15  specification and/or prosecution history.

16       106.    The person of ordinary skill would understand that there are many ways in which a

17  software or hardware component could be structured and/or configured to control data migration

18  between a first network coupled device and a second network coupled device, and the claims do

19  not specify any particular structure to be used in the alleged invention.  There are many ways in

20  which a system could control data migration between devices, each with its own corresponding

21  structure.  In fact, the very function of controlling data migration is not standardized in the field of

22  computer technology.  Thus, a person of ordinary skill would not be able to discern any structure

23  from the mere reference to "synchronization manager" and "interactive agent" and would instead

24  expect the patentee to provide some structure.  For instance, control of data migration may be

25  implemented all within a single computer process and mostly involve logic to dispatch data

26  between code modules within the same program.  It could store the data on filesystems or within

27  databases as its flow is controlled through the system. It could involve a network service that

28

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG

1    queues and dispatches data between distinct programs or network services that process the data.

2    It could involve a load balancer that additional selects between instances of these programs for

3    greater scalability.  It could use a locking mechanism to prevent multiple users from accessing and

4    modifying the same data at the same time.  Without specifying one of those structural mechanisms

5    for controlling data migration, the term recites only a structure-less function.

6    107.    I understand that Synchronoss has suggested that "synchronization manager

7    communicating with at least one interactive agent to control data migration between a first network

8    coupled device and a second network device" simply means "software or hardware component

9    that manages a user's account and controls data migration among network coupled devices in

10   communication with at least one interactive agent."  While I disagree that this is an appropriate

11   construction of the term, it is consistent with and supports my view that the term itself adds no

12   structure to the corresponding function of controlling data migration between a first network

13   coupled device and a second network coupled device.

14   108.    Without any further explanation of the term in the language of the claims

15   themselves or in the patent specification or prosecution history, the person of ordinary skill would

16   understand "synchronization manager communicating with at least one interactive agent to control

17   data migration between a first network coupled device and a second network device" as broadly

18   reciting the function of controlling data migration between a first network coupled device and a

19   second network coupled device, but that the claim term does not itself denote any particular

20   structure for doing so.  The term is thus, in my opinion, a means-plus-function term.  The function

21   it recites is controlling data migration between a first network coupled device and a second network

22   coupled device.

23   109.    Once I concluded that the term was a means-plus-function term, I reviewed the

24   patent specification to determine what structure, if any, might be disclosed therein that is

25   associated with the function of controlling the migration of data between devices.  I found that the

26   specification does disclose structure for accomplishing that function.  Figures 15 and 16 depict

27   data flow charts for push and pull synchronization in the system, such that a person of ordinary

28

39

1   skill in the art would understand they provide an algorithmic structure to the process of data

2   migration from the management server to other components of the system. *See* '696 patent at

3   32:1-8. Thus, the corresponding structures for "synchronization manager" and "interactive agent"

4   can be found within Figures 15 and 16 and the text associated with those figures. '696 patent at

5   33:32-36:24. The person of ordinary skill would recognize this structure and associate it with the

6   corresponding function of controlling data migration between a first network coupled device and

7   a second network coupled device.

8

9   **J.    "[S]ynchronization agent" (claims 16, 17, 18, 19, 20)**

10      110.    In my opinion, "synchronization agent" is a means-plus-function term that refers to

11   the structure depicted in Figures 15 and 16 and the text associated with those figures, i.e., '696

12   patent at 33:32-36:24.

13      111.    I understand that the parties disagree as to the meaning of the term "synchronization

14   agent" in the '696 patent, and in particular, as to whether a person of ordinary skill would

15   understand that phrase as reciting means for performing a specific function without reciting

16   structure for performing that function. In my opinion, the person of ordinary skill in the art would

17   understand "synchronization agent" as only reciting a function— controlling the flow of user data

18   in the synchronization system—but providing no structure for performing that function. It is thus

19   a means-plus-function term. As I discuss below, my review of the patent specification indicates

20   that the specification discloses a corresponding structure for "synchronization agent." A person

21   of ordinary skill in the art would be able to recognize that structure in the specification and

22   associate it with the corresponding function claimed by synchronization agent."

23      112.    As an initial matter, the term "synchronization agent" would not have been

24   understood by the person of ordinary skill as a known term of art, nor does the '696 patent suggest

25   a definition of the term that refers to any particular structure. The term does not have any well

26   understood structural meaning in the field of computer systems and technology. To the contrary,

27   the person of ordinary skill in the art would understand the word "agent" to simply be a generic

28

1    descriptor for software or hardware that performs a specified function.  The use of the modifier

2    "synchronization" does not impart any structural significance or meaning to the term "agent."

3    Rather, the term effectively connotes a black box for collectively performing the claimed function

4    of controlling the flow of user data in the synchronization system.

5        113.    Claim 16 is directed to a "synchronization agent management server," which is in

6    communication with a "plurality of synchronization agents."  I reviewed both the specification and

7    the prosecution history of the '696 patent, and I was unable to find any reference to

8    "synchronization agent" apart from instances wherein the claim language is itself quoted

9    substantively verbatim in the specification and/or prosecution history.

10       114.    The person of ordinary skill would understand that there are many ways in which a

11   software or hardware component could be structured and/or configured to control the flow of user

12   data in the synchronization system, and the claims do not specify any particular structure to be

13   used in the alleged invention.  There are many ways in which a system could control the flow of

14   user data, each with its own corresponding structure.  In fact, the very function of controlling the

15   flow of user data is not standardized in the field of computer technology.  Thus, a person of

16   ordinary skill would not be able to discern any structure from the mere reference to

17   "synchronization agent" and would instead expect the patentee to provide some structure.  For

18   instance, control of data flow may be implemented all within a single computer process and mostly

19   involve logic to dispatch data between code modules within the same program.  It could store the

20   data on filesystems or within databases as its flow is controlled through the system.  It could

21   involve a network service that queues and dispatches data between distinct programs or network

22   services that process the data.  It could involve a load balancer that additional selects between

23   instances of these programs for greater scalability.  It could use a locking mechanism to prevent

24   multiple users from accessing and modifying the same data at the same time.  Without specifying

25   one of those structural mechanisms for controlling the flow of user data, the term recites only a

26   structure-less function.

27

28

115.    I understand that Synchronoss has suggested that "synchronization agent" simply means "software that generates or incorporates the change transactions." While I disagree that this is an appropriate construction of the term, it is consistent with and supports my view that the term itself adds no structure to the corresponding function of controlling the flow of user data in the synchronization system.

116.    Without any further explanation of the term in the language of the claims themselves or in the patent specification or prosecution history, the person of ordinary skill would understand "synchronization agent" as broadly reciting the function of controlling the flow of user data, but that the claim term does not itself denote any particular structure for doing so. The term "synchronization agent" is thus, in my opinion, a means-plus-function term. The function it recites is controlling the flow of user data in the synchronization system.

117.    Once I concluded that the term was a means-plus-function term, I reviewed the patent specification to determine what structure, if any, might be disclosed therein that is associated with the function of controlling the flow of user data in the synchronization system. I found that the specification does disclose structure for accomplishing that function. Figures 15 and 16 depict data flow charts for push and pull synchronization in the system, such that a person of ordinary skill in the art would understand they provide an algorithmic structure to the process of controlling data flow from the management server to other components of the system. *See* '696 patent at 32:1-8. Thus, the corresponding structures for "synchronization agent" can be found within Figures 15 and 16 and the text associated with those figures. '696 patent at 33:32-36:24. A person of ordinary skill would recognize this structure and associate it with the corresponding function of controlling the flow of user data in the synchronization system.

IV.    THE CLAIM TERMS OF THE '446 PATENT

118.    The '446 patent, entitled "Acquisition and Synchronization of Digital Media to a Personal Information Space," issued on Sept. 8, 2009. It claims priority to Application No. 09/710,162, which was filed on November 10, 2000. *See* '446 Patent. For purposes of my opinions

1   here, I have been asked to assume that this is the priority date for purposes of the knowledge of a

2   person of ordinary skill in the art.

3       119.    The '446 patent is directed to the storage of digital media in a personal information

4   space that is coupled to a network.  *See* '446 Patent at 3:45-51.  The personal information space is

5   a storage area housing information uniquely associated with a particular user that stores a user-

6   defined set of information.  *See* '446 Patent at 5:4-8.  It can be housed on a server or other device

7   capable of communicating with other devices.  *See* '446 Patent at 5:4-8, 27-29.  Digital media

8   stored in the personal information space is synchronized on one or more network coupled

9   apparatuses by sending difference or change transactions—only the changes to system data that

10  have occurred on that system and instructions for implementing those changes.  *See* '446 Patent at

11  ABSTRACT, 5:22-26, 6:24-29.  Transfer can be initiated by a sync request made by the user from

12  a web browser.  *See* '446 Patent at 6:44-55.

13      120.    I have been asked to address how, in the context of the '446 patent, a person of

14  ordinary skill in the art as of the priority date would understand the claim term "web browser,"

15  which is found in asserted claims 1 and 11, and incorporated in asserted claims 2, 6, 7, 8, 9, 10,

16  12, 13, 14, 15, 18 and 19, which depend from claims 1 and 11.

17      **A.     "[W]eb browser" (claims 1, 2, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 18, 19)**

18      121.    In my opinion, a "web browser" means a software application, such as Microsoft

19  Internet Explorer, for viewing and interacting with web pages on the World Wide Web.

20      122.    I understand that the parties disagree as to the meaning of the phrase "web browser"

21  in the context of the '446 patent, and in particular, as to whether a person of ordinary skill would

22  understand the term as referring specifically to a "software application, such as Microsoft Internet

23  Explorer, for viewing and interacting with web pages on the World Wide Web," as Dropbox has

24  proposed, or a more general "software application for interacting with a networked server via an

25  Internet connection using hypertext transfer protocol (http) or secure http," as Synchronoss has

26  proposed.

27

28

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG

123.   In my opinion, "web browser" is a well-understood term of art that refers specifically to a software application used to view and interact with web pages on the World Wide Web.  Examples of web browsers that were widely known in the art at the time of the priority date of the '696 patent include Microsoft Internet Explorer and Netscape Navigator.  Put simply, as the ordinary English words that make up the claim term imply, it is a piece of software that enables users to "browse" the "web."  This is the term's plain and ordinary meaning to a person of ordinary skill in the art, and it is confirmed by various references.  In addition, I understand that Synchronoss proposed this very construction in a past case involving the '696 patent.  *See* Joint Claim Construction and Prehearing Statement (Dkt. No. 48), *Synchronoss Tech., Inc v. Newbay Software, Inc.*, No. 3:11-cv-04947-FLW-TJB (D.N.J. Nov. 14, 2012).

124.   The proposed construction that Synchronoss has advanced in this case focuses instead on the use of "HTTP," the Hypertext Transfer Protocol, which is the protocol underlying communications between web servers (*i.e.*, software that makes web pages available over a network) and web browsers (*i.e.*, software with which those web pages are accessed by and displayed to a user).  It is possible to use HTTP for network connections between client and server software even where the client application does not directly display the content to a user.  The person of ordinary skill in the art would not have used the term "web browser" in Synchronoss's broader sense to refer to *any* client application that communicates via HTTP, however.  Had Synchronoss (or its predecessor) wished to claim any HTTP client, it could have referred directly to an "HTTP client," to "software communicating via HTTP," or some similar claim term.

125.   The use of "web browser" in the '446 patent and its prosecution history is consistent with Dropbox's proposed construction.

126.   Claims 1 and 11 are directed, respectively, to a method and system for transferring data across a network, and both claims include the limitation that data transfer over the network occurs "in response to a sync request made from a web browser at the network-coupled apparatus by the user."  The patent specification further explains that the web browser provides the interface for the user to "indicate his acceptance" of data into his personal information store by, for example,

"clicking on a virtual button."  '696 patent at 6:15-20.  Similarly, the specification discloses that the user interacts with "a browser application 100, such as a World Wide Web browser, which allows the user access to an information store."  *Id.* at 7:52-54.  These references suggest that a "web browser" is interactive software through which users are able to make requests.  That further confirms my opinion that a "web browser" is a type of software application that provides a user interface that allows users to view and interact with web pages.  It does not refer more generally to any interactive software application that enables a user to interact with an Internet-based server, much less to any software, interactive or otherwise, that communicates via HTTP.  The patent could easily have conveyed the latter interpretation by using generic claim language such as, for example, "interactive agent" or "client interface."  Instead, it chose to use a term that was and is widely known in the art as referring to a specific type of software application, analogous to Microsoft Internet Explorer.

127.    As of the priority date of the '446 patent, the two most popular web browsers in use were Netscape Navigator and Microsoft Internet Explorer.  Since then, many other web browsers, such as Google Chrome, Safari, and Mozilla Firefox have come into widespread use.  However, all web browsers share the same fundamental characteristics.  They all enable users to interact with web pages or similar content on the Internet, by requiring users to enter a URL (e.g., http://www.cnn.com/) for the information resource they desire, requesting the retrieving the content (if it is not already locally cached within the user's browser), and then by visually displaying that page to the user via the browser's graphical rendering engine.  These are defining characteristics of a web browser.  While web browsers are capable of communicating via HTTP, and they use that protocol to retrieve web pages, not all applications that communicate via HTTP are "web browsers."  In particular, an application that interacts with an Internet-based server but lacks these specific characteristics would not be understood as being a "web browser" by a person of ordinary skill.

128.    Indeed, the HTTP Standard is careful to describe the entity making a request as a "user agent" (not as a browser), which it defines as "The client which initiates a request. These are

often browsers, editors, spiders (web-traversing robots), or other end user tools."  "Hypertext Transfer Protocol -- HTTP/1.1", RFC 2616, June 1999, page 8.   In particular, the HTTP specification expressly states that there are multiple types of client applications that initiate HTTP requests; browsers are only one example of such.  Indeed, the word "browser" only appears three times in the entire 175-page standard for the HTTP protocol.

129.   Furthermore, I have reviewed arguments made by Synchronoss during the *Inter Partes* Reexamination of the '446 patent show that Synchronoss understood "web browser" to be an application that performed a function more specific than merely allowing a user to interact with an Internet-based server using HTTP.  For instance, in the Inter Partes Reexamination of the '446 patent, the petitioner argued that a prior art reference "Hopmann" taught the "web browser" limitation because it disclosed:  (1) that its system and method could "be used with standard protocols such as HTTP"; (2) "[t]he synchronization request command may include traditional HTTP or WebDAV commands such as PROPFIND or SEARCH"; and (3) "the client can upload the changes to the server in a manner normally used with HTTP protocols."  Request for *Inter Partes* Reexamination of the '446 Patent at 139-40 (P.T.O. Sep. 14, 2012).   Synchronoss distinguished Hopmann on the basis that it did "not teach that the synchronization request command is made from a web browser," because it was "well known by one skilled in the art that HTTP commands can be made via, for example, a Telnet session."  *See* Patent Owner's Amendment/Response, *Inter Partes* Reexamination of the '446 Patent at 42 (P.T.O. Jan. 15, 2013).  Thus, Synchronoss took the position that there may be applications that communicate via HTTP but are not "web browsers," which is contrary to the position it is taking here.

130.   For all these reasons, a person of ordinary skill would understand the use of "web browser" in the '446 patent to mean a software application, such as Microsoft Internet Explorer, for viewing and interacting with web pages on the World Wide Web.

1      Dated: August 8, 2017

                                                    Michael J. Freedman, Ph. D.

2

DECLARATION OF MICHAEL J. FREEDMAN, PH. D.:
CASE NO. 4:16-CV-00119-HSG