1    MARK L. HOGGE (*Pro Hac Vice*)
     SHAILENDRA K. MAHESHWARI (*Pro Hac Vice*)
2    NICHOLAS H. JACKSON (SBN 269976)
     DENTONS US LLP
3    1900 K Street, N.W.
     Washington, DC 20006
4    Telephone: (202) 408-6400
     Facsimile: (202) 408-6399
5    Email: mark.hogge@dentons.com
     Email: shailendra.maheshwari@dentons.com
6    Email: nicholas.jackson@dentons.com

7
     SARAH S. ESKANDARI (SBN 271541)
8    DENTONS US LLP
     One Market Plaza,
9    Spear Tower, 24th Floor
     San Francisco, CA 94105
10   Telephone: (415) 267-4000
     Facsimile: (415) 267-4198
11   Email: sarah.eskandari@dentons.com

12
     *Attorneys for Plaintiff*
13   *SYNCHRONOSS TECHNOLOGIES, INC.*

14

15    **UNITED STATES DISTRICT COURT**
      **NORTHERN DISTRICT OF CALIFORNIA**
16    **OAKLAND DIVISION**

| | |
|---|---|
| 17   SYNCHRONOSS TECHNOLOGIES, INC., | Case No. 4:16-CV-00119-HSG-KAW |
| 18   Plaintiff, | **SYNCHRONOSS'S OPENING CLAIM CONSTRUCTION BRIEF** |
| 19   v. | |
| 20   DROPBOX, INC. | Date: Nov. 1, 2017 |
| 21   Defendant. | Time:   10:00 a.m. |
| | Place:  Oakland, Courtroom 2, 4th Flr |
| | Judge:  Hon. Haywood S. Gilliam, Jr. |
| 22   SYNCHRONOSS TECHNOLOGIES, INC., | Case No. 4:16-CV-00120-HSG-KAW |
| 23   Plaintiff, | **SYNCHRONOSS'S OPENING CLAIM CONSTRUCTION BRIEF** |
| 24   v. | |
| 25   EGNYTE, INC. | Date: Nov. 1, 2017 |
| | Time:   10:00 a.m. |
| 26   Defendant. | Place:  Oakland, Courtroom 2, 4th Flr |
| | Judge:  Hon. Haywood S. Gilliam, Jr. |

26

27

# **TABLE OF CONTENTS**

I. BACKGROUND AND STATEMENT OF FACTS ...................................................1

   A.   THE '757 PATENT ...........................................................................2

   B.   THE '696 PATENT ...........................................................................2

   C.   THE '446 PATENT ...........................................................................3

II. ARGUMENT ....................................................................................3

   A.   LEGAL STANDARDS ......................................................................3

      1.   Claim Construction ................................................................3

      2.   Means-Plus-Function Claim Elements ................................................ 5

   B.   DISPUTED TERMS ...........................................................................7

      1.   The '757 Patent ...................................................................7

         a. "a previous state of said data" / "copy of a previous state of said data"....................7

         b. "management server" / "management dedicated network coupled device" / "synchronization agent management server"....................................................... 8

         c. "[first / second] system" / "[first / second] device" / "device[s]" / "network coupled device[s]" / "network coupled apparatus[es]".................................. 10

      2.   The '696 Patent ................................................................. 11

         a. "user identifier module" / "authentication module identifying a user coupled to the synchronization system" / "user authenticator module" / "user login authenticator" / "user data flow controller"................................................................ 11

         b. "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" / "synchronization agent" ........................................................ 17

         c. "versioning modules" / "versioning information" ................................. 20

         d. "transaction identifier module".................................................. 23

         e. "universally unique identifier".................................................. 25

      3.   The '446 Patent ................................................................. 26

a. "digital media file" ........................................................................................ 26

b. "web browser" ................................................................................................. 28

III. CONCLUSION ........................................................................................................... 30

SYNCHRONOSS'S OPENING CLAIM CONSTRUCTION BRIEF
*Case No. 4:16-cv-00119-HSG-KAW / Case No. 4:16-cv-00120-HSG-KAW*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blast Motion, Inc. v. Zepp Labs., Inc.*,
   2017 U.S. Dist. LEXIS 16549 (S.D. Cal. Feb. 6, 2017) ............................................6, 12, 22, 23

*Datatreasury Corp. v. Ingenico S.A.*,
   2003 U.S. Dist. LEXIS 28147 (E.D. Tex. Aug. 19, 2003) ......................................................16

*Finjan, Inc. v. Blue Coat Sys.*,
   2014 U.S. Dist. LEXIS 149077 (N.D. Cal. Oct. 20, 2014)......................................................12

*Flo Healthcare Solutions, LLC v. Kappos*,
   697 F.3d 1367 (Fed. Cir. 2012)..........................................................................................6, 13

*GENBAND USA LLC v. Metaswitch Networks Ltd.*,
   2015 U.S. Dist. LEXIS 103512 (E.D. Tex. Aug. 6, 2015) ....................................................19

*Goss Int'l Ams., Inc. v. Graphic Mgmt. Assocs.*,
   739 F. Supp. 2d 1089 (N.D. Ill. 2010) ..................................................................................16

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
   91 F.3d 1580 (Fed. Cir. 1996)........................................................................................ *passim*

*Harari v. Lee*,
   656 F.3d 1331 (Fed. Cir. 2011)..............................................................................................27

*Keithley v. Homestore.com, Inc.*,
   2007 U.S. Dist. LEXIS 71126 (N.D. Cal. Sept. 10, 2007) ....................................................27

*Layne Christensen Co. v. Bro-Tech Corp.*,
   2011 U.S. Dist. LEXIS 80319 (D. Kan. July 22, 2011)........................................................28

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
   248 F.3d 1303 (Fed. Cir. 2001)................................................................................................7

*Milos Misha Subotincic v. 1274274 Ont., Inc.*,
   2012 U.S. Dist. LEXIS 196603 (C.D. Cal. June 14, 2012) ..................................................15

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................................... *passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
   182 F.3d 1298 (Fed. Cir. 1999)................................................................................................5

*Plant Equip., Inc. v. Intrado, Inc.*,
   2012 U.S. Dist. LEXIS 59495 (E.D. Tex. Apr. 27, 2012)....................................................27

*Tech. Props. Ltd. LLC v. Canon Inc.,*
    2016 U.S. Dist. LEXIS 126713 (N.D. Cal. Sep. 16, 2016) ....................................16

*TecSec, Inc. v. IBM,*
    731 F.3d 1336 (Fed. Cir. 2013).......................................................... *passim*

*In re Thrift,*
    298 F.3d 1357 (Fed. Cir. 2002)............................................................19

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996).........................................................4, 11

*VPS, LLC v. SmugMug, Inc.,*
    2012 U.S. Dist. LEXIS 160811 (N.D. Ill. Nov. 9, 2012).........................................12

*Williamson v. Citrix Online, LLC,*
    792 F.3d 1339 (Fed. Cir. 2015) (en banc).........................................6, 7, 12

**Statutes**

35 U.S.C. § 112, ¶ 6 ...................................................................... *passim*

**Other Authorities**

N.D. California Local Patent Rule 4-5(a)
    rev. January 17, 2017 .......................................................................1

THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS, Seventh edition
    pages 63, 234, 239, 267-68, 445, 529-30, 638, 703-04, 1241 (2000)........................... *passim*

U.S. Patent No. 6,671,757 ("the '757 Patent"), Multer, et al.,
    Data transfer and synchronization system," December 30, 2003 .................................. *passim*

U.S. Patent No.  6,757,696 ("the '696 Patent"), Multer, et al.,
    "Management server for synchronization system," June 29, 2004................................. *passim*

U.S. Patent No. 7,587,446 ("the '446 Patent"), Onyon, et al.,
    "Acquisition and Synchronization of digital media to a personal
    information space," September 8, 2009 ......................................................... *passim*

Pursuant to Patent L.R. 4-5(a) and the Scheduling Orders in these cases, Plaintiff Synchronoss Technologies, Inc. ("Synchronoss") proposes the claim constructions below to aid the Court and to instruct the jury in understanding contested claim terms that appear in the three patents asserted in the above captioned litigations. Synchronoss has accused Defendants Dropbox, Inc., and Egnyte, Inc. (collectively, "Defendants"), of infringing U.S. Patent Nos. 6,671,757 ("the '757 Patent"); 6,757,696 ("the '696 Patent"), and 7,587,446 ("the '446 Patent") (collectively, "the Asserted Patents"). (No. 4:16-cv-119, D.I. 137-3, 137-4, 137-5, and No 4:16-cv-120, D.I. 137-3, 137-4, 137-5 (Exs. C-E to the Joint Claim Construction and Prehearing Statement ("JCCS"))).

Across the Asserted Patents, the parties have agreed to the construction of 12 terms. No. 4:16-cv-119, D.I. 137-1; No. 4:16-cv-120, D.I. 82-1 (Ex. A to the JCCS). The parties submitted ten groupings of claim terms that also require construction. No. 4:16-cv-119, D.I. 137-2; No. 4:16-cv-120, D.I. 82-2 (Ex. B to the JCCS). Synchronoss's proposed constructions are supported by the intrinsic records of the Asserted Patents and the understanding of one of ordinary skill in the art as evidenced by contemporaneous documents. Defendants' proposed constructions, on the other hand, are supported primarily by a litigation-driven, extrinsic expert declaration. Defendants' proposed constructions distort the scope of the Asserted Patents' claims by adding limitations that are unsupported by the intrinsic record and confuse the meaning of terms that were well-understood to those of ordinary skill in the art at the time the Asserted Patents were conceived and filed.

## I. BACKGROUND AND STATEMENT OF FACTS

The Asserted Patents are directed to the synchronization of data among elements such as computer systems, personal information devices like smart phones, hand-held computers and laptops that are connected to a computer network such as the Internet. The Asserted Patents are not members of the same family, but they disclose related subject matter. The '446 Patent incorporates the '757 Patent in its entirety. '446 Patent, 1:8-11, 5:34-39. The Asserted Patents focus on servers of computer-specific systems and components for data transfer and

synchronization.

## A.  THE '757 PATENT

The growth of personal computing devices in the late 1990s and early 2000s brought about a need to synchronize documents and other personal information among all computer systems that belonged to or were associated with a particular user without occupying too much of a user's data memory or overtaxing transfer bandwidth.  '757 Patent, 1:23-35, 2:45-51.  The '757 Patent, entitled "Data Transfer and Synchronization System," addresses the need for keeping information synchronized between the many different devices available to a user.  '757 Patent, 1:36-38. The '757 Patent provides for a system and method for efficiently, quickly and easily synchronizing devices which can couple to the Internet, or any network. For example, the '757 Patent discloses a system that includes: (i) a first sync engine on a first system; (ii) a second sync engine is provided on a second system and; (iii) a data store coupled to a network and in communication with the first and second systems.  The first sync engine interfaces with data on the first system to identify differences in data and provides instructions for implementing the differences.  The second system is coupled to receive the difference information from the data store via the network to update data on the second system with difference information identified by the first sync engine whereupon the two systems are in sync.  '757 Patent, 3:32-42. This technology permits synchronization of devices at independent times or upon request using an intervening network based storage server to store changes to data (occurring at any point in time) and for all the different devices in the system in a data independent format. '757 Patent, 3:23-31.

## B.  THE '696 PATENT

The '696 Patent, entitled "Management Server for Synchronization System" also addresses many of the above described issues using a data synchronization system, but focuses on the patented management server.  '696 Patent, 3:20-50.  The patented synchronization system allows for the maintenance of matching records and data across multiple network coupled devices.  The system includes for example, in one claimed embodiment, a storage server and a

management server that includes a user identifier module, a user authenticator module, and a transaction identifier module. *Id.*

### C.  THE '446 PATENT

Digital media has become increasingly popular. '446 Patent, 1:26-67, 2:1-20. Digital media may be acquired in a multiplicity of formats, from various sources, and can be used with a variety of devices. Digital media can contain public data, private events, and other data objects such as text files or data files that belong to a user. *Id.* at 2:21-27. The '446 Patent, entitled "Acquisition and Synchronization of Digital Media to a Personal Information Space" addresses the daunting task of keeping information on a device and between the different devices in a personal information space synchronized and/or backed up. The inventions embodied by the Asserted Patents were made by allowing users to move digital media files around the personal information space effectively to synchronize them. '446 Patent, 2:28-31. This is done through a method for acquiring and maintaining a digital media store in a personal information space where at least a portion of the data from the personal information space is transferred in a differencing transaction from the personal information space to a network coupled device in response to a user request. '446 Patent, 3:45-51.

## II.  ARGUMENT

### A.  LEGAL STANDARDS

#### 1.  Claim Construction

Generally, the words of a claim are given the ordinary and customary meaning that they would have to a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). In order to determine what a person of ordinary skill in the art would have understood the terms to mean, a court looks to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (internal quotations omitted). When the ordinary meaning is "readily apparent," claim construction "involves little more than the application of the widely accepted

meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. Patentees may choose, however, to be their own lexicographers by providing a clearly stated definition in the patent specification or file history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The Federal Circuit has articulated the principles that a court should adhere to and has summarized those principles in *Phillips*, 415 F.3d at 1323. The "intrinsic" record – the patents' claims, the patent specification and, where necessary, the prosecution history – is of primary significance. *Id.* at 1317. The Federal Circuit has also authorized use of extrinsic evidence, but has cautioned, "while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record' in determining 'the legally operative meaning of claim language.'" *Id.* (internal citations omitted).

The claim construction process starts with an examination of the claim language itself. It is a "bedrock principle" that "the claims of a patent define the invention" and that the "claims are of primary importance, in the effort to ascertain precisely what it is that is patented." *Id.* at 1312 (internal citations and quotations omitted). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314 (internal citations omitted). In addition to the particular claim being examined, the context provided by other claims may be helpful as well. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* at 1314 (internal citations omitted).

The Federal Circuit in *Phillips* recognized though that "[t]he claims, of course, do not stand alone." *Id.* at 1315. Claim language must be read in the context of the specification, which is usually dispositive. *Id.* The specification "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. Although the specification is important to understanding the claims, the Federal Circuit has "repeatedly warned against confining the claims" to the examples described in the specification. *Phillips*, 415 F.3d at 1323 (internal

- 4 -

citations omitted).  The Court labeled the mistake of "reading a limitation from the written description into the claims" as "one of the cardinal sins of patent law."  *Id.* at 1320 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)).

In addition to the claims and the specification, courts can also utilize the prosecution history when it is helpful, although the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.* at 1317 (internal citations omitted).

Lastly, courts may rely on extrinsic evidence, such as dictionaries or expert testimony, if necessary, but such evidence is "less significant than the intrinsic record in determining the legally operative meaning of the claim language" and "less reliable than the patent and its prosecution history in determining how to read claim terms. . . ."  *Id.* at 1317-18 (internal citations and quotations omitted).  The use of such extrinsic evidence may not be used to contradict the meaning of the claim terms as evidenced by the intrinsic record.  *Id.* at 1317-19.  It is appropriate though "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field."  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).  For example, a dictionary definition has "the value of being an unbiased source 'accessible to the public in advance of litigation.'"  *Phillips*, 415 F.3d at 1322 (quoting *Vitronics*, 90 F.3d at 1585).  Conversely, the Federal Circuit has cautioned courts on undue reliance on expert reports and testimony generated at the time of and for the purpose of the litigation because such extrinsic evidence "can suffer from bias that is not present in intrinsic evidence."  *Id.* at 1318.

### 2.  Means-Plus-Function Claim Elements

"An element in a claim for a combination may be expressed as a means or a step for performing a specified function without recital of structure, material, or acts in support thereof."  35 U.S.C. § 112, ¶ 6 (pre-AIA).  However, § 112, para. 6 "does not apply to all functional

- 5 -

language." *Blast Motion, Inc. v. Zepp Labs., Inc.*, 2017 U.S. Dist. LEXIS 16549, at *8 (S.D. Cal. Feb. 6, 2017).  Failure to use the word "means" creates a rebuttable presumption that § 112, para. 6 does not apply.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc).  In order to assess if a claim element is a means-plus-function element, "the essential inquiry is . . . whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Id.*  The presumption that § 112, para. 6 does not apply can be overcome, "if the challenger demonstrates that the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  *Id.*  "[A] drafter's decision to define 'a particular mechanism . . . in functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section 112(6) because '[m]any devices take their names from the functions they perform.'"  *Flo Healthcare Sol.s, LLC v. Kappos*, 697 F.3d 1367, 1374 (Fed. Cir. 2012) (internal citations omitted).  Dictionary definitions establish that a term has a generally understood meaning in the relevant art, even if the definition is expressed in functional terms.  *Id.*; *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996).  "To determine if the claim recites sufficient structure, 'it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.'"  *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1347 (Fed. Cir. 2013) (internal citations omitted).  It is also not important that a term "does not call to mind a single well-defined structure" because "the same could be said of other commonplace structural terms such as 'clamp' or 'container.'  What is important is not simply that [the disputed term] is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art."  *Greenberg*, 91 F.3d at 1583.

If a patentee claims an element in this form, the claim element "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶ 6 (pre-AIA).  Structure disclosed in the specification is

"corresponding" if the specification or prosecution history "clearly links or associates that structure to the function recited in the claim." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). For computer-implemented claims, structure is expressed in the specification as "a mathematical formula, in prose, or as a flow chart, or in any other manner that provides specific structure." *Williamson*, 792 F.3d at 1352.

### B. DISPUTED TERMS

#### 1. The '757 Patent

##### a. "a previous state of said data" / "copy of a previous state of said data"

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "a previous version of the data or previous information about the data before the changes to the data occurred" | "a copy of a previous version of the data that is used in a comparison against a copy of the current version of the data to generate difference information" |

Claims 1, 16, and 24, the asserted independent claims, each recite "a previous state of said data." As is shown in the specification and contemporaneous architecture documentation from the original patentee, FusionOne, a previous "state" of the data is not limited to only complete versions of the data being synchronized, but can also include data about the data being synchronized (i.e. a previous state). Accordingly, the proper construction of "a previous state of said data" is "a previous version of the data or previous information about the data before the changes to the data occurred."

The '757 Patent describes an "application object store 920" that "stores a snapshot of the previous state of the data from the application object 910 in the device engine." '757 Patent, 12:12-14. Similarly, the FusionOne Synchronization Platform Architecture Guide ("Architecture Guide"), which implemented the invention claimed in the '757 Patent, expounds on this by stating, "The Application Object Store (AOS) holds the state of the data as of the last sync." FusionOne Synchronization Platform Architecture Guide (v1) at 10 (Attached as Exhibit A to the Declaration of Sarah S. Eskandari ("Eskandari Decl.")). The Architecture Guide notes, "The

AOS does not need to contain a complete copy of the data [i.e. a previous version].  In some cases a hash can be stored in the AOS and used for change determination." *Id.*  A hash is information about the data being synchronized and can be a calculated variable or metadata about the data being synchronized to be compared to a subsequent state of the data in order to allow "the device engine to check the state of the last synchronization against data packs which have been provided to the storage server to determine which data packages to apply." '757 Patent, 12:65-13:1.  These data packages can have many different data states that can be used to create the hash to be compared, none of which require the entire previous version to be stored. For example, a Version, Signature, AppliedVersion, AppliedSize, or CompressedSize could be utilized to create the hash in order to allow the device engine to compare and determine what data packages to apply to synchronize the data.  *Id.* at 40:40-66.

It is also apparent that the patentee could have utilized the term "version" as proposed by Defendants, but chose not to. For example, the '757 Patent discloses that "Additional data packages **can be** maintained to permit rollback of previous **versions** of information," but does not require that these packages be stored in order to rollback to previous versions (not states) of the information stored. '757 Patent, 34:31-32 (emphasis added).

For these reasons, "a previous state of said data" is not limited only to "previous versions of data" as proposed by Defendants, but also includes information about the data being synchronized that would permit the device engine to determine if data has been updated and, if so, what data packages to update.

### b.  "management server" / "management dedicated network coupled device" / "synchronization agent management server"

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "software or hardware component that manages a user's account" | "a centralized server which controls behavior and characteristics of the entire network of device engines across all users" |

Claims 9 and 21 of the '757 Patent, and claims 9, 10, 11, 12, 13, 14, and 15 of the '696 Patent recite a "management server." Claim 5 of the '696 Patent recites a "management

dedicated network coupled device." Claims 16, 17, 18, 19, and 20 of the '696 Patent recite a "synchronization agent management server." Synchronoss and Defendants agree that each of these terms should have the same construction, but the parties disagree as to what that construction should be.

The proper construction of each of these terms is "software or hardware component that manages a user's account." The '757 Patent and the '696 Patent expressly define a management server as the element "that manages users' accounts." '757 Patent, 17:30; '696 Patent, 16:50. The specification also describes several functions of the "management server." The management server authenticates device engines before permitting synchronization between engines or with a storage server. '757 Patent, 32:61-64. The management server also identifies the device engines associated with the management server, *id.* at 33:7-8, and supports the management of the users and devices associated with the users of the system, *id.* at 33:28-34:10. Each of these functions would be properly understood as "managing a user's account" as proposed by Synchronoss.

At the outset, Synchronoss does not contend that Defendants' proposed construction is incorrect, only that it is incomplete and confusing. Indeed, their proposed construction is taken verbatim from the '757 Patent's specification, which states, "The management server is a centralized server which controls behavior and characteristics of the entire network of device engines across all users." '757 Patent, 32:38-40. Within the context of the claims, however, the management server is provided to authorize access to difference information among the first sync engine, the second sync engine, and the data store. '757 Patent, claim 9. This permits multiple devices related to a user's account (i.e., the devices that include the first and second sync engines) to be individually identified and synchronized. Any additional users or device engines that may be entailed in an "entire network" or "all users" only adds additional limitations that are not recited in the claims.

Contemporaneous documents from the original patentee further show this. The FusionOne Synchronization Platform Operations Guide describes the "management server" as "a component that stores information about user accounts, devices and dataclasses." FusionOne

Synchronization Platform Operations Guide at 5 (Eskandari Decl., Exhibit B).  Similarly, the Architecture Guide describes the management server as "keep[ing] track of the current sync state of every device that the user has connected in their account" and notes, "All the user account information is managed by the MS."  FusionOne Synchronization Platform Architecture Guide at 11 (v1.0).

Accordingly, in the context of the claims, the management server manages two sync engines for a user account to authorize access to the data store as recited in the claims. Requiring management of an entire network of unclaimed device engines across a multitude of unclaimed users only serves to confuse the claim and import unclaimed language from the specification.  For this reason, each of "management server" / "management dedicated network coupled device" / "synchronization agent management server" should be construed as the "software or hardware component that manages a user's account" as explicitly defined in the asserted '757 and '696 Patents.

      **c.**  **"[first / second] system" / "[first / second] device" / "device[s]" / "network coupled device[s]" / "network coupled apparatus[es]"**

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a collection of elements or components organized for a common purpose, and may include hardware components of a computer system, personal information devices, hand-held computers, notebooks, or any combination of hardware which may include a processor and memory which is adapted to receive or provide information to another device; or any software containing such information residing on a single collection of hardware or on different collections of hardware" | Plain and ordinary meaning – "computer or computing device such as a personal computer, portable computer, desktop computer, server, smart telephone, cellular telephone, standard telephone, or personal data assistant (PDA)" |

Claim 1 of the '757 Patent recites a system for synchronizing data between "a first system and a second system." Similarly, claim 16 of the '757 Patent claims a system that includes "a first device" and "a second device" coupled to a network that provide and receive

change transactions, and claim 24 recites an internet synchronization system that includes "a first device coupled to the Internet" and "a second device coupled to the Internet" that are each in communication with a storage server. The '696 Patent similarly recites "network coupled device[s]" (Claims 1, 9, 21, and 24). Finally, the '446 Patent recites "network coupled apparatus" (Claims 1, 3, and 11) and "network coupled devices" (Claim 11). The parties agree that each of these terms should be construed the same; however, they disagree on the proper construction.

For these terms, the patentee chose to be its own lexicographer. *Vitronics*, 90 F.3d at 1582. The '757 Patent (which is incorporated by reference in the '446 Patent at 1:8-17) and the '696 Patent both expressly state, "a 'device' is defined as a collection of elements or components organized for a common purpose, and may include hardware components of a computer system, personal information devices, hand-held computers, notebooks, or any combination of hardware which may include a processor and memory which is adapted to receive or provide information to another device; or any software containing such information residing on a single collection of hardware or on different collections of hardware." '757 Patent, 5:15-23; '696 Patent, 4:28-36. Accordingly, the patentee's definition controls. The "plain and ordinary meaning" proposed by defendants is not incorrect, but is incomplete to the extent that it limits the definition to hardware devices and excludes "any software containing such information residing on a single collection of hardware or on different collections of hardware." Accordingly, the construction for these terms proposed by Synchronoss is correct.

### 2. The '696 Patent

#### a. "user identifier module" / "authentication module identifying a user coupled to the synchronization system" / "user authenticator module" / "user login authenticator" / "user data flow controller"

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| user identifier module – "hardware or software that identifies a user" | Each term is subject to 35 U.S.C. § 112(6). Function: |

| | |
|---|---|
| authentication module identifying a user coupled to the synchronization system – "software that verifies a user's access to the synchronization system"<br><br>user authenticator module – "software that verifies the authenticity of a user"<br><br>user login authenticator – "software that authenticates a user's log-in"<br><br>user data flow controller – "software that controls the transmission or reception of change transactions" | user identifier module – "Identifying users"<br><br>authentication module identifying a user coupled to the synchronization system – "Identifying and authenticating a user coupled to the synchronization system"<br><br>user authenticator module – "Authenticating users"<br><br>user login authenticator – "Authenticating user logins"<br><br>user data flow controller – "Controlling the flow of user data in the synchronization system"<br><br>Structure:<br>No corresponding structure is disclosed in the specification for each claimed function |

These terms are recited in claims 1, 9, 16, and 24 of the '696 Patent.  Defendants contend that these claim elements are purely functional claims under 35 U.S.C. § 112, ¶ 6 (pre-AIA).  Synchronoss disagrees.  None of these elements utilizes the phrase "means for," meaning a presumption exists that these elements are not means-plus-function claim elements.  *Williamson*, 792 F.3d at 1348; *Blast Motion, Inc.*, 2017 U.S. Dist. LEXIS 16549, at *46-47 (rejection the proposition that the term "module" automatically triggers the presumption that a claim element is a means-plus-function element).  Defendants only rely on conclusory, baseless, litigation-induced expert testimony to overcome that presumption.  *See* No. 4:16-cv-119-HSG, D.I. 137-6, Declaration of Michael J. Freedman (hereinafter, "Freedman Decl.").  In addition, other courts have previously held that "authenticator," "user identifier," "communications module," and "data storage module" are structural terms. *Blast Motion, Inc.*, 2017 U.S. Dist. LEXIS 16549, at *50-56; *Finjan, Inc. v. Blue Coat Sys.*, 2014 U.S. Dist. LEXIS 149077, at *41-42 (N.D. Cal. Oct. 20, 2014) (finding that "certificate authenticator" is the structure corresponding to the term "means for determining whether to trust the first Downloadable security profile"); *VPS, LLC v. SmugMug, Inc.*, 2012 U.S. Dist. LEXIS 160811, at *46-47 (N.D. Ill. Nov. 9, 2012) ("There is no

dispute that user identifier has an ordinary meaning in the art, namely 'the name used to associate a user profile with a user when a user signs on to the system.'" (citing IBM DICTIONARY OF COMPUTING (10th ed. 1993)).

Each of the terms "user," "identifier," "module," "authentication," "login," "controller," and "flow control" have well understood meanings in the computer science art. IEEE 100, THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS 63, 234, 239, 267-68, 445, 529-30, 638, 703-04, 1241 (2000) (hereinafter "IEEE") (Eskandari Decl., Exhibit C).  When combined, each of the claim elements likewise recites a structure.  *See Flo Healthcare*, 697 F.3d at 1374. For example, a "user" in computer science is "one who uses the services of a computer program."  *Id.* at 1241.  An "identifier" in software is "[t]he name, address, label, or distinguishing index of an object in a computer program."  IEEE at 529.  And a "module" in software is "[a] program unit that is discrete and identifiable with respect to compiling, combining with other units and loading" or "a logically separable part of a program."  *Id.* at 703-04.  Combining the understanding of one skilled in the art as shown by the dictionary definitions, the term is not purely functional; instead "user identifier module" would be understood as a software program that applies a name, address, label, or distinguishing index of a user of a computer program.  *See TecSec*, 731 F.3d at 1347.

Dropbox's expert, Dr. Freedman, implicitly recognized that the term "user identifier module" has structure because it refers to "a broad class of structures" and "identifies the structures by their functions."  *See id.*  In his declaration, Dr. Freedman states that a person of ordinary skill in the art "would understand there are many ways in which a software or hardware component could be structured and/or configured to identify users."  Freedman Decl. at ¶ 42. Dr. Freedman even goes on to list nearly 20 different structures that would fall within this class. As the Federal Circuit has recognized, it is not dispositive that a term "does not call to mind a single well-defined structure, . . . but that the term, as a name for structure, has a reasonably well understood meaning in the art."  *Greenberg*, 91 F.3d at 1583.  Dr. Freedman actually shows that the term would be understood to one of ordinary skill in the art as having structure, despite

1  claiming that this term lacks structure.  At a minimum, Defendants, by relying solely on

2  Dr. Freedman's declaration, have failed to carry their burden of showing that the term "user

3  identifier module" is wholly functional.

4         Further, the specification shows that these terms are structural as well.  The '696 Patent

5  states that "The device name and device class uniquely identify a particular device type that is

6  being synchronized. . . ."  '696 Patent, 34:1-2.  In addition, "[e]ach user has one more device

7  entries in the management server authorization records and each device name is unique for this

8  user's space . . . with his or her own personal identification number."  *Id.* at 34:3-7.  The '696

9  Patent also specifies, "An account is the root structure, which identifies information about the

10  user's account [i.e., a user identifier].  It may have exemplary field tags (eFieldTag_[NAME])

11  such as Name, Password, User-Name, and Version."  *Id.* at 42:6-11.

12         Similarly, Figure 17 depicts a flow chart that includes a "Sign up" and "Add User 1712"

13  module.  These modules have the function of identifying the user as described in the '696 Patent,

14  which states that "As indicated in Fig. 17, the add user module 1712 adds user records to the user

15  in the device database 1750."  *Id.* at 32:14-15.  The system can then authenticate a user based on

16  a user log-in (i.e. an identifier) from the welcome screen at 1710. *Id.* at 32:19-22.  Accordingly,

17  as would have been understood to one of skill in the art, the term "user identifier module" has

18  structure and would have been understood to one of skill in the art as "hardware or software that

19  identifies a user."

20         Likewise, "authentication module identifying a user coupled to the synchronization

21  system," "user authenticator module," and "user login authenticator" are structural terms.

22  "Authentication" is a well-understood and defined term that means "The process of validating a

23  user or process to verify that the user or process is not counterfeit" or "The service used to

24  establish the identity of one station as a member of the set of stations authorized to associate with

25  another station" in computers and computer networks.  IEEE at 63.  "Login" also has a well-

26  understood definition to one of ordinary skill in the art, "The process of establishing

27

communication with and verifying the authority to use a network or computer." IEEE at 638.
For this reason alone, these terms are not purely functional under § 112, para. 6.

Defendants again solely rely on Dr. Freedman's declaration to show that the terms lack structure, but again, in an effort to undermine the terms, Dr. Freedman merely acts to show that the terms suggest a definite structure to a person of ordinary skill in the art. Dr. Freedman again describes nearly 20 structural elements that he understands to be included in the term "authentication module," "user authenticator module," and "user login authenticator" by one of ordinary skill in the art. Freedman Decl. at ¶¶ 51, 60, 70. These descriptions again show that the terms refer to a "broad class of structures" that have "a reasonably well understood meaning" to one of ordinary skill in the art. *TecSec*, 731 F.3d at 1347; *Greenberg*, 91 F.3d at 1583.

The '696 Patent even shows module (1420 and 1545) that authenticates users in the flow chart depicted in Figures 15 and 16. '696 Patent, Figs. 15 & 16. Figure 17 likewise shows the module for "confirm account 1724." *Id.* at Fig. 17. In the text corresponding to Fig. 15, the '696 Patent describes, "The synchronization request is confirmed at 1410 and if the request is verified, a connection is made to the storage server at step 1415. Once a connection is established, the connection to the management server is made at step 1420 to authenticate the user identification via the management server." *Id.* at 34:13-16. Similarly, in the text corresponding to Fig. 16, the '696 Patent describes, "Upon connection to the storage server, a further connection to management server 1545 will occur to authenticate the user in the system." *Id.* at 36:11-14. For these reasons, one of ordinary skill in the art would understand "authentication module identifying a user coupled to the synchronization system," "user authenticator module," and "user login authenticator" to be structural terms with the meanings described by Synchronoss, above. At a minimum, Defendants, by relying solely on Dr. Freedman's declaration, have failed to carry their burden of showing that these terms are wholly functional.

Finally, "user data flow controller" is also not a means-plus-function claim element. Courts have previously explicitly found that "a controller" is a known structural term. *Milos Misha Subotincic v. 1274274 Ont., Inc.*, 2012 U.S. Dist. LEXIS 196603, at *41 (C.D. Cal. June

14, 2012) (citing list of cases that "have specifically held that the term 'controller' connotes sufficient structure"); *Goss Int'l Ams., Inc. v. Graphic Mgmt. Assocs.*, 739 F. Supp. 2d 1089, 1100 (N.D. Ill. 2010) (citing COMPREHENSIVE DICTIONARY OF ELECTRICAL ENGINEERING, 139 (Phillip A. Laplante ed., CRC Press 1999)); *Datatreasury Corp. v. Ingenico S.A.*, 2003 U.S. Dist. LEXIS 28147, at *64 (E.D. Tex. Aug. 19, 2003) ("[T]he Court finds that the term 'controller' is sufficiently definite, and that the addition of adjectival modifiers 'data access' further makes the term 'controller' more definite" (citing MODERN DICTIONARY OF ELECTRONICS (6th ed.)).  The Northern District of California has also previously held that "controller" is the corresponding structural term in the specification for an explicit means-plus-function claim element.  *Tech. Props. Ltd. LLC v. Canon Inc.*, 2016 U.S. Dist. LEXIS 126713, at *6 (N.D. Cal. Sep. 16, 2016) (finding that "a controller" is the structure corresponding to the claim limitation "means for mapping").

In addition to controller being a structural term on its own, each of "user," "data," "flow control," and "controller" is a defined term that would be understood by one skilled in the art. IEEE at 234, 267-68, 445, and 1241.  Furthermore, the '696 Patent itself describes that "Fig. 17 shows a general depiction of the data flow and the functional specification of the management server utilized in accordance with the present invention."  '696 Patent, 32:6-8.  This indicates that the management server itself is the data flow controller and the structure of the data flow is shown in the flow charts, Figures 15 and 16.  '696 Patent, 32:1-5 ("Further information with respect to the management server and the data flow from the management server to the other components of the system of the present invention will become apparent with respect to the discussion of the process flow and data flow diagrams in Figs. 15-17.").

Defendants again solely rely on expert testimony to show that the term lacks structure, but again, in an effort to undermine the terms, Dr. Freedman merely acts to show that the term suggests a definite structure to a person of ordinary skill in the art.  Dr. Freedman again describes six structural elements that he understands to be included in the term "user data flow controller" by one of ordinary skill in the art.  Freedman Decl. at ¶ 80. This description again shows that the

term refers to a "broad class of structures" that have "a reasonably well understood meaning" to one of ordinary skill in the art. *TecSec*, 731 F.3d at 1347; *Greenberg*, 91 F.3d at 1583. At a minimum, Defendants, by relying solely on Dr. Freedman's declaration, have failed to carry their burden of showing that the term "user data flow controller" is wholly functional.

The specification makes it clear that the "data flow" that is controlled is the data packets that constitute the "difference information" or the "change transactions."[1] These are in fact the "deltas" that are "got," "checked," "updated," and "uploaded" in Figure 15 at 1435-1475 (and described in the associated pseudo-code) and Figure 16 at 1515-1535 and 1555-1575, which is likewise structure that is shown in the specification for the "data flow." '696 Patent at 34:28-35:65 and 36:2-24; *see also id.* at 34:28-29 ("As shown at steps 1460, 1465, 1470, and 1475, the Δ may include updates at the item level 1460, application level 1465, device level 1470, or network level 1475."); 36:20-22 ("As shown, this may include uploading an item Δ 1575, an application Δ 1570, uploading a device Δ 1565, or a network Δ 1560."). The '696 Patent further describes how the data (i.e. the difference information) is packaged for transmission in accordance with the data flow and process flow diagrams of Figures 15-17. *Id.* at 36:29-37:18. Accordingly, as proposed by Synchronoss, "user data flow controller" is properly understood as "software that controls the transmission or reception of change transactions" as shown in Figures 15 and 16 of the '696 Patent and described in the associated text.

**b.** **"synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" / "synchronization agent"**

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled | Each term is subject to 35 U.S.C. § 112(6)<br><br>Function: |

---

[1] The parties have agreed that "change transactions" is construed as "the sending or receipt of difference information." JCCS, Ex. A.

| | |
|---|---|
| device and a second network device – "software or hardware component that manages a user's account and controls data migration among network coupled devices in communication with at least one software that transmits or receives change transactions to control data migration between a first network coupled device and a second network coupled device"<br><br>synchronization agent – "software that generates or incorporates the change transactions" | synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device – "Controlling data migration between a first network coupled device and a second network coupled device."<br><br>synchronization agent – "Controlling the flow of user data in the synchronization system"<br><br>Structure:<br>A hardware or software component configured to perform the algorithm set forth in Figures 15 and 16 of the '696 Patent and the corresponding text. |

Defendants again contend that these claim elements are purely functional claims under 35 U.S.C. § 112, ¶ 6 (pre-AIA). Synchronoss disagrees. None of these elements utilizes the phrase "means for," meaning a presumption exists that these elements are not means-plus-function claim elements. Again, Defendants' sole basis that the terms lack structure is the conclusory and baseless declaration of Dr. Freedman to overcome that presumption.

The "management server," discussed above in the context of the '757 Patent, and the "synchronization manager" are different terms for claiming the same element. *Compare* '696 Patent, claim 1 (reciting "a synchronization manager communicating with at least one interactive agent") *with* claim 9 ("a management server communicating with said network coupled devices"). It is likewise apparent from the patentee's contemporaneous documentation and exemplary code that "manager" is intended to be the "management server." Architecture Guide at 6 (including code referencing "ServerManager") and 11-12 (using multiple configuration terms for the Management Server and referencing "manager" and stating that "server managers are responsible for sending asynchronous PAPI transactions to the managed servers").

The Defendants do not contend that the term "management server" lacks structure. *Supra*, Section B.1.b. The terminology used is even analogous. Claim 16 of the '696 Patent recites a "synchronization agent management server," which Defendants agree is construed the

same as "management server" but disagree with respect to a "synchronization manager communicating with at least one interactive agent." The '696 Patent contains ample disclosure of the structure associated with the management server. *See supra* Section B.1.b. "Synchronization manager" should be construed in the same manner.

Next, Defendants mischaracterize the "synchronization agent" as having the same structure as the "management server." The context of the claims makes it apparent that the "synchronization agent management server" is the server that manages distributed synchronization agents (i.e., the sync engines or device engines). It is not itself an "agent."

"Agent" has a known and defined structure in the art that is understood by one of ordinary skill as "the managed nodes in a network." IEEE at 22. Courts have previously held that "agent" is a known structural term. *In re Thrift*, 298 F.3d 1357, 1364 (Fed. Cir. 2002) (construing "speech user agent" as a non-means-plus-function claim element); *GENBAND USA LLC v. Metaswitch Networks Ltd.*, 2015 U.S. Dist. LEXIS 103512, at *54-55 (E.D. Tex. Aug. 6, 2015) (finding that "the term 'agent' connotes structure to a person of ordinary skill in the art"). "Synchronization agent" is likewise a structural term as shown in the patentee's contemporaneous documentation. Architecture Guide at 45-46 (describing the functions and features of the "FusionOne PC Synchronization Agent"). This is significantly more definite and structural than Dr. Freedman's unsupported assertion that an "agent" is a "descriptor for software or hardware that performs a specified function." Freedman Decl., ¶ 112. One of ordinary skill would likewise understand that "The agent is controlled by a network control host or manager." IEEE at 22.

This is apparent by the context of the claims. For example, claim 16 describes a "synchronization agent management server" that is in communication with "a plurality of synchronization agents." The "synchronization agents" are the nodes that are controlled by the network manager (i.e., the management server). In the context of the '696 Patent, these nodes are the device engines that transmit or receive the change logs / difference information from the devices. *See* '696 Patent, 13:28-38 ("The output of the device engine 900 comprises a data

package which is output to storage server 850.  As noted above, only one device engine need be connected to the storage server 850 at a given time. . . .  Access to areas of the storage server is controlled by a management server (MS) described more fully below.").  The device engines can then "login to the management server to authenticate the device and provide the device engine with the location of the individual device's data packages on the storage server." *Id.* at 13:40-43.

Dr. Freedman clearly recognizes that an "agent" is a term of art that is well understood by those of ordinary skill. He repeatedly refers to "agents" and "user agents" as the distributed elements that communicate with the centralized server.  Freedman Decl., ¶¶ 42, 51, 60, 70, 128. The HTTP standard, cited by Dr. Freedman, likewise shows that "agent" is a term of art that has a particular meaning.  *Id.* at ¶ 128 (defining "user agent" as "The client which initiates a request").  This is no different from the device engines (i.e. the synchronization agents) that transmit and receive the difference information to the management server / synchronization manager.  At a minimum, Defendants, by relying solely on Dr. Freedman's declaration, have failed to carry their burden of showing that the terms "synchronization manager" and "synchronization agent" are wholly functional.

Accordingly, for the reasons discussed above, "synchronization manager" should be construed the same as the above-discussed management server, and "synchronization agent" should be construed analogously to the "sync engine" term agreed-to by the parties with respect to the '757 Patent, as "software that generates or incorporates the change transactions." JCCS, Ex. A.

### c.   "versioning modules" / "versioning information"

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| versioning modules – "software that applies versioning information to objects in a change transaction"<br><br>versioning information – "information about modifications to data" | versioning modules – This term is subject to 35 U.S.C. § 112(6).<br><br>Function: "Applying a version number per object in the data package"<br><br>Structure: A hardware or software component configured to identify a |

| | |
|---|---|
| | DataPack file using specific rules based on the file name. The file name is of the form 'UUID.VER' where UUID is the identifier for the specific object and VER is the transaction version number. The version number is of the form 'D0001' with additional digits used for large version numbers. The 'D000' value may be reserved for the base version for the object." |
| | versioning information – "A unique version number applied per object in the data package using specific rules based on the file name. The file name is of the form 'UUID.VER' where UUID is the identifier for the specific object and VER is the transaction version number. The version number is of the form 'D0001' with additional digits used for large version numbers. The 'D000' value may be reserved for the base version for the object." |

"Versioning information" and "versioning module" are recited in claims 1, 9, 16, 24 of the '696 Patent. A proper understanding of the term "versioning information" is "information about modifications to data," and "versioning module" is "software that applies versioning information to objects in a change transaction" as proposed by Synchronoss.

"Version" and "information" are terms that are well understood in the art. As described in the IEEE dictionary, "version" is "[a] unique identification of software based on the attributes of the software. Version differentiates software objects with the same value of the *tag* attribute. Versions of bundles or products have the same value of the *tag* attribute and will differ by the value of at least one of *revision*, *architecture*, *vendor_tag*, *location*, or *qualifier* attributes." IEEE at 1252. A different "version" has the same *tag* (e.g., object identifier), but a different second indicator, such as *revision* (e.g., version number). "Information" is, as would be understood to laypersons, "the meaning assigned to data." IEEE at 553. Accordingly, one of ordinary skill in the art would understand "versioning information" as information that differentiates when modifications have been made to an object. It is merely the bytes that

- 21 -

1    indicate what revision of the DataPack (i.e., the change transaction) is being maintained or

2    transmitted. '696 Patent, 12:10-12, 38:67, 39:14, 40:18, 40:43, 42:6-11, 42:41, 42:65.

3        Defendants, on the other hand, commit the cardinal sin of patent law by improperly

4    attempting to import an embodiment disclosed in the specification into the construction.  *See*

5    *Phillips*, 415 F.3d at 1320.  Specifically, Defendants attempt to limit the term "versioning

6    information" to one disclosed embodiment when the "version number" is in a particular format,

7    U0001, where the number "0001" are incremented for subsequent versions.  *Id.* at 38:18-54.

8    Nothing in the specification or the claims requires "versioning information" to be in such a

9    particular format.

10        Defendants next contend that "versioning module" is a purely functional claim element

11    under 35 U.S.C. § 112, ¶ 6 (pre-AIA). Synchronoss disagrees.  "Versioning module" does not

12    use the phrase "means for," meaning a presumption exists that the element is not means-plus-

13    function claim elements.  Defendants can only cite to Dr. Freedman's baseless declaration to

14    overcome the presumption.  As noted above, Courts have previously held that "communications

15    module" and "data storage module" are structural terms.  *Blast Motion, Inc.*, 2017 U.S. Dist.

16    LEXIS 16549, at *50-56.  For the reasons discussed below, Dr. Freedman's declaration does not

17    overcome the presumption.

18        "Versioning module" is not a means-plus-function element as Defendants contend.  First,

19    as described above, "version" has a well-understood meaning to a person of ordinary skill in the

20    art.  Further, the specification expressly shows the "versioning module 915" in the device engine

21    described in prose at col. 13, lines 3-27 and depicted at in the device engine at Fig. 9A.  The '696

22    Patent even expressly shows in an exemplary pseudo-code how the version number ("DataPack

23    Version") is appended to the data package transaction.  '696 Patent, 40:55-63 ("Header ::= ID +

24    DataPackID + DataPackVersion"). The specification makes clear that "versioning module" is the

25    element "which applies a version number per object in the data package."  *Id.* at 12:10-12.  Or as

26    Synchronoss has proposed in the context of the claims, "software that applies versioning

27    information to objects in a change transaction."

Defendants' expert again implicitly recognized that the term "versioning module" has structure because he refers to "a broad class of structures" that have "a reasonably well understood meaning" to one of ordinary skill in the art. *See TecSec*, 731 F.3d at 1347; *Greenberg*, 91 F.3d at 1583. In his declaration, Dr. Freedman states that a person of ordinary skill in the art "would understand there are many ways in which a software or hardware component could be structured and/or configured to apply a version number." Freedman Decl., ¶ 98. Dr. Freedman then lists approximately 17 structural ways that were known to one of ordinary skill in the art. As is clear from the case law, a term that suggests a broad class of structures itself connotes structure. *TecSec*, 731 F.3d at 1347. Accordingly, "versioning module" is not "purely functional" in a manner that makes it a claim element subject to 35 U.S.C. § 112, ¶ 6. At a minimum, Defendants, by relying solely on Dr. Freedman's declaration, have failed to carry their burden of showing that the term "versioning module" is wholly functional.

### d. "transaction identifier module"

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| transaction identifier module – "software for identifying a transaction" | Each term is subject to 35 U.S.C. § 112(6).<br><br>Function: Identifying transactions in the synchronization system<br><br>Structure: None identified in the specification |

Claims 1, 9, 16, 24 of the '696 Patent each recite a "transaction identifier module." Defendants contend that these claim elements are purely functional claims under 35 U.S.C. § 112, ¶ 6 (pre-AIA). Synchronoss disagrees. None of these elements utilizes the phrase "means for," meaning a presumption exists that these elements are not means-plus-function claim elements. Defendants have only Dr. Freedman's declaration for support, and Dr. Freedman's declaration offers nothing more than a conclusory, litigation-induced extrinsic statement.

As noted above, Courts have previously held that "communications module" and "data storage module" are structural terms. *Blast Motion, Inc.*, 2017 U.S. Dist. LEXIS 16549, at *50-

56.  In the present case, each of "transaction," "transaction_ID," "identifier," and "module" are terms that are well understood in the art.  A "transaction" is "[a]n event that requires data contained in a master file to be processed.  *See also:* change transaction."  IEEE at 1197.  Similarly, "transaction_ID" (i.e., "transaction identifier") is a term of art that refers to "[a] value selected by an initiator to designate a given I/O transaction."  *Id.*  Likewise, an "identifier" is "[t]he name, address, label, or distinguishing index of an object in a computer program."  *Id.* at 529.  "Module," as was discussed above, is "[a] program unit that is discrete and identifiable with respect to compiling, combining with other units, and loading" or "[a] logically separable part of a program."  *Id.* at 703-04.  Accordingly, each of these terms imputes structure to the term, and would thus be understood to one of ordinary skill in the art as "a logically separable part of a program that applies a name, address, label, or distinguishing index to an event that requires data contained in a master file to be processed in a computer program."  Or as proposed and simplified slightly by Synchronoss, "software for identifying a transaction."  In the context of the claims, for example claim 9, the "transaction identifier module" is the software that applies the "unique transaction identifier values" that is associated with each transaction object.  '696 Patent, claim 9.  One example of a "unique transaction identifier value" that is disclosed in the '696 Patent is a Universally Unique ID, *id.* at 38:48-54, but this is a disclosed embodiment that is specifically recited in some claims, but not in others. *Compare, e.g.*, *id.* at claim 1 *with id.* at claim 9; *see also id.* at 24:28-31 (describing that the system uses both information of folders' unique IDs and UUIDs).

Dr. Freedman, the sole evidence relied on by Defendants, implicitly recognized that the term "transaction identifier module" has a structure that refers to "a broad class of structures" that "has a reasonably well understood meaning in the art." *TecSec*, 731 F.3d at 1347; *Greenberg*, 91 F.3d at 1583.  Dr. Freedman expressly states, "[T]here are many ways in which a system could identify transactions, each with its own distinct structure." Freedman Decl., ¶ 89.  Dr. Freedman goes on to list approximately 15 different structures to which one of ordinary skill in the art would understand this term to refer.  *Id.*  Dr. Freedman's declaration, while claiming

that this term lacks structure, actually shows that the term would be understood to one of ordinary skill in the art as having structure. At a minimum, Defendants, by relying solely on Dr. Freedman's declaration, have failed to carry their burden of showing that the term "transaction identifier module" is wholly functional.

The specification supports this understanding as well. The '696 Patent states, "A DataPack essentially contains a sequence of transactions describing the changes to information." '696 Patent, 37:62-63. The general architecture of the DataPack includes "transactions, application data, file data, files, objects and identifiers to be carried in the data package. . . . The first portion of the data package will be the data package identifier." *Id.* at 38:3-9. In one exemplary embodiment, "A DataPack file is identified using specific rules based on the file name. The file name is of the form 'UUID.VER' where UUID is the identifier for the specific object and VER is the transaction version number." *Id.* at 38:48-51.

Accordingly, for the reasons described above, "transaction identifier module" is properly construed as "software for identifying a transaction" as proposed by Synchronoss.

### e.   "universally unique identifier"

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "A unique 128 bit value which may be assigned by the system provider" | "128-bit value consisting of 16 octets that guarantees uniqueness across space and time and is standardized by the Open Software Foundation" |

Claim 1 recites "a transaction identifier module assigning a universally unique identifier to each user of transaction objects in said data store" and "a current table of universally unique identifier values and versioning information." For the term "universally unique identifier" the patentee chose again to be its own lexicographer, explicitly stating, "Each UUID [Universally Unique ID] has a unique 128 bit value which may be assigned by the system provider." '696 Patent, 38:34-35. Accordingly, the proper construction, as proposed by Synchronoss, is "a unique 128 bit value which may be assigned by the system provider."

Defendants, on the other hand, add additional limitations that are not discussed in the specification. The '696 Patent makes no mention that the value "guarantees uniqueness across space and time," and even a 128-bit value does not "guarantee" uniqueness across time and space. Indeed, as the IEEE has noted, "[v]arious versions of UUIDs exist, and references for generation of UUIDs abound." IEEE at 1237. The ITU-T UUID standard, X.667, even notes that UUIDs generated by the ITU-T standard are "extremely likely to be different" but does not guarantee it across "space and time." ITU-T Standard X.667 at v (Sept. 13, 2004) (Eskandari Decl., Exhibit D). Accordingly, selecting the UUID standardized by the Open Software Foundation, as Defendants have, is inappropriate. What then remains is the description of the UUID in the intrinsic record, namely, "A unique 128 bit value which may be assigned by the system provider."

### 3. The '446 Patent

#### a. "digital media file"

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| digital media file – plain and ordinary meaning – "a file comprising digital media content" | digital media file – plain and ordinary meaning – "digital audio or video content in the form of an individual file such as an MPEG, MP3, RealAudio, or Liquid Audio file" |

Claims 1 and 11 recite both "digital media file." The parties all agree that the plain and ordinary meaning of this term controls (i.e. the patentee did not provide a unique definition), but disagree what the plain and ordinary meaning is. Synchronoss proposes "digital media file" means just as it would be understood to lay persons – "a file comprising digital media content."

Defendants, on the other hand, again commit the cardinal sin of patent law and attempt to limit "digital media file" to embodiments disclosed in the specification, namely "digital audio and video." *Phillips*, 415 F.3d at 1320. This term "digital media file" has two components – "digital" (i.e., expressed in numerical form for use by a computer device) and "media" (i.e., a means of communication). Synchronoss agrees that two examples of digital media disclosed in the specification are audio and video files, '696 Patent, 1:29-30; but the specification also

recognizes that "text and graphics" are likewise digital media, *id.*  One of ordinary skill in the art and laypersons alike would recognize that digital images, such as JPEG and bitmap files, and text files, like Microsoft Word documents, would likewise be digital media.  Even the evidence cited by Defendants shows this.  For example, the '446 Patent states that digital media content "can include text information as well as binary information. . . .  In the system of the present invention, changes to either the text information or the binary information are transferred or synced, as the case may be, in a series of differencing transactions. . . ."  '446 Patent, 5:11-26. For this reason, addition of the words "audio or video" only serves to improperly import embodiments disclosed in the specification.

Next, Defendants add the word "individual" in front of file.  It is unclear what exactly is intended by the word "individual"; however, if Defendants intend this to mean "one and only one" then this is incorrect.  It is a tenet of patent law that "the indefinite article 'a' means 'one or more' in open-ended claims containing the transitional phrase 'comprising'" unless the claims or specification clearly indicate otherwise.  *Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011).  In the '446 Patent, the specification plainly indicates that the patentee understood "individual files" as distinct from "files," but only claimed "files."  '446 Patent, 3:34-37 ("Users would benefit from a mechanism allowing them to select individual files, or all or a portion of a directory of files, and move them to different devices in the personal information space effectively and efficiently.").

Defendants also attempt to add exemplary language of examples disclosed in the specification to their proposed constructions, which would only serve to confuse the issues for the jury.  Addition of exemplary language from the specification to a claim term's construction has been found to "create unnecessary confusion" for the jury and be superfluous. *Keithley v. Homestore.com, Inc.*, 2007 U.S. Dist. LEXIS 71126, at *23-24 (N.D. Cal. Sept. 10, 2007); *see also Plant Equip., Inc. v. Intrado, Inc.*, 2012 U.S. Dist. LEXIS 59495, at *32-33 (E.D. Tex. Apr. 27, 2012) ("[T]he suggested inclusion of an example in a construction – 'such as TCP/IP' – is improper.").  Courts have likewise rejected inclusion of exemplary embodiments from the

specification into the proposed construction as inappropriate and injecting a fact question into the construction of the claim term. *Layne Christensen Co. v. Bro-Tech Corp.*, 2011 U.S. Dist. LEXIS 80319, at *13 (D. Kan. July 22, 2011). Accordingly, exemplary language (i.e., "such as an MPEG, MP3, RealAudio, or Liquid Audio file") should not be used in the term's construction.

After removing the exemplary language and the limitations incorrectly imported from the specification, Defendants' construction is substantially similar to Synchronoss's – "digital . . . content in the form of a[] . . . file." For this reason, Synchronoss's proposed construction, "a file comprising digital media content," is the proper construction of the term "digital media file."

### b.  "web browser"

| Synchronoss's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a software application that allows a user access to an information store on the World Wide Web" | "software application, such as Microsoft Internet Explorer, for viewing and interacting with web pages on the World Wide Web" |

Claims 1 and 11 of the '446 Patent each recite a web browser. Synchronoss has proposed that the proper construction of "web browser" is "a software application that allows a user access to an information store on the World Wide Web." In comparison, Defendants have proposed "a software application, such as Microsoft Internet Explorer, for viewing and interacting with web pages on the World Wide Web." As is described below, the construction proposed by Synchronoss is the definition given in the '446 Patent's specification, whereas Defendants' proposed construction is built almost entirely out of extrinsic, litigation-driven expert testimony.

The '446 Patent expressly describes "a browser application 100, such as a World Wide Web browser, which allows the user access to an information store." '446 Patent, 7:52-54. Accordingly, in the context of the '446 Patent, a "web browser" is a type of "browser application" that allows a user access to an information store on the World Wide Web.

Defendants' proposed construction, however, imports an embodiment disclosed in the specification (Internet Explorer) as an example in an attempt to confuse the jury and limit the

claim.  *See supra*, Section 4.a (exemplary language from the specification is inappropriate to be used in a claim).  Internet Explorer, which is a disclosed embodiment, is not even used in this manner as can be seen in the text and figures cited by Defendants.  Figure 2, cited by Defendants, is a Microsoft Internet Explorer window, reproduced below, called "an explorer window view 10' of a particular file system," and is used as one manner "of selecting media data."  '446 Patent, 6:37-41.  In the window 10', "a user may select one or more of the files listed in the file system window."  *Id.* at 6:41-43.  The window 10' thus shows a file system directory, not a web page.  The patent then goes on to state in that same paragraph, "Alternative forms of selection of media data, such as, for example, those enunciated above or simply interacting with a web page enabling a sync request enabling a sync request by clicking on a button 65 in a web page are contemplated."  *Id.* at 6:52-55.  Accordingly, a file system in an Internet Explorer window and a web page are two alternative disclosed embodiments discussed in the '446 Patent, not one and the same as proposed by Defendants.



SYNCHRONOSS'S OPENING CLAIM CONSTRUCTION BRIEF
*Case No. 4:16-cv-00119-HSG-KAW / Case No. 4:16-cv-00120-HSG-KAW*

1    For these reasons, "web browser" is properly construed as defined in the '446 Patent as

2 "a software application that allows a user access to an information store on the World Wide

3 Web." '446 Patent, 7:52-54. The extrinsic declaration relied on by Defendants is contrary to the

4 definition provided in the specification, inconsistent with the disclosed embodiments, and must

5 therefore be discounted. *Phillips*, 415 F.3d at 1318 ("a court should discount any expert

6 testimony 'that is clearly at odds with the claim construction mandated by the claims themselves,

7 the written description, and the prosecution history, in other words, with the written record of the

8 patent.'" (internal citations omitted)).

9 **III. CONCLUSION**

10    For the foregoing reasons, Synchronoss respectfully requests that the Court adopt its

11 proposed constructions.

12

13 Dated: September 22, 2017                    Respectfully submitted,

14                                             By: */s/ Sarah S. Eskandari*

15                                             Sarah S. Eskandari
                                              **Dentons US LLP**
16                                             One Market Plaza,
                                              Spear Tower, 24th Floor
17                                             San Francisco, CA 94105

18                                             Shailendra K. Maheshwari
19                                             Mark L. Hogge
                                              Nicholas H. Jackson
20                                             **Dentons US LLP**
                                              1900 K Street NW
21                                             Washington, D.C. 20006

22                                             ***Attorneys for Plaintiff Synchronoss***
23                                             ***Technologies, Inc.***

24

25

26

27

SYNCHRONOSS'S OPENING CLAIM CONSTRUCTION BRIEF
*Case No. 4:16-cv-00119-HSG-KAW / Case No. 4:16-cv-00120-HSG-KAW*

**CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below I caused to be served the

**SYNCHRONOSS'S OPENING CLAIM CONSTRUCTION BRIEF AND**

**DECLARATION OF SARAH S. ESKANDARI IN SUPPORT OF DEFENDANT**

**SYNCHRONOSS'S OPENING CLAIM CONSTRUCTION BRIEF** via the Court's CM/ECF

system upon all counsel of record registered to receive electronic filings as indicated on the

Court's website, pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5-1.


Dated: September 22, 2017                          By: /s/ Sarah S. Eskandari