Thomas H.L. Selby (*Pro Hac Vice*)
David M. Krinsky (*Pro Hac Vice*)
Adam D. Harber (*Pro Hac Vice*)
Christopher J. Mandernach (*Pro Hac Vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & PATCHEN, LLP
One Ferry Building, Suite 355
San Francisco, CA 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208

Attorneys for Defendant
DROPBOX, INC.

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| SYNCHRONOSS TECHNOLOGIES, INC., | No. 4:16-cv-00119-HSG |
| Plaintiff, | **DROPBOX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT LOCAL RULE 4-5(b)** |
| v. | |
| DROPBOX, INC., | |
| Defendant. | Honorable Haywood S. Gilliam, Jr. |

**REDACTED VERSION SOUGHT TO BE SEALED**

**TABLE OF CONTENTS**

I.    LEGAL PRINCIPLES ..................................................................................................1

II.   DISPUTED TERMS ..................................................................................................2

      A.    U.S. PATENT NO. 6,671,757 ("'757 PATENT") ..........................................2

            1.    "a previous state of said data" / "copy of a previous state of said data" ..................................................................................................2

            2.    "management server" / "management dedicated network coupled device" / "synchronization agent management server" ............................6

            3.    "[first/second] system" / "[first/second] system" / "device[s]" / "network coupled device[s]"/ "network coupled apparatus[es]" ................8

      B.    U.S. PATENT NO. 6,757,696 ("'696 PATENT") ..........................................9

            1.    Means-Plus-Function Claim Terms ..........................................................9

                  a.    Governing Law ..............................................................................9

                  b.    Application to the '696 Patent .....................................................10

                  c.    "user identifier module" / "authentication module identifying a user coupled to the  synchronization system" / "user authenticator module" / "user login authenticator" .............14

                        1)    The terms are subject to 35 U.S.C. § 112(6).....................15

                        2)    The specification fails to disclose sufficient structure....................................................................................17

                  d.    "transaction identifier module".....................................................17

                  e.    "user data flow controller"............................................................19

                  f.    "versioning modules" / "versioning information" .........................21

                  g.    "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" / "synchronization agent"...............................................................23

            2.    "universally unique identifier"................................................................25

C.    U.S. PATENT NO. 7,587,446 ("'446 PATENT") ...................................................28

1.    "digital media file"...........................................................................................28

2.    "web browser" .................................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aguayo v. Universal Instruments Corp.*, No. CIV.A. H-02-1747, 2003 WL
  25787593 (S.D. Tex. June 9, 2003) ....................................................15, 18

*Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2993856
  (N.D. Cal. July 20, 2012).......................................................................29

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir.
  2008) .......................................................................................9, 13, 17

*Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353 (Fed. Cir. 2017) ...............................3

*Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362
  (Fed. Cir. 2008)....................................................................................8, 27

*Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371 (Fed. Cir. 2009)...........................9, 11, 14

*Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004) ...............................5, 24

*Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2010 WL 1222771 (N.D.
  Cal. Mar. 24, 2010)................................................................................8

*Davies Innovations, Inc. v. SIG Sauer, Inc.*, No. 16-CV-352-LM, 2017 WL
  3731052 (D.N.H. Aug. 29, 2017) ...............................................................6

*Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361 (Fed. Cir. 2012)..........................13

*Farstone Tech., Inc. v. Apple Inc.*, 2015 WL 5898273 (C.D. Cal. Oct. 8, 2015),
  *aff'd*, 668 F. App'x 366 (Fed. Cir. 2016).....................................................15

*Finjan, Inc., v. Proofpoint, Inc.*, No. 13-CV-05808-HSG, 2015 WL 7770208
  (N.D. Cal. Dec. 3, 2015) (Gilliam, J.)..........................................................9

*GoDaddy.com, LLC v. RPost Comm. Ltd.*, 2016 WL 212676 (D. Ariz. Jan. 19,
  2016) .................................................................................................15

*Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996) ...........................11, 12

*Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244 (Fed. Cir. 2008)...............................8

*HealthSpot, Inc. v. Computerized Screening, Inc.*, No. 1:14-CV-00804, 2015 WL
  1523960 (N.D. Ohio Apr. 2, 2015)..............................................................19

*Hemlsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379 (Fed. Cir. 2009) .................24, 28

*Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052 (Fed. Cir. 2005)....................................12

*Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295 (Fed. Cir. 2004) .........................22

*Keithley v. Homestore.com*, 636 F. Supp. 2d 978 (N. D. Cal. 2008)..............................................13

*Klaustech, Inc. v. Google, Inc.*, No. C 10-05899 JSW, 2016 WL 2957044 (N.D. Cal. May 23, 2016) ...........................................................................................................19

*Konami Gaming, Inc. v. Marks Studios, LLC*, No. 214CV01485JADCWH, 2017 WL 3174905 (D. Nev. July 25, 2017) ...................................................................................19

*Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004)..........10, 12, 20

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336 (Fed. Cir. 2005) .............................1

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) .....................................1, 4

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003) .............................................................................................................9, 22, 25

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005) ............................................1

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473 (Fed. Cir. 1998)...............................9

*Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302 (Fed. Cir. 2012)............................................ *passim*

*Nystrom v. TREX Co.*, 424 F.3d 1136 (Fed. Cir. 2005) ...................................................................5

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................... *passim*

*Plano Encryption Techs., LLC v. Am. Bank of Texas*, No. 15-CV-1273-JRG, 2016 WL 3959808 (E.D. Tex. July 22, 2016) ...........................................................................5

*Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396 (Fed. Cir. 2004)............................27

*Pure Techs. Ltd. v. Pressure Pipe Inspection Co. Ltd.*, No. 05-CV-0336N, 2007 WL 5747073 (N.D. Tex. Dec. 4, 2007) ..............................................................................5

*Rockwell Automation, Inc. v. 3-S Smart Software Sols.*, No. 15-CV-1543-JRG, 2016 WL 5811485 (E.D. Tex. Oct. 5, 2016) ...........................................................................15

*Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 15-CV-349, 2016 WL 6275390 (E.D. Tex. Oct. 25, 2016).....................................................................................15

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005)...............................6

*Synchronoss Tech., Inc. v. NewBay Software, Inc.*, No. 11-cv-04947-FLW, Dkt. No. 48-2 (D.N.J. Nov. 14, 2012) ...............................................................................29

*Tech. Props. Ltd. LLC v. Canon Inc*, No. C 14-3640 CW, 2015 WL 5535830 (N.D. Cal. Sept. 18, 2015) ....................................................................................20

*TecSec, Inc. v. IBM*, 731 F.3d 1336 (Fed. Cir. 2013) ...................................................11

*Teva Pharm. USA, Inc. v. Sandoz Inc.*, 810 F. Supp. 2d 578 (S.D.N.Y. 2011) ........................4, 12

*Tyco Healthcare Group LP v. Applied Med. Resources Corp.*, No. 09-CV-176,
   2011 WL 13136264 (E.D. Tex. Feb. 18, 2011) .........................................................29

*Verint Sys. Inc. v. Red Box Recorders Ltd.*, 166 F. Supp. 3d 364 (S.D.N.Y. 2016) ...............11, 15

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ...........................................7

*Watts v. XL Sys., Inc.*, 232 F.3d 877 (Fed. Cir. 2000) ...................................................9

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc) ..................... *passim*

## OTHER AUTHORITIES

35 U.S.C. § 112(6) .............................................................................................. *passim*

1    Synchronoss proposes constructions of the synchronization patents in this case that
2  violate several bedrock claim construction principles in an effort to broaden its claims beyond
3  any proper reading of the intrinsic record.  Unable to find appropriate support for its positions,
4  Synchronoss misleadingly quotes the patent specifications, omits mention of its positions in prior
5  litigations and IPRs, disregards the Federal Circuit's limitation on functional claiming, and
6  attempts to rewrite the claims using its own non-public documents that post-date the asserted
7  priority dates by nearly four years.  By contrast, Dropbox's constructions are supported by the
8  intrinsic record, § 112(6) and Federal Circuit caselaw, and the uncontroverted (even after cross
9  examination) declaration of Princeton University Computer Science Professor Dr. Michael
10  Freedman.  Dropbox respectfully requests the Court adopt its proposed constructions.

11  **I.    LEGAL PRINCIPLES**

12    The general principles governing claim construction are well known to this Court.  Of
13  primary importance is the language of the claims, the patent specification, and the prosecution
14  history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-17 (Fed. Cir. 2005) (en banc).  Claim
15  terms are generally given their "ordinary and customary meaning"—"the meaning that the term
16  would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at
17  1312-13.  But they should not be construed "in a vacuum." *Medrad, Inc. v. MRI Devices Corp.*,
18  401 F.3d 1313, 1319 (Fed. Cir. 2005).  The specification "is the single best guide to the meaning
19  of a disputed term." *Phillips,* 415 F.3d at 1315.  Thus, a term should not be construed so broadly
20  that it does not find support in the specification. *See LizardTech, Inc. v. Earth Res. Mapping,*
21  *Inc.*, 424 F.3d 1336, 1344 (Fed. Cir. 2005).  Similarly, the "'undisputed public record' of
22  proceedings in the Patent and Trademark Office is of primary significance in understanding the
23  claims." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995).  It reflects
24  how the patentee and USPTO understood the invention. *Phillips*, 415 F.3d at 1317.

25    Finally, "extrinsic evidence in the form of expert testimony can be useful to a court for a
26  variety of purposes, such as . . . to ensure that the court's understanding of the technical aspects
27  of the patent is consistent with that of a person of skill in the art, or to establish that a particular
28  term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318.

## II.    DISPUTED TERMS

### A.    U.S. PATENT NO. 6,671,757 ("'757 PATENT")

#### 1.    "a previous state of said data" / "copy of a previous state of said data"

| Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|
| "a previous version of the data or previous information about the data before the changes to the data occurred" | "a copy of a previous version of the data that is used in a comparison against a copy of the current version of the data to generate difference information" |

Synchronoss's proposed construction impermissibly expands the scope of the claims contrary to both the intrinsic record—including its own representations in a recently concluded *inter partes* review ("IPR") proceeding—and black-letter Federal Circuit law. As Synchronoss itself urged in the IPR, the '757 patent makes clear that "differences" are generated by comparing two versions of a given file—not *information about* the file. For example, the specification explains that "Delta Module 950 calculates differences in data between the output of the application object 910 and *the copy of the data* which is provided in an application object store (AOS) 920." '757 patent at 12:18-21;[1] *see also id.* at 14:38-42 ("The device engine uses the local application object store 920 to *keep track of the last synchronized version* of each application's actual data, which is then used for the next data comparison by the delta module . . . ."). The term "copy of a previous state of said data" is what the '757 patent claims use to refer to this concept, and therefore should be defined as Dropbox proposes.

Unlike Synchronoss's arguments here, its arguments in the IPR (involving all three independent claims of the '757 patent) were fully consistent with these disclosures and Dropbox's proposed construction. In distinguishing the prior art at issue in the IPR, Synchronoss repeatedly emphasized that the claims require a comparison between two copies of a file—not merely *information about* the files—and therefore mandate that each client device store an actual copy of the previous version of the data being synchronized for purposes of such comparison. Synchronoss argued that the Nichols reference at issue in the IPR did not invalidate

---

[1] All emphasis is added unless otherwise noted.

DROPBOX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5(B)
CASE NO. 4:16-CV-00119-HSG

the claims because "[t]here's no discussion [in Nichols] of keeping **an extra copy** hanging around" on the client.  Decl. of C. Mandernach in Supp. of Dropbox's Resp. Claim Constr. Br. ("Decl."), Ex. A at 21:15-23 (Oral Arg. Tr.); *see id.* at 21:1-2 ("So clearly both of versions of the data are on the client [in the '757 patent]."); *id.* at 19:12-14 (in Nichols, "there is no copy or multiple copies of a widget's value"); *id.* at 18:8-13 ("So both copies of the data and different versions of that data are all associated with a client [in the '757 patent]"); Decl., Ex. B at 27 (Patent Owner's Resp.) ("claim 1 requires the presence of two states of the data on the same system"); *id.* at 29 ("Petition fails to explain how Nichols discloses the presence of both versions of the same data file/data on the same device/system").  Synchronoss prevailed on that claim.

Here, in contrast, Synchronoss argues that the claims cover a comparison not just to a copy of a previous state **of the data** (as the claim actually says), but also to "**information about** the data."  The example it provides—without citing to a single piece of intrinsic evidence—is the use of a so-called "hash" value in a comparison.  Opening Claim Constr. Br ("Br.") at 7-8.  As Synchronoss explains, a hash value is akin to a digital signature for a file.  It characterizes large amounts of data using a much smaller numeric value, calculated using a hash function or algorithm.  On this point, Synchronoss was correct in the IPR and is wrong here; "information about" data being updated is not a "previous state" of that data.  For example, a hash is not itself a previous state of the data, cannot be used to re-generate that data, and does not require the presence of the data on the system.  Even though hashing was widely known in the prior art, *e.g.*, Decl., Ex. C at 42 (reference considered during '757 patent prosecution), there is no mention or example anywhere in the '757 patent describing the use of hashes to perform a comparison or suggesting that such hashes are part of the term "previous state of said data."  Nor is there any intrinsic evidence supporting the notion that a "previous state of the data" encompasses any unspecified information about data, as opposed to a previous version of the data itself.

Synchronoss's change in tune is as impermissible as it is incorrect.  It is black-letter law that a patentee may not argue the claims "one way in order to maintain their patentability and in a different way against accused infringers."  *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) (statements made during IPR may give rise to prosecution disclaimer).

1    Synchronoss's statements in the IPR regarding the "previous state of said data" were far from

2    incidental; they were central to its arguments for why Nichols failed to anticipate the claims. *See*

3    Decl., Ex. B at 25-31. Synchronoss is barred from opportunistically changing positions here.

4         Synchronoss's position in the IPR also contradicts its assertion here that the patentee's

5    decision not to use the word "version" is somehow significant. Br. at 8. As the language quoted

6    above makes clear, Synchronoss itself used the terms "version" and "state of data"

7    interchangeably—and repeatedly conveyed to the PTAB that the claims of the '757 patent

8    required two "versions" of the same data on the same system. Moreover, the patent itself uses

9    the terms "version" and "state" interchangeably. For instance, the specification explains that

10   "[t]he device engine uses the local application object store 920 to keep track of the ***last***

11   ***synchronized version*** of each application's actual data, which is then used for the next data

12   comparison by the delta module on the next sync request." '757 patent at 14:38-42. Elsewhere

13   in the specification, the same application object store is described as "stor[ing] a snapshot of the

14   ***previous state*** of the data from the application objection." *Id.* at 12:12-16.

15        Recognizing it cannot point to any intrinsic evidence to support its impermissibly broad

16   construction, Synchronoss turns instead to supposedly "contemporaneous architecture

17   documentation from the original patentee, FusionOne." Br. at 7. Specifically, Synchronoss cites

18   two internal documents throughout its brief, the FusionOne Synchronization Platform

19   Architecture Guide and Operations Guide. Its reliance on these documents is improper for a host

20   of reasons. ***First***, by sworn admission of Synchronoss's counsel in support of its sealing motion,

21   neither document has ever been "publicly disclosed" or made "publicly available." ECF 143-1,

22   at 1. Thus, a person of ordinary skill would not have access to either document today, let alone

23   at the priority dates, to discern the meaning of the claims. "[T]he focus in construing disputed

24   terms in claim language is not the subjective intent of the parties to the patent . . . [but] what one

25   of ordinary skill in the art at the time of the invention would have understood the term to mean."

26   *Markman*, 52 F.3d at 986; *see also Teva Pharm. USA, Inc. v. Sandoz Inc.*, 810 F. Supp. 2d 578,

27   597 (S.D.N.Y. 2011) (declining to consider evidence "not available to one of ordinary skill in the

28   art, even today"). Recourse to such non-public evidence is typically improper because it

subverts the notice function that is supposed to be served by the intrinsic record. *Phillips*, 415 F.3d at 1319; *see also Nystrom v. TREX Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (rejecting use of extrinsic evidence to support construction "divorced from . . . written description and prosecution history"). Synchronoss provides no reason to believe its internal documents have any bearing on how a person of ordinary skill would have understood the claims as of the priority date, much less that they broaden the claim terms to encompass concepts mentioned nowhere in the specification.

*Second*, contrary to Synchronoss's representations, the FusionOne documents are not "contemporaneous." Both are dated 2004, almost four years *after* the asserted priority date. *See* Eskandari Decl., Ex. A at 38; Ex. B at 48. Claim construction is properly the practice of construing claims as written, not as patentees wish they had written them after the fact. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Thus, courts routinely reject the use of extrinsic evidence that post-dates the priority date of the patent in claim construction analysis. *See Pure Techs. Ltd. v. Pressure Pipe Inspection Co. Ltd.*, No. 05-CV-0336N, 2007 WL 5747073, at *6 n.11 (N.D. Tex. Dec. 4, 2007); *Plano Encryption Techs. v. Am. Bank of Texas*, No. 15-CV-1273-JRG, 2016 WL 3959808, at *21 (E.D. Tex. July 22, 2016).

*Third*, even if recourse to extrinsic documents about Synchronoss's commercial software were somehow appropriate, there is no evidence that the documentation provided has anything to do with the asserted claims of the '757 patent. There is no mention of this software in either the patent or file history, and Synchronoss performs no analysis to map the software onto the claims beyond its conclusory declaration that the software "implemented the invention claimed in the '757 Patent." Br. at 7. At most, Synchronoss's documents might conceivably support the proposition that a system Synchronoss's predecessor once made used "information about" previous versions of the data to perform synchronization—a point entirely irrelevant to claim construction. Indeed, the documents do not demonstrate even that much. For example, the very quote used by Synchronoss makes clear that such hashes are only used **"*[i]n some cases*"**—not across the board in the described system. Br. at 8 (citing Eskandari Decl., Ex. A at 10). Thus, even if one assumes that Synchronoss's system embodies the patent claims, that assumption

sheds no light on whether the "previous state of the data" limitation encompasses hashes of the data. There is no basis to conclude that the asserted '757 claims are directed to the "cases" where hashes are used. For these very reasons, courts routinely reject attempts to construe claims based on purported commercial embodiments of the invention. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1339-40 (Fed. Cir. 2005); *Davies Innovations, Inc. v. SIG Sauer, Inc.*, No. 16-CV-352-LM, 2017 WL 3731052, at *5 (D.N.H. Aug. 29, 2017).

### 2. "management server" / "management dedicated network coupled device" / "synchronization agent management server"

| Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|
| "software or hardware component that manages a user's account" | "a centralized server which controls behavior and characteristics of the entire network of device engines across all users" |

Synchronoss admits, as it must, that Dropbox's proposed construction for "management server" is taken directly from the patent specification. *See* Br. at 9; '757 patent at 32:38-40. "When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." *Martek Biosciences*, 579 F.3d at 1380; *see also Phillips,* 415 F.3d at 1315. Here, the specification uses language clearly indicating that it is providing a definition for "management server." '757 patent at 32:38-40 ("The management server **is a** centralized server that . . . ."). Synchronoss offers no reason to depart from this clear definition.

In contrast to the clear definitional language supporting Dropbox's proposed construction, the portions of the specification cited by Synchronoss in support of its construction only identify particular functions performed by the management server. *See id.* at 17:30 ("a management server **that manages** users' accounts"); *id.* at 32:61 ("the management server **supports** an authentication interface"); *id.* at 33:7-8 ("Each device engine is uniquely identified and tracked **by the** management server"). The same is true of dependent claim 9 which Synchronoss cites. *Id.* at claim 9 ("said management server locks access to difference information on the datastore during communication with the first and the second sync engines"). Neither the specification nor the claims say that managing user accounts is **all** that a management

server does; nor do they purport to define the term with reference to that function. On the contrary, the specification identifies a number of other functions performed by the management server that have nothing to do with managing user accounts. *See, e.g., id.* at 33:4-6 ("control[ling] the device engine acquisition, renewal, and releasing of locks against data stored in the network"); *id.* at 33:19-23 ("support[ing] client's advertising mechanisms, enabling the display of banner or similar advertising on a device engine system"). It therefore makes no sense to define "management server" based on only one of many functions it performs, especially in light of the patentee's express definition, which includes (but is not limited to) that function.

Realizing the patent specification is unhelpful to it, Synchronoss again seeks refuge in FusionOne's non-public, post-dated technical documents. That is unavailing for the reasons discussed above. *See supra* pp. 4-6. On this term, the use of such documents is particularly improper because the specification itself provides an explicit definition. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). But even if such evidence were considered, the excerpts cited by Synchronoss do not undermine Dropbox's proposed construction. The fact that the management server "stores information about user accounts, devices and dataclasses," and "keep[s] track of the current sync state of every device that the user has connected in their account," Br. at 10, does not preclude other functionalities. Nor would using the specification's (and Dropbox's) definition put these functionalities outside of the claim scope. In fact, the very same documents—in portions that Synchronoss fails to cite— plainly support Dropbox's construction. For instance, the Operations Guide states that in addition to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the management server ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Eskandari Decl., Ex. A at 5. Similarly: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Eskandari Decl., Ex. A at 11. Even these technical documents define a management server as managing an entire network of device engines, not just "a user's account."

Finally, Synchronoss urges the Court to ignore the specification's clear definition because it is, somehow, "confusing." Br. at 9. It is not. But even if it were, the relief would not be to

1  redefine the term based on improper extrinsic evidence, but to find the term to be indefinite. *See*

2  *Halliburton Energy Servs., Inc. v. M–I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).

3         3.   **"[first/second] system" / "[first/second] system" / "device[s]" /**
            **"network coupled device[s]"/ "network coupled apparatus[es]"**
4

| Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|
| "a collection of elements or components organized for a common purpose, and may include hardware components of a computer system, personal information devices, handheld computers, notebooks, or any combination of hardware which may include a processor and memory which is adapted to receive or provide information to another device; or any software containing such information residing on a single collection of hardware or on different collections of hardware" | Plain and ordinary meaning – "computer or computing device such as a personal computer, portable computer, desktop computer, server, smart telephone, cellular telephone, standard telephone, or personal data assistant (PDA)" |

11         Dropbox's construction recognizes that "system," "apparatus," and "device" have

12  different meanings, and harmonizes these terms in the context of the claims.   Dropbox

13  acknowledges that the specification of the '757 patent defines the term "device."  '757 patent,

14  5:15-23.   But this does not end the inquiry:  there is no analogous definition provided for

15  "system," "network coupled device," or "network coupled apparatus."  Synchronoss makes no

16  attempt to explain why the specification's definition for "device" must necessarily cover these

17  additional terms.   On the contrary, the fact that the '757 patent uses the term "system" in some

18  claims (claims 1–15) and "device" in others (claims 6–23) suggests they are not the same. *Bd. of*

19  *Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008).

20  Moreover, to the extent the definition of "device" purports to cover mere software in the absence

21  of any hardware, it is inconsistent with how "device" is used in the claims.  Claims 16 and 24 of

22  the '757 patent both refer to "device[s]" "coupled to [a network/the Internet]."  Likewise, several

23  claims of the '757 patent refer to a "network coupled device."  Use of the word "coupled" in this

24  context is analogous to using the word "connected."  *See Conceptus, Inc. v. Hologic, Inc.*, No. C

25  09-02280 WHA, 2010 WL 1222771, at *14 (N.D. Cal. Mar. 24, 2010).   Standalone software

26  cannot, however, cannot be "coupled" to a network, and the specification itself refers to the

27  device "having an ***input and output*** coupled to a network." *See* '757 patent at 4:8-10.

28

Dropbox's proposal to construe these terms as having their plain meaning eliminates this inconsistency. *See Phillips*, 415 F.3d at 1313; *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("[T]he inventor's lexicography" must be "interpreted by the court as they would be understood and interpreted by a person in that field of technology.").

### B.    U.S. PATENT NO. 6,757,696 ("'696 PATENT")

#### 1.    Means-Plus-Function Claim Terms

##### a.    Governing Law

Means-plus-function claiming under 35 U.S.C. § 112(6) allows a patentee to express a claim limitation by reciting a "means or step for performing a specified function without . . . recit[ing] [the] . . . structure, material, or acts in support thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc) (quoting 35 U.S.C. § 112(6)). When it does so, the "scope of coverage" is restricted to the "structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof," if any. *Id*. If no such structure is reasonably disclosed, the claim is invalid as indefinite. *Id*. at 1351-52. The primary purpose underlying the limitations imposed by § 112(6) is "to avoid pure functional claiming." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Otherwise, a patentee could "claim all possible means of achieving a function" and thus turn a claiming technique intended for the patentee's convenience into a monopoly far broader than the scope of the invention. *See Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003).

Although the word "means" creates a presumption of a means-plus-function term, a phrase lacking the word "means" is subject to § 112(6) "if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1348-49 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)); *see also Finjan, Inc., v. Proofpoint, Inc.*, No. 13-CV-05808-HSG, 2015 WL 7770208, at *10 (N.D. Cal. Dec. 3, 2015) (Gilliam, J.).

1   The uniform standard for making such a determination is whether the claim term is "understood

2   by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for

3   structure." *Williamson*, 792 F.3d at 1349.  The use of "well-known nonce word[s]" such as

4   "module," "mechanism," "element," or "device" is "tantamount to using the word 'means'"

5   because such words typically do not denote sufficiently definite structure. *Id.* at 1350.

6       Once a claim term is determined to be a means-plus-function term, construing it is a two-

7   step process. ***First***, the court must identify the claimed function. *Id.* at 1351. ***Second***, the court

8   must determine what structure, if any, disclosed in the specification corresponds to that function.

9   *Id.*  To constitute "'adequate' corresponding structure," intrinsic evidence must clearly link or

10  associate it to the claimed function, and the structure must be capable of achieving the claimed

11  function. *Id.* at 1352.  "[I]f a person of ordinary skill in the art would be unable to recognize the

12  structure in the specification and associate it with the corresponding function in the claim, a

13  means-plus-function clause is indefinite." *Id.*

### b.    Application to the '696 Patent

15      Synchronoss asks this Court—both through its constructions and its opposition to

16  Dropbox's—to allow precisely what § 112(6) and the caselaw prohibit:  claims to a general

17  purpose computer for performing various functions, unbounded by any particular structure.

18      Synchronoss's arguments about why these claim terms are not subject to § 112(6) suffer

19  from several fundamental and overarching flaws. ***First***, Synchronoss asserts that the disputed

20  terms—which include "well-known 'nonce' words" like "module," *Williamson*, 792 F.3d at

21  1350—are not purely functional because the constituent words that make up each claim term can

22  be located in a technical dictionary. *See, e.g.*, Br. at 13.  But whether the words in a claim term

23  "have well understood meanings in the computer science art," as Synchronoss argues, *see id.*, is

24  not the correct inquiry under § 112(6).  The question, instead, is whether "the words of the claim

25  are understood by persons of ordinary skill in the art to have a sufficiently definite meaning ***as***

26  ***the name for structure***." *Williamson*, 792 F.3d at 1349; *see also Lighting World, Inc. v.*

27  *Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359 (Fed. Cir. 2004) ("[I]t is sufficient if the claim

28  term is used in common parlance or by persons of skill in the pertinent art ***to designate structure***

10

. . . .").  The distinction between whether a word connotes a structure or a function is not whether it can be located in a dictionary; functional terms have common definitions too.  If merely locating the individual words of a claim in a technical dictionary were sufficient to put the term outside the scope of § 112(6), almost no claim term would ever qualify.  That is not the law.  In *Williamson*, for example, the Federal Circuit concluded that "distributed learning control module" was subject to § 112(6).  792 F.3d at 1350-51.  But the words "distributed," "learning," "control," and "module" can all be located in the IEEE dictionary Synchronoss cites repeatedly in its opening brief.  Courts, in fact, have rejected the very argument Synchronoss makes here. *See, e.g.*, *Verint Sys. Inc. v. Red Box Recorders Ltd.*, 166 F. Supp. 3d 364, 379-80 (S.D.N.Y. 2016) ("[t]he term 'computer application,' while defined in a technical dictionary" is a means-plus-function term that "fails to provide sufficient additional structure").

**Second**, Synchronoss argues that because a "broad class of structures that have a reasonably well understood meaning to one of ordinary skill" may perform the functions in question, the terms fall outside the scope of § 112(6).  *See, e.g.*, Br. at 13.  Again, that is not the law.  "That various methods might exist to perform a function is 'precisely why' the disclosure of specific programming is required" for a means-plus-function term.  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012) (citing *Blackboard*, 574 F.3d at 1385).  As discussed above, the main purpose behind 35 U.S.C. § 112(6) is to prevent a patentee from "claim[ing] all possible means of achieving a function."  *Blackboard*, 574 F.3d at 1385.  Synchronoss's reasoning would render the doctrine meaningless, because **any** function is associated with a "broad class of structures."  That is why **the patent** "must identify the method for performing the function, whether or not a skilled artisan might otherwise be able to glean such a method from other sources or from his own understanding."  *Noah Sys.*, 675 F.3d at 1317.

Synchronoss's misstatement of the law in this regard is premised on two pre-*Williamson* cases, *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996), and *TecSec, Inc. v. IBM*, 731 F.3d 1336 (Fed. Cir. 2013).  It reads both cases so broadly as to vitiate the en banc Federal Circuit's entire doctrine in *Williamson*.  *Greenberg* addressed the question of how much structural detail a person of ordinary skill must understand a claim term to have for that term to

1   connote sufficiently definite structure under § 112(6). 91 F.3d at 1583. The court held that the

2   term need not call to mind a "single well-defined structure," but must have "as the name for

3   structure . . . a reasonably well understood meaning in the art." *Id.* The example it used was a

4   "clamp," which has a sufficiently definite structural meaning, even though different clamps may

5   contain minor structural differences. *Id.* That bears no relation to the dispute here, where the

6   issue is not whether a plainly structural term like "clamp" has a reasonably well-defined

7   meaning, but whether terms like "user identifier module" are "the name for structure" at all.

8       Synchronoss's reliance on *TecSec* is similarly misplaced. It repeatedly quotes the

9   language from *TecSec* that "a broad class of structures" associated with a claim term may be

10  sufficient to conclude that the claim recites definite structure. *See* Br. at 6. That language, in

11  turn, was taken from the Federal Circuit's opinion in *Lighting World, Inc. v. Birchwood Lighting,*

12  *Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004). As in *Greenberg*, the court in *Lighting World* was

13  responding to the argument that a particular claim term did not recite sufficient structure because

14  it did not denote "specific" structure. *Id.* at 1359. The court noted that the appropriate test was

15  whether "the term is one that is understood to describe structure, as opposed to a term that is

16  simply a nonce word or a verbal construct that is not recognized as the name of structure." *Id.* at

17  1359-60. Even setting aside that *Williamson* is a later en banc decision that must be followed if

18  it conflicts with *TecSec*, *TecSec*'s reference to a "broad class of structures" does not depart from

19  *Williamson*'s requirement of a "sufficiently definite meaning **as the name for structure**."

20      **Third**, Synchronoss criticizes Dropbox's reliance on a supposedly "litigation-driven,

21  extrinsic expert declaration," which it attempts to counter (ironically) with unsubstantiated

22  attorney argument. Such argument is "insufficient to cast doubt on [an expert's] opinions"

23  "regarding how one of ordinary skill in the art would understand" disclosures in the

24  specification. *Teva Pharma. USA, Inc. v. Sandoz Inc.*, 810 F. Supp. 2d 578, 591 (S.D.N.Y. 2011)

25  (citing *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005)).

26  Synchronoss deposed Dropbox's expert, Dr. Freedman. That it does not identify **a single**

27  **statement** from that deposition to undermine his supposedly litigation-driven opinions is telling.

28      **Fourth**, Synchronoss defends the claim terms at issue as structural by pointing to various

snippets of the patent specification, most of which do no more than restate the claimed function or refer to a general purpose computer for performing it (and the rest of which, as detailed below, fail to provide structure implementing the correct function).  For example, Synchronoss asserts that the statement "[u]pon connection to the storage server, a further connection to management server 1545 will occur ***to authenticate the user in the system***" discloses adequate structure for the authentication related claim terms.  Br. at 15.  Merely "restat[ing] the function associated with the means-plus-function limitation," however, "is insufficient to provide the required corresponding structure."  *Noah Sys.*, 675 F.3d at 1317; *see also Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) (purported algorithm cannot "merely provide[] functional language" and must provide a "step-by-step procedure" for accomplishing the function).

Elsewhere, Synchronoss identifies disclosures of a general purpose computer with broad functionality as providing the relevant structure.  For example, it asserts that the "management server" performs the authentication functions and therefore provides the corresponding structure for claim terms relating to authentication.  Br. at 15.  The management server, however, is simply a "general purpose computer" that can be programmed to perform various functions.  *See supra* pp. 6-8.  The mere possibility "one of skill in the art could program a computer to perform the recited functions cannot create structure where none otherwise is disclosed."  *Williamson*, 792 F.3d at 1351.  Instead, the patent specification must disclose a "special purpose computer" programmed to perform the claimed function.  *Aristocrat Techs.*, 521 F.3d at 1333.  That is, the corresponding structure must be ***the algorithm disclosed to perform the function***, not merely a computer that may be programmed "to perform very different tasks in very different ways."  *See id.*; *see also Keithley v. Homestore.com*, 636 F. Supp. 2d 978, 993-95 (N. D. Cal. 2008) (claim term indefinite where specification merely described the presence of a server).

***Finally***, Synchronoss's brief is notable for its almost complete failure to defend its own proposed constructions for the terms Dropbox contends are subject to § 112(6).  That is unsurprising, as those constructions only highlight why the terms are means-plus function terms in the first place:  Each of Synchronoss's proposed constructions is ***purely functional***.  The "user

identifier module," according to Synchronoss, is simply "hardware or software that identifies a user," and the "user authenticator module" is "software that verifies the authenticity of a user." Such constructions would allow precisely what the law prohibits—"claim[s to] all possible means of achieving" the function specified in the claim term. *Blackboard*, 574 F.3d at 1385.

        c.     **"user identifier module" / "authentication module identifying a user coupled to the synchronization system" / "user authenticator module" / "user login authenticator"**

| Claim Term (Asserted Claims) | Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|---|
| "user identifier module" (claims 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20) | "hardware or software that identifies a user" | This term is subject to 35 U.S.C. § 112(6). Claimed Function(s): Identifying users. Corresponding Structure: None identified in the specification. |
| "authentication module identifying a user coupled to the synchronization system" (claims 1, 3, 5, 6) | "software that verifies a user's access to the synchronization system" | This term is subject to 35 U.S.C. § 112(6). Claimed Function(s): Identifying and authenticating a user coupled to the synchronization system. Corresponding Structure: None identified in the specification. |
| "user authenticator module" (claims 9, 10, 11, 12, 13, 14) | "software that verifies the authenticity of a user" | This term is subject to 35 U.S.C. § 112(6). Claimed Function(s): Authenticating users. Corresponding Structure: None identified in the specification. |
| "user login authenticator" (claims 16, 17, 18, 19, 20) | "software that authenticates a user's log-in" | This term is subject to 35 U.S.C. § 112(6). Claimed Function(s): Authenticating user logins. Corresponding Structure: None identified in the specification. |

      These terms relate to the functions of user identification or authentication. Identification typically involves presenting an identity to the system, whereas authentication is the process of validating such an identity. *See* Decl., Ex. D ¶¶ 42, 51 (Decl. of Michael J. Freedman, Ph.D.). Each term amounts to nothing more than generic "software or hardware" for performing one or both of these functions by any means possible, as Synchronoss's proposed constructions acknowledge. The terms are thus subject to 35 U.S.C. § 112(6) and invalid as indefinite.

### 1)     The terms are subject to 35 U.S.C. § 112(6).

Three of the claim terms—"user identifier module," "authentication module," and "user authenticator module"—use the well-known nonce word "module" as a substitute for "means." *Williamson*, 792 F.3d at 1350.   The Federal Circuit has specifically noted that "module" is "simply a generic description for software or hardware that performs a specified function" and "sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used."   *Id.*   Since *Williamson*, courts have consistently held that terms using the word "module" are subject to § 112(6).   *See, e.g.*, *Farstone Tech., Inc. v. Apple Inc.*, 2015 WL 5898273, at *3 (C.D. Cal. Oct. 8, 2015), *aff'd*, 668 F. App'x 366 (Fed. Cir. 2016); *Verint*, 166 F. Supp. 3d at 384; *Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 15-CV-349, 2016 WL 6275390, at *18-20 (E.D. Tex. Oct. 25, 2016); *Rockwell Automation, Inc. v. 3-S Smart Software Sols.*, No. 15-CV-1543-JRG, 2016 WL 5811485, at *35 (E.D. Tex. Oct. 5, 2016).

Because the word "module" imparts no structure, the modifiers—"user identifier," "authentication," and "user authenticator"—must do so in order "to take the overall claim limitation out of the ambit of § 112, para. 6." *Williamson*, 792 F.3d at 1351.   None do.   Those terms simply refer to functions—identifying or authenticating users—and the uncontroverted evidence is that a person of ordinary skill would understand there are many different ways a software or hardware component could be structured to perform those functions. *See* Decl., Ex. D ¶¶ 42, 50, 60.   As of the priority date, numerous structural options existed for each of the following sub-components of a "module" that performs user identification or authentication:  (1) how identification/authentication information is obtained from the user or device; (2) the format of identification/authentication data; (3) the communication protocol used for the authentication process; and (4) the storage mechanism for identification/authentication data.   *Id.*   Each distinct combination of these sub-components provides unique structural character.   For that reason, courts have held that the mere inclusion of "authentication" and "identifier" in a claim term does not impart definite structure to the term. *See, e.g.*, *GoDaddy.com, LLC v. RPost Comm. Ltd.*, 2016 WL 212676, *56-57 (D. Ariz. Jan. 19, 2016); *Aguayo v. Universal Instruments Corp.*, No. CIV.A. H-02-1747, 2003 WL 25787593, at *13-14 (S.D. Tex. June 9, 2003).

1    Synchronoss, for its part, fails to cite a single case supporting its position that these terms

2    connote definite structure. The three cases it does cite are completely inapposite. *Blast Motion,*

3    *Inc. v. Zepp Labs, Inc.* concerned the term "data storage module," and the party arguing that it

4    was a means-plus-function term also conceded that its contextual use in the claims disclosed

5    sufficient structure. No. 15-CV-700 JLS, 2017 WL 476428, at *16 (S.D. Cal. Feb. 6, 2017).

6    *Finjan, Inc. v. Blue Coat Sys.*, is even further off the mark. No. 13-CV-03999-BLF, 2014 WL

7    5361976, at *11 (N.D. Cal. Oct. 20, 2014). There, the parties agreed that the term "means for

8    determining whether to trust the first Downloadable security profile" was a means-plus-function

9    term, and the court held only that the ***corresponding structure*** for the claimed function was the

10   "certificate authenticator 515" disclosed in the specification. *Id.* at *11. Notably, "certificate

11   authenticator" in that case was not a generic term, but a reference to specific component that the

12   specification described in detail. *See id.* at *11-12. *Finjan* does not suggest that the term

13   "certificate authenticator" inherently discloses structure. Finally, in *VPS, LLC v. SmugMug, Inc.*,

14   the court merely found—under the pre-*Williamson* means-plus function standard—that a broader

15   claim limitation referring to a "user identifier" was not subject to § 112(6); there was no dispute

16   about the term "user identifier" itself or a generic "user identifier module." No. 10 CV 2142,

17   2012 WL 5471012, at *15-16 (N.D. Ill. Nov. 9, 2012).

18       Although the term "user login authenticator" does not include the word "module," it too

19   recites function without sufficient structure. The mere absence of the word "module" does not

20   magically impart structure to a claim term where none existed. As the Federal Circuit

21   recognized in *Williamson*, there is no fixed or required list of "nonce words," 792 F.3d at 1350;

22   simply adding the suffix "-or" or "-er" to a verb provides no more structure than the word

23   "module" does. Nor does the inclusion of the term "login" in "user login authenticator" impart

24   sufficient structure. Authenticating via a user login is just one of many different alternatives for

25   an authentication system that were available as of the priority date. *See* Decl., Ex. D ¶¶ 42, 51.

26   Because a "user login authenticator" is nothing more than a black box for authenticating user

27   logins, it "fails to recite sufficiently definite structure." *Williamson*, 792 F.3d at 1351.

28

1          **2)      The specification fails to disclose sufficient structure.**

2          As Dropbox's proposed constructions indicate, each of the claim terms discussed above

3    is associated with the functions of identifying and authenticating users.  Synchronoss does not

4    dispute that these are the correct functions for the terms at issue, as reflected in the functional

5    constructions it has proposed for the same terms.  However, there is not sufficiently definite

6    structure in the specification that a person of ordinary skill would be able to associate with either

7    of these functions.  Decl., Ex. D ¶¶ 45-46, 54-55, 63-64, 73-74; *Williamson*, 792 F.3d at 1351.

8          This is true even accounting for the portions of the specification Synchronoss cites in its

9    attempt to find sufficient structure.  To the extent the cited portions disclose structure at all, they

10   do not "link[] or associate[] that structure to the function recited in the claims." *Williamson*, 792

11   F.3d at 1352.  For example, Synchronoss cites a portion of the specification discussing the

12   authorization of "device name[s]."  Br. at 14.  But nothing in the specification suggests that a

13   "device name" identifies or authenticates users.  Likewise, the "add user module 1712"

14   Synchronoss cites performs neither user identification nor user authentication; it is a completely

15   distinct module that "adds user records to the user in device database." '696 patent at 32:14-15.

16   The description of the "account root structure" also is not structure for a user identification or

17   authentication module, but rather relates to "data package files." *Id.* at 41:58-42:11.

18         Other excerpts cited by Synchronoss merely restate the claimed function, and do not

19   contain any structural disclosures. *See Noah Sys.*, 675 F.3d at 1317.  For example, parts of the

20   specification noting that the management server authenticates users through a network

21   connection, Br. at 15, provide no information about the structure for the authentication module;

22   they only state that the function of authentication is performed.  These disclosures are inadequate

23   for another reason:  they simply disclose a general purpose computer that may be programmed to

24   perform the claimed function. *Aristocrat Techs.*, 521 F.3d at 1333.  There is no disclosure of

25   structure in the form of "an algorithm to perform the claimed function[s]" of identifying or

26   authenticating users. *Williamson*, 792 F.3d at 1352.  Each such term is therefore indefinite.

27         **d.      "transaction identifier module"**

28

| Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|
| "software for identifying a transaction" | This term is subject to 35 U.S.C. § 112(6). Claimed Function(s): Identifying transactions in the synchronization system. Corresponding Structure: None identified in the specification. |

The claim term "transaction identifier module" is likewise a means-plus-function term that is indefinite because the specification fails to disclose adequate corresponding structure.

In conjunction with the nonce word "module," the prefix "transaction identifier" does not impart sufficiently definite structure to the term. *See Aguayo*, 2003 WL 25787593, at *13. "Transaction identifier module" is not a term that is "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348. Nor is there a standard way "transactions" are "identified" in the computer science art, much less a widely known structure for a module performing such a function. *See* Decl., Ex. D ¶ 89. Rather, the structure of such a module may depend on: (1) the format of the transaction identifier used in the system; (2) the method by which the transaction identifier is generated and assigned to a transaction; (3) the method by which a transaction is identified; and (4) where the module is located in a networked system. *Id.* "That various methods might exist to perform a function is 'precisely why' the disclosure of specific programming is required" for a means-plus-function term. *Noah Sys.*, 675 F.3d at 1317. There is no such disclosure here.

Properly construed as a means-plus-function term, "transaction identifier module" is indefinite. The function of a "transaction identifier module" is "identifying transactions." There is no question the specification fails to disclose "adequate corresponding structure" associated with that function. Decl., Ex. D ¶ 92. In fact, it nowhere mentions a "transaction identifier module," much less any algorithmic structure for identifying transactions. Synchronoss suggests such structural disclosure can be found in the patent's description of "DataPack" files. Br. at 24. But the cited excerpts do not disclose any algorithm or flow chart showing how the system assigns or identifies transactions. DataPack files are not even "transactions" themselves; rather, as Synchronoss admits, they include "application data, file data, files, objects, and identifiers."

18

Br. at 25. Nor does the specification make the requisite "link" between the description of the DataPack files and the term "transaction identifier module" in the claims. *Williamson*, 792 F.3d at 1352. The claims easily could have recited a "DataPack file" if that was what the patentee intended. They instead recite a "transaction identifier module" that has no corresponding description—structural or otherwise—in the specification.

### e. "user data flow controller"

| Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|
| "software that controls the transmission or reception of change transactions" | This term is subject to 35 U.S.C. § 112(6).<br>Claimed Function(s): Controlling the flow of user data in the synchronization system.<br>Corresponding Structure: None identified in the specification. |

The next term at issue is "user data flow controller," which is also a means-plus-function term that is indefinite because the specification fails to disclose corresponding structure.

Like the terms above, "user data flow controller" is not "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348. There is no standard way systems control the flow of user data, much less a widely known structure for a component that performs such a function. *See* Decl., Ex. D ¶ 80. In fact, the structural choices for such a "controller" are wide-ranging and include: (1) use of a locking mechanism; (2) use of data storage; (3) use of a load balancer; and/or (4) an authentication component. *See id.* Against this backdrop, the '696 patent does not make the requisite structural disclosure under § 112(6). *See Noah Sys.*, 675 F.3d at 1317.

"Controller" is a generic functional term, and several courts post-*Williamson*, including in this District, have concluded that "controller" does not convey sufficiently definite structure to fall out of the ambit of § 112(6). *See Klaustech, Inc. v. Google, Inc.*, No. C 10-05899 JSW, 2016 WL 2957044, at *6 (N.D. Cal. May 23, 2016) ("central controller"); *Konami Gaming, Inc. v. Marks Studios, LLC*, No. 214CV01485JADCWH, 2017 WL 3174905, at *6 (D. Nev. July 25, 2017) ("game controller"); *HealthSpot, Inc. v. Computerized Screening, Inc.*, No. 1:14-CV-

00804, 2015 WL 1523960, at *11-12 (N.D. Ohio Apr. 2, 2015) ("logic for controlling"). Synchronoss's pre-*Williamson* cases discussing the use of "controller" applied a much stronger presumption against means-plus-function claiming in the absence of the word "means" than the law now permits. *See Lighting World*, 382 F.3d at 1358. The only post-*Williamson* case Synchronoss cites is inapposite. In *Tech. Props. Ltd. LLC v. Canon Inc.*, the court was not asked to construe a term containing the word "controller." No. C 14-3640 CW, 2015 WL 5535830, at *5-6 (N.D. Cal. Sept. 18, 2015). Rather, the court found that the specification's description for a controller was adequate corresponding structure for a separate means-plus-function term. *Id.*

The stated function of the "user data flow controller" is controlling the flow of user data in the synchronization system described in the '696 patent. Synchronoss does not dispute that this is the proper function for the term. The specification, however, fails to disclose "adequate corresponding structure" associated with that function. Decl., Ex. D ¶ 83. In fact, the specification nowhere mentions a "user data flow controller," much less any algorithmic structure for controlling the flow of user data. *Id.* Synchronoss attempts to uncover such structure by arguing that the "management server" disclosed in the specification "itself is the data flow controller." Br. at 16. But the specification does not make the requisite "link[]" between its description of the management server and the claim term. *Williamson*, 792 F.3d at 1352. Even if it did, the disclosures Synchronoss cites are insufficient because the management server is simply a general purpose computer that can be programmed to perform various functions. *See supra* pp. 6-8. To constitute adequate corresponding structure, there must be a disclosure of an algorithm to perform the specific claimed function of controlling the flow of user data. *Williamson*, 792 F.3d at 1352. Synchronoss also cannot rely on the high level flowcharts in Figures 15 and 16 and general disclosures relating to how data is downloaded, uploaded, and synchronized in the system as a disclosure of adequate corresponding structure, Br. at 17, because those disclosures merely concern synchronization in the system generally. Decl., Ex. D ¶ 83. They provide no basis to isolate any particular structure as associated specifically with the function of controlling the flow of user data. *Id.* The "user data flow controller" is a specific component of the broader synchronization system. Because the

specification does not clearly associate certain structure with its function, the term is indefinite.

**f.    "versioning modules" / "versioning information"**

| Claim Term (Asserted Claims) | Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|---|
| "versioning modules" (claims 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20) | "software that applies versioning information to objects in a change transaction" | This term is subject to 35 U.S.C. § 112(6). Claimed Function(s): "Applying a version number per object in the data package" Corresponding Structure: "A hardware or software component configured to identify a DataPack file using specific rules based on the file name. The file name is of the form 'UUID.VER' where UUID is the identifier for the specific object and VER is the transaction version number. The version number is of the form 'D0001' with additional digits used for large version numbers. The 'D000' value may be reserved for the base version for the object." |
| "versioning information" (claims 1, 3, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20) | "information about modifications to data" | "A unique version number applied per object in the data package using specific rules based on the file name. The file name is of the form 'UUID.VER' where UUID is the identifier for the specific object and VER is the transaction version number. The version number is of the form 'D0001' with additional digits used for large version numbers. The 'D000' value may be reserved for the base version for the object." |

The term "versioning modules" is also a means-plus-function term subject to § 112(6). Unlike the terms above, the specification provides a description of the corresponding structure. The "scope of coverage" is therefore limited by that structure, and cannot be expanded to cover every possible way to achieve the claimed function, as Synchronoss urges.  792 F.3d at 1347.

The prefix "versioning" does not impart sufficiently definite structure into the well-known nonce word "module."  "Versioning" is what the module *does*—i.e., it is the function, not "the name for structure."  *Id.* at 1348.  A person of ordinary skill would have numerous structural choices available when implementing such a module, including:  (1) the data format for versioning information; (2) how the version numbers are generated and assigned; and (3) the scope of versioning data within a system.  *See* Decl., Ex. D ¶ 98.  Different combinations of these alternatives yields numerous unique structural configurations, and the claims do not make

1    the disclosure required to avoid § 112(6) against that backdrop. *Noah Sys.*, 675 F.3d at 1317.

2        Apart from conclusory statements, Synchronoss does not explain why the term

3    "versioning modules" would be "understood by persons of ordinary skill in the art to have a

4    sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348. The fact

5    that "version" has a well-understood meaning does not imply the term "versioning module" has a

6    widely known *structure* associated with it. It does not. *See* Decl., Ex. D ¶¶ 98-100.

7        Accordingly, the next step in construing "versioning modules" is to identify the claimed

8    function and locate corresponding structure, if any, in the specification. *Williamson*, 792 F.3d at

9    1351-52. Here, the specification clearly identifies the function performed by the "versioning

10   modules": "Device engine 860 further includes a versioning module *which applies a version

11   number per object in the data package*." '696 patent at 12:10-12. The specification further

12   discloses structure associated with that claimed function. It explains precisely how a version

13   number is generated and assigned to transactions in a data package file. *Id.* at 38:48-54. The

14   portions of the specification identified by Synchronoss do not change either the function or

15   structure associated with "versioning modules." Synchronoss merely cites the same portion of

16   the specification that yielded Dropbox's proposed function, and pseudocode providing additional

17   detail—consistent with Dropbox's proposed structure—about how version numbers are assigned

18   to transactions in the data package file. Br. at 22. In light of the disclosures in the specification,

19   Synchronoss cannot now expand the scope of its claim to cover any possible structure associated

20   with the claimed function. *Med. Instrumentation & Diagnostics Corp.*, 344 F.3d at 1211.

21       As for the related term "versioning information," Dropbox is not "attempting to import an

22   embodiment disclosed in the specification," as Synchronoss asserts. Br. at 22. It is merely using

23   "the specific rules" set out verbatim in the specification to identify how version numbers are

24   generated and assigned in the claimed synchronization system. '696 patent at 38:48-54. The

25   patent never says these "specific rules" are optional, or merely part of a particular embodiment.

26   "Even when guidance is not provided in explicit definitional format, the specification may define

27   claim terms by implication such that the meaning may be found in or ascertained by a reading of

28   the patent documents." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300

(Fed. Cir. 2004).  That is precisely the case here, as reflected by Dropbox's construction.

        **g.**    **"synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" / "synchronization agent"**

| Claim Term (Asserted Claims) | Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|---|
| "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" (claims 1, 3, 5, 6) | "software or hardware component that manages a user's account and controls data migration among network coupled devices in communication with at least one software that transmits or receives change transactions to control data migration between a first network coupled device and a second network coupled device" | This term is subject to 35 U.S.C. § 112(6). Claimed Function(s):  "Controlling data migration between a first network coupled device and second network coupled device." Corresponding Structure:  A hardware or software component configured to perform the algorithm set forth in Figures 15 and 16 of the '696 patent and the corresponding text. |
| "synchronization agent" (claims 16, 17, 18, 19, 20) | "software that generates or incorporates the change transactions" | This term is subject to 35 U.S.C. § 112(6). Claimed Function(s):  "Controlling the flow of user data in the synchronization system." Corresponding Structure:  A hardware or software component configured to perform the algorithm set forth in Figures 15 and 16 of the '696 patent and the corresponding text. |

     The terms are both means-plus-function terms for which the specification discloses the same broad corresponding structure.  The "scope of coverage," therefore, cannot be expanded to reach every conceivable way to achieve the claimed functions, as Synchronoss urges. *Williamson*, 792 F.3d at 1347.

     Like the terms above, "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" is not a term that is "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348.  There is not a standard way to "control data migration" between two network coupled devices, much less a widely known

23

structure for a software or hardware component that performs such a function. *See* Decl., Ex. D ¶ 106. The structural choices for such an apparatus are wide-ranging and include: (1) use of a locking mechanism; (2) use of data storage; (3) use of a load balancer; and/or (4) use of a network service. *Id.* As with other functional terms in the patent, the claims do not make the disclosure required to avoid § 112(6) against that backdrop. *Noah Sys.*, 675 F.3d at 1317.

The term "synchronization agent" suffers from the same deficiency. It would not be "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348. The word "agent" in this claim term is no different than if the words "device" or "module" had been used. *Id.* Synchronoss's suggestion that courts have categorically concluded that the word "agent," in and of itself, connotes structure, is wrong. In *Genband USA LLC v. Metaswitch Networks Ltd.*, the case cited by Synchronoss for this proposition, the court merely concluded that the claim language at issue there, in light of the specification, provided structural character to the specific "agent" being construed. No. 14-CV-33-JRG, 2015 WL 4722185, at *17 (E.D. Tex. Aug. 7, 2015). But there is nothing in claim 16 of the '696 patent providing such structure for a "synchronization agent."

Synchronoss argues that the claim terms "synchronization manager" and "management server" are the same and should be construed the same way. Br. at 18. However, "different claim terms are presumed to have different meanings." *Hemlsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381-82 (Fed. Cir. 2009). Synchronoss identifies no disclosure in the patent to overcome this presumption, and none exists. Likewise, Synchronoss's suggestion that "synchronization agents" and "device engines" are the same should be rejected. Br. at 19-20. Synchronoss is attempting to sidestep the specification's failure to adequately define the term "synchronization agent." Such post-hoc rationalizations are improper; the terms must be construed as written, not as Synchronoss wishes they had been. *Chef Am.*, 358 F.3d at 1374.

Synchronoss also asks the Court to rely on the post-dated, non-public FusionOne documentation as a basis to construe these terms. Its request is improper for the reasons discussed above. *See supra* pp. 4-6. Accordingly, the terms "synchronization manager communicating with at least one interactive agent to control data migration between a first

network coupled device and a second network device" and "synchronization agent" fail to recite sufficiently definite structure and are subject to § 112(6).

The next step in construing these terms is determining the claimed function and locating corresponding structure, if any, in the specification. *Williamson*, 792 F.3d at 1351-52. Here, the term "synchronization manager communicating with at least one interactive agent to ***control data migration between a first network coupled device and a second network device***" itself discloses the claimed function: "Controlling data migration between a first network coupled device and second network coupled device." As for "synchronization agent," the specification suggests that it communicates with the "synchronization manager" to control the flow of user data in the synchronization system. Synchronoss does not dispute these claimed functions.

Here, the specification discloses structure that a person of ordinary skill would be able to associate with these claim terms. Figures 15 and 16 depict flow charts for synchronization processes in the invention; they show how the synchronization manager interacts with individual agents to manage data migration in the synchronization system. The corresponding structure for both terms, therefore, is disclosed in those flowcharts and the associated text. '696 patent at 33:32-36:24. Synchronoss argues that Dropbox improperly conflates the structure of the "synchronization agent management server" and the structure for "synchronization agent." Br. at 19. But Dropbox is only reflecting the description in the patent. Figures 15 and 16 generally describe "push" and "pull" synchronization. Neither figure isolates the characteristics of the synchronization agent from the synchronization manager. Synchronoss, in any event, has failed to identify corresponding structure for either term. In light of the disclosures in the specification, Synchronoss cannot now expand the scope of its claim to cover any possible structure associated with the claimed functions. *Med. Instrumentation & Diagnostics Corp.*, 344 F.3d at 1211.

**2.     "universally unique identifier"**

| Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|
| "A unique 128 bit value which may be assigned by the system provider" | "128-bit value consisting of 16 octets that guarantees uniqueness across space and time and is standardized by the Open Software Foundation" |

1   The primary dispute between the parties on this term is whether it refers to the well-

2   known term of art by the same name, or whether, as Synchronoss contends, it refers to any 128-

3   bit identifier that may be assigned by the system provider.  Both the intrinsic evidence and

4   uncontroverted expert testimony support Dropbox's construction.

5   At the outset, it is undisputed that "universally unique identifier" (or "UUID") was at the

6   priority date a well-known term of art with a specified meaning.  Decl., Ex. D ¶ 30.  UUID refers

7   specifically to an identifier that uses the same general format, which was standardized by the

8   Open Software Foundation, and is designed to facilitate the generation of universally unique

9   values.  *See* Decl., Ex. D ¶ 29.  Nonetheless, Synchronoss asserts that the patentee "chose . . . to

10  be its own lexicographer" for this term, and cites a single sentence from the specification as

11  providing the relevant definition.  Br. at 25.  But the cited language—noting that "[e]ach UUID

12  has a unique 128 bit value which may be assigned by the system provider"—does not purport to

13  *redefine* the term "universally unique identifier"; it merely recites some (but not all) aspects of

14  an identifier that has long been known in the field of computer science.  Dropbox agrees that a

15  "universally unique identifier" "has a unique 128 bit value" and "may be assigned by the system

16  provider."  But the uncontroverted expert testimony is that a person of ordinary skill would

17  understand that those are not the sole or defining features of a UUID.  *See* Decl., Ex. D ¶ 29.

18  In that regard, the intrinsic evidence makes clear that the patentee did not intend to

19  redefine the well-known term UUID.  Synchronoss focuses on a single, non-definitional sentence

20  in the specification, while ignoring other portions of the specification making clear that the term

21  "universally unique identifier" is being used in accordance with its customary meaning in the

22  field.  In particular, the specification explains that the "universally unique identifier" is a "128-

23  bit UUID as defined by *standard*."  '696 patent at 41:7-9; *see also id.* at 43:41-42 (referring to

24  "the Universally Unique Identifier (UUID) *standard*").  The specification also repeatedly places

25  the well-known acronym "UUID" in parentheses after "universally unique identifier," thereby

26  equating its use of the term with its customary meaning in the field.  *Id.* at 38:11-12; 12:12-13.

27  The definitional features of a UUID that Synchronoss tries to write out of the claims are

28  not mere technicalities.  The very purpose of a UUID is—as its name implies—to guarantee

1  ***universal*** uniqueness, so that objects on different systems will have different identifiers. Merely

2  giving an object a 128-bit identifier does not accomplish that. Rather, as Dr. Freedman explains,

3  UUIDs are in a standardized format, with specific rules on how each octet—the 16 8-bit values

4  that make up a 128-bit identifier—are derived and generated. Decl., Ex. D ¶¶ 30, 34. Those

5  rules guarantee, to a high degree of probability, a UUID's uniqueness across space and time, so

6  that objects such as files may be identified uniquely worldwide, not just within a given computer

7  system. Although Synchronoss argues that the "'696 Patent makes no mention that the value

8  'guarantees uniqueness across space and time,'" Br. at 26, it overlooks both the explicit use of

9  the word "universally," and that this concept is part of the recognized meaning of "UUID."

10      Synchronoss's generic definition, in contrast, provides no guarantee of such universal

11  uniqueness outside of a given computer system. It therefore reads the word "universally" out of

12  the claim, and fails to differentiate the term "universally unique identifier" used in independent

13  claim 1 from "unique transaction identifier" used in claims 9 and 16, which does not recite an

14  explicit universal uniqueness requirement. Both transgressions violate black-letter claim

15  construction law. *See Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed.

16  Cir. 2004); *Bd. of Regents of the Univ. of Texas Sys.*, 533 F.3d at 1371.

17      Finally, Synchronoss's selective and misleading quotation of documents to suggest that

18  there are various versions of UUIDs, and that even UUIDs are not universally unique, is

19  unavailing. The UUID standard contemplates alternative methods of generating a UUID, which

20  are specified by a "version" code in one of the octets, but Dropbox's construction covers those

21  alternative methods. *See* Decl., Ex. D ¶ 30. Synchronoss also suggests that the UUID is not

22  intended to be universally unique by quoting selectively from the ITU-T UUID standard.

23  However, the relevant document notes that "a UUID is either guaranteed to be different from all

24  other UUIDs generated before 3603 AD or is extremely likely to be different." *See* Eskandari

25  Decl., Ex. D at v. That there may be some exceedingly rare hypothetical circumstances in which

26  a UUID is not universally unique, or that the UUID specification will cease to be "universal" a

27  millennium and a half from now, does not undermine the fact that the guarantee of uniqueness is

28  a core feature of a UUID, and UUIDs are considered in the art as providing such uniqueness

1    within the bounds of current technology.  Decl., Ex. D ¶¶ 30, 37.  On these points, Dr. Freedman

2    is undisputed, as Synchronoss has offered no *evidence* to the contrary, only attorney argument.

3    **C.    U.S. PATENT NO. 7,587,446 ("'446 PATENT")**

4    **1.    "digital media file"**

| Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|
| plain and ordinary meaning – "a file comprising digital media content" | plain and ordinary meaning – "digital audio or video content in the form of an individual file such as an MPEG, MP3, RealAudio, or Liquid Audio file" |

The parties' dispute regarding this term centers on whether a "digital media file" is what it says—a digital media file—or whether it should be redefined, as Synchronoss requests, to include any type of file that happens to contain some digital media content.  Synchronoss's construction is inconsistent with both the intrinsic record and the plain meaning of the term.

The specification effectively provides a definition for "digital media file" by indicating that "digital media content can comprise a series of files such as MPEG, MP3, RealAudio," '446 patent at 1:42-44, and by referring to "[d]igital audio and video" as types of "digital media," *id.* at 1:25-30; *see also id.* at 3:21-30.  In other words, a "digital media file"—as opposed to "digital media content"—refers to an individual *file* such as an MPEG or MP3.[2]  The specification does not suggest that a digital media file is defined by the mere presence of digital media content.

The use of the term "digital media file" in the claims is also consistent with Dropbox's proposed construction, not Synchronoss's.  For example, claim 1 refers to "media data comprising a directory of digital media files," distinguishing between mere "media data" on the one hand, and complete "digital media files" on the other.  Synchronoss's construction conflates the two concepts, violating the Federal Circuit's "instruct[ion] that different claim terms are presumed to have different meanings." *Hemlsderfer*, 527 F.3d at 1381-82.

Synchronoss misleadingly quotes from the patent specification to suggest that a "digital

---

[2]  Synchronoss claims to be confused by the use of the word "individual" in Dropbox's construction, Br. at 27, but the term simply emphasizes that a "digital media file" is a discrete, complete media file like an MP3 or JPEG, not any file that happens to contain some media data. It does not mean that there is "one and only one" such file in a given embodiment of the claims.

media file" may be something other than an audio or video file. Br. at 27. The specification says no such thing. Rather, it merely notes the unremarkable—and undisputed—proposition that a digital media file like an MP3 "can **include** text information as well as binary information." '446 patent at 5:11-17; *see also id.* at col. 5:20-21 (MP3 audio file may "**contain** binary information"). It does not purport to expand the common meaning of a "digital media file."

In that regard, Dropbox's inclusion of exemplary language ("such as an MPEG, MP3, RealAudio, or Liquid Audio file") is not an improper attempt to limit the claim to those examples. The Court is perfectly capable of ensuring that does not happen at trial. Rather, such language—which comes directly from the specification—is meant only to clarify the meaning of "digital media file." That is particularly important here, where Synchronoss is attempting to blur the meaning of an otherwise common term. While there may be instances where such exemplary language risks confusion, there are others, like here, where it provides the jury with helpful clarification. *See, e.g., Tyco Healthcare Group LP v. Applied Med. Resources Corp.*, No. 09-CV-176, 2011 WL 13136264, at *4 (E.D. Tex. Feb. 18, 2011); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2993856, at *4 (N.D. Cal. July 20, 2012).

### 2.    "web browser"

| Synchronoss's Proposed Construction | Dropbox's Proposed Construction |
|---|---|
| "a software application that allows a user access to an information store on the World Wide Web" | "software application, such as Microsoft Internet Explorer, for viewing and interacting with web pages on the World Wide Web" |

Synchronoss assails Dropbox's proposed construction of "web browser" as "built almost entirely out of extrinsic, litigation-driven expert testimony." Br. at 28. It nowhere mentions that Dropbox's construction is taken almost verbatim from **Synchronoss's own proposed construction** in a prior litigation involving the '696 patent. *See* Decl., Ex. F (*Synchronoss Tech., Inc. v. NewBay Software, Inc.*, No. 11-cv-04947-FLW, Dkt. No. 48-2 (D.N.J. Nov. 14, 2012)). This undisclosed shift in positions is nothing more than an improper attempt to expand the term web browser to include items like Dropbox's proprietary mobile application—which is not a "web browser" under any proper construction. Synchronoss's construction here is inconsistent

1    with plain and ordinary meaning of the term and the '446 patent itself.

2    At the outset, "web browser" is not a complicated or technical term requiring special

3    knowledge or training to understand.  As anyone who uses the internet knows, a "web browser"

4    is an application for "brows[ing]" the "web."  Where, as here, "the ordinary meaning of claim

5    language as understood by a person of skill in the art may be readily apparent even to lay judges,

6    . . . claim construction . . . involves little more than the application of the widely accepted

7    meaning of commonly understood words." *Phillips*, 413 F.3d at 1314.  The "widely accepted

8    meaning" of "web browser" is a "software application, such as Microsoft Internet Explorer, for

9    viewing and interacting with web pages on the World Wide Web"—precisely the construction

10   Dropbox proposes.  Decl., Ex. D ¶¶ 123-28.  Synchronoss recognized as much when it proposed

11   essentially the same construction in the *NewBay* case—a "software application, such as Internet

12   Explorer, for viewing and interacting with the World Wide Web." Decl., Ex. E.  Dropbox's

13   construction (following defendant NewBay's in the prior case) merely adds the reference to

14   "web pages" for clarity.  Either construction, however, requires a "web browser" to be for

15   browsing and is thus far more appropriate than the one Synchronoss now proposes.

16   Synchronoss's present construction strips "web browser" of its core distinguishing

17   feature:  that it is a program to "browse" the "web."  It is not any application that allows access

18   to a remote information store on the World Wide Web.  Such a redefinition finds no support in

19   the intrinsic record.  Although Synchronoss suggests its construction is taken from the patent

20   specification, that is wrong.  While the specification notes that a web browser "***allows*** the user

21   access to an information store," '446 patent at 7:52-54, that is neither the sole nor defining

22   feature of a web browser, either in the '446 patent or common usage.

23   Finally, as with the construction of "digital media file," there is nothing improper or

24   confusing about the inclusion of the exemplary language "such as Microsoft Internet Explorer"

25   in Dropbox's proposed construction, *see supra* pp. 28-29.  The source of this language is

26   ***Synchronoss's own construction*** in the *NewBay* case.

27

28

DROPBOX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5(B)
CASE NO. 4:16-CV-00119-HSG

1  Dated: October 6, 2017                    Respectfully submitted,

2                                            By: /s/ Thomas H.L. Selby

3                                            Thomas H.L. Selby (*Pro Hac Vice*)
                                             David M. Krinsky (*Pro Hac Vice*)
                                             Adam D. Harber (*Pro Hac Vice*)
4                                            Christopher J. Mandernach (*Pro Hac Vice*)
                                             WILLIAMS & CONNOLLY LLP
5
                                             Stephen E. Taylor (SBN 058452)
6                                            Jonathan A. Patchen (SBN 237346)
                                             TAYLOR & PATCHEN, LLP
7
                                             Attorneys for Defendant DROPBOX, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DROPBOX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO PATENT L.R. 4-5(B)
CASE NO. 4:16-CV-00119-HSG