MARK L. HOGGE (*Pro Hac Vice*)
SHAILENDRA K. MAHESHWARI (*Pro Hac Vice*)
NICHOLAS H. JACKSON (SBN 269976)
DENTONS US LLP
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 408-6400
Facsimile: (202) 408-6399
Email: mark.hogge@dentons.com
Email: shailendra.maheshwari@dentons.com
Email: nicholas.jackson@dentons.com

SARAH S. ESKANDARI (SBN 271541)
DENTONS US LLP
One Market Plaza,
Spear Tower, 24th Floor
San Francisco, CA 94105
Telephone: (415) 267-4000
Facsimile: (415) 267-4198
Email: sarah.eskandari@dentons.com

*Attorneys for Plaintiff*
*SYNCHRONOSS TECHNOLOGIES, INC.*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| SYNCHRONOSS TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> DROPBOX, INC. <br><br> Defendant. | Case No. 4:16-CV-00119-HSG-KAW <br><br> **SYNCHRONOSS'S REPLY CLAIM CONSTRUCTION BRIEF** <br><br> Date: Nov. 1, 2017 <br> Time: 10:00 a.m. <br> Place: Oakland, Courtroom 2, 4th Flr <br> Judge: Hon. Haywood S. Gilliam, Jr. |
| SYNCHRONOSS TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> EGNYTE, INC. <br><br> Defendant. | Case No. 4:16-CV-00120-HSG-KAW <br><br> **SYNCHRONOSS'S REPLY CLAIM CONSTRUCTION BRIEF** <br><br> Date: Nov. 1, 2017 <br> Time: 10:00 a.m. <br> Place: Oakland, Courtroom 2, 4th Flr <br> Judge: Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

I.    ARGUMENT ...................................................................................................1

A. The '757 Patent ...........................................................................................1

    a.    "a previous state of said data" / "copy of a previous state of said data"........................1

    b.    "management server" / "management dedicated network coupled device" / "synchronization agent management server".................................................................2

    c.    "[first / second] system" / "[first / second] device" / "device[s]" / "network coupled device[s]" / "network coupled apparatus[es]" ...........................................................3

B. The '696 Patent ...........................................................................................4

    a.    Alleged Means-Plus-Function Claim Elements................................................4

    b.    "user identifier module" / "authentication module identifying a user coupled to the synchronization system" / "user authenticator module" / "user login authenticator" / "user data flow controller"...................................................................................9

    c.    "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" / "synchronization agent" ...................................................................10

    d.    "versioning modules" / "versioning information" ........................................11

    e.    "transaction identifier module"..................................................................12

    f.    "universally unique identifier"..................................................................12

C. The '446 Patent .........................................................................................13

    a.    "digital media file"..................................................................................13

    b.    "web browser" ........................................................................................14

II.    CONCLUSION..............................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                **Page(s)**

*Apple, Inc. v. Samsung Elecs. Co.*,
    2012 WL 2993856 (N.D. Cal. July 20, 2012)........................................................................15

*Blast Motion, Inc. v. Zepp Labs., Inc.*,
    2017 U.S. Dist. LEXIS 16549 (S.D. Cal. Feb. 6, 2017) ........................................................6

*Cias, Inc. v. Alliance Gaming Corp.*,
    504 F.3d 1356 (Fed. Cir. 2007)...............................................................................................4

*Info-Hold, Inc. v. Applied Media Techs. Corp.*,
    783 F.3d 1262 (Fed. Cir. 2015).............................................................................................11

*Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*,
    309 F.3d 1365 (Fed. Cir. 2002)...............................................................................................1

*Linear Tech. Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004)...............................................................................................7

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc).............................................................................15

*Synchronoss Tech., Inc. v. NewBay Software, Inc.*,
    No. 11-cv-04947-FLW, D.I. 67-2 (D.N.J. Nov. 30, 2012) ...............................................14, 15

*TecSec, Inc. v. IBM*,
    731 F.3d 1336 (Fed. Cir. 2013)...............................................................................................5

*Tyco Healthcare Group LP v. Applied Med. Resources Corp.*,
    2011 WL 13136264 (E.D. Tex. Feb. 18, 2011) ....................................................................15

*Williamson v. Citrix Online, LLC*,
    770 F.3d 1371 (Fed. Cir. 2014) *vacated by Williamson*, 792 F.3d 1339 .................................7

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) (en banc).......................................................................4, 6, 7, 8

**Statutes**

35 U.S.C. § 112, para. 6 ......................................................................................... *passim*

**Other Authorities**

6,671,757 ("the '757 Patent") ...................................................................................1, 2, 3

6,757,696 ("the '696 Patent") ...................................................................................1, 4, 12

7,587,446 ("the '446 Patent") ...................................................................................1, 13

IEEE 100, THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS 63

    (2000) ................................................................................................5, 7, 11, 12

Pursuant to Patent L.R. 4-5(c) and the Scheduling Orders in these cases, Plaintiff Synchronoss Technologies, Inc. replies to the responsive claim construction briefs filed by Defendants Dropbox, Inc., and Egnyte, Inc. (collectively, "Defendants") regarding the construction of certain terms of U.S. Patent Nos. 6,671,757 ("the '757 Patent"); 6,757,696 ("the '696 Patent"), and 7,587,446 ("the '446 Patent") (collectively, "the Asserted Patents"). (No. 4:16-cv-119, D.I. 137-3, 137-4, 137-5, and No 4:16-cv-120, D.I. 137-3, 137-4, 137-5 (Exs. C-E to the Joint Claim Construction and Prehearing Statement ("JCCS"))).

## I. ARGUMENT

### A. The '757 Patent

#### a. "a previous state of said data" / "copy of a previous state of said data"

Defendants find fault with arguments made during the IPRs in which the contested claims of the '757 patent were found valid. In those IPRs, however, the construction of the term "previous state of said data" was not disputed or at issue, nor did the Patent Trial and Appeals Board construe the term. *See, e.g.*, D.I. 152-2, IPR2016-00851, Final Written Decision at 9-12 (only construing the terms "Difference Transaction" and "Difference Transaction Generator"). The dispute in the IPR with respect to the Nichols reference was whether Nichols disclosed a "difference transaction generator," not "a previous state of said data." Accordingly, Defendants arguments regarding prosecution history estoppel in the IPRs are misplaced.

Defendants also fault Synchronoss's citation to the Architecture Guide as attempting to vary the definition from the specification, but this is plainly not the case. First, reliance on a document that was created approximately the same time as the issue dates of the asserted patents is proper. *See Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1370 (Fed. Cir. 2002) ("We may look, therefore, to the dictionary definition of the claim term 'mobility' as of the date the patents issued."). Second, the Architecture Guide complements, rather than varies the disclosure in the '757 patent. The Architecture Guide expressly states, "The Application Object Store (AOS) **holds the state of the data as of the last sync**." FusionOne Synchronization Platform Architecture Guide (v1) at 10 ( D.I. 144, Exhibit A to Synchronoss's

Opening Claim Construction Brief (hereinafter "Op. Br.")) (emphasis added). This is nearly verbatim the description from the specification, which states, "Application object store 920 is a mirrored interface **which stores a snapshot of the previous state of the data** from the application object 910 in the device engine." '757 patent, 12:12-14 (emphasis added).

The Architecture Guide then goes on to state, "The AOS does not need to contain a complete copy of the data [i.e. a previous version]. In some cases a hash can be stored in the AOS and used for change determination." Exhibit A to Op. Br. at 10. This is also consistent with the '757 patent's specification which notes the variety of data stored. Specifically, the "application object" which is stored in the application object store "includes an item interface that permits management of individual information entries such as records or files or components of information entries such as fields within records." '757 patent, 39:25-29. Those fields include information about the data, as well as the data itself including "FileAttributes," "CreationDate," "ModificationDate," "AccessDate," "FileSize," "FileBody," "DeltaSize," and "**Hash**." *Id.* at 44:45-56 (emphasis added). Accordingly, the '757 patent expressly recognizes storing of a hash about the data as described in the Architecture Guide.

Accordingly, Synchronoss's proposed construction is not improper as Defendants allege, and thus is the correct construction of the term "a previous state of said data."

      **b.**  **"management server" / "management dedicated network coupled device" / "synchronization agent management server"**

Defendants fail to acknowledge that, while their proposed construction is taken directly from the specification, so too is Synchronoss's. '757 patent, 17:30 ("MS, a management server that manages users' accounts"). While Defendants find many faults with Synchronoss's proposed construction compared to their own, the proposed constructions are effectively a difference without a distinction. Both proposed constructions are aspects of the management server. By managing users' accounts, the management server is managing the device engines and vice versa. If the construction proposed by Defendants were modified to use the terminology of the asserted claims, then the issue would likely be resolved.

For example, in claim 1 of the '757, an "entire network of device engines across all users" is not claimed. Further, an "entire network of device engines across all users" is inconsistent with the claim language because the claimed network is what the management server is coupled to. '757 patent, claim 8, 47:31-32. Next, the management server is not in communication with "device engines." Instead, it is in communication with "a first sync engine" and "a second sync engine" coupled to the network. If Defendants' proposed construction were modified to be consistent with the claims' language, then Defendants' proposed construction would be effectively the same as Synchronoss's – i.e. "a centralized server which controls behavior and characteristics of the sync engines" is really no different than "the software or hardware component that manages a user's account." By managing a user's account, the management server is controlling the behavior and characteristics of the devices associated with that user. This is apparent as the specification uses both descriptions for the claimed management server. Accordingly, either the Synchronoss's proposed construction or the Defendants' proposed construction that has been conformed to the claim's terminology would both be appropriate.

c. **"[first / second] system" / "[first / second] device" / "device[s]" / "network coupled device[s]" / "network coupled apparatus[es]"**

Defendants confusingly argue that their proposed construction "recognizes that 'system,' 'apparatus,' and 'device' have different meanings, and harmonizes these terms in the context of the claims." D.I. 149-3, Dropbox, Inc.'s Responsive Claim Construction Brief (hereinafter "Br.") at 8.[1] Defendants' construction does no such thing. Like Synchronoss, Defendants offer one unified construction for these terms, without any distinction among "system," "device," "network coupled device," and "network coupled apparatus." Synchronoss's proposed construction however, is the precise definition given in the specification. '757 patent, 5:14-22 ("In accordance with the discussion herein, **a 'device' is defined as** a collection of elements or components organized for a common purpose, and may include hardware components of a

---

[1] Dropbox's and Egnyte's responsive briefs are substantially the same. Accordingly, quotes and cites to the responsive brief are specifically to Dropbox's, but applies equally to Egnyte's.

computer system, personal information devices, hand-held computers, notebooks, or any combination of hardware which may include a processor and memory which is adapted to receive or provide information to another device; or any software containing such information residing on a single collection of hardware or on different collections of hardware." (emphasis added)).

None of Defendants counterarguments are availing. Defendants confusingly argue that the patentee intended the terms "system" and "device" to have a different definition, but then propose the same definition for both of these terms. Defendants also argue without citation to any evidence that "standalone software cannot, however, be 'coupled' to a network." Even if that is true, it is irrelevant. The asserted claims utilize the open-ended "comprising" preamble, meaning that additional, unrecited elements are not excluded. *Cias, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007). For these reasons, Synchronoss's proposed construction is correct, as it is the precise definition given for these terms by the patentee.

**B. The '696 Patent**

**a. Alleged Means-Plus-Function Claim Elements**

Defendants attempt to characterize a structural claim term by overreaching in their reliance on Federal Circuit precedent and attempt to shift the burden to Synchronoss to prove that claim terms are structural. None of the disputed terms use the key phrase "means for"; however, Defendants consistently ignore the presumption that 35 U.S.C. § 112, para. 6 does not apply because this phrase is not used. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc) ("the failure to use the word 'means' also creates a rebuttable presumption—this time that § 112, para. 6 does not apply."). The only evidence on which Defendants rely is conclusory expert testimony that implicitly supports Synchronoss's assertion that each of the terms is structural in the art. Furthermore, despite Dropbox's assertion that its expert declaration is "uncontroverted," Synchronoss has cited dictionary definitions that indicate that each of the terms used in the disputed claim elements are structural, and not purely functional, as well as offered its own expert declaration. *See* D.I. 142. Accordingly, Defendants

1  have not met their burden of establishing that any of the disputed terms are properly construed as

2  means-plus-function claim elements.

3        Defendants repeatedly conclude that the terms used in the disputed terms lack structure,

4  but fail to offer any argument or evidence why – much in the same way as their expert did during

5  his deposition by only offering circular definitions. Declaration of Sarah S. Eskandari

6  ("Eskandari Decl. "), Ex. A, at 39:12-16, 40:13-41:7 ("Q: what in the claim, not in the

7  specification, would provide structure that these would not be means plus function claim

8  elements? . . . A: one would look for various things in claims. Were there additional -- were there

9  explanations or additional information that told -- that describes how something operates in a

10  particular structured way, was a term -- were the terms being used, terms of art that one of

11  ordinary skill in reading this would understand them to lend particular structure, would they also

12  be terms that one, when looking at the specification, would also know that are imbibed with

13  certain structure that, again, would tell one that it's not just a pure means for performing some

14  functionality."). Dr. Freedman misapplied the standard in assessing whether a term was

15  structural or not. Instead of assessing whether the term was structural, he repeatedly considered

16  whether the term has a particular structure, which is an incorrect standard. As the Federal Circuit

17  has noted, "it is sufficient if the claim term is used in common parlance or by persons of skill in

18  the pertinent art to designate structure, even if the term covers a broad class of structures and

19  even if the term identifies the structures by their function." *TecSec, Inc. v. IBM*, 731 F.3d 1336,

20  1347 (Fed. Cir. 2013) (internal citations omitted). The cited dictionary definitions show that the

21  terms are used in by persons of ordinary skill to connote structure, even if it covers the broad

22  class of structures that Dr. Freedman enumerates in his declaration.

23        In the present disputed terms, even assuming for the sake of argument that "module"

24  lacks sufficient structure, the other terms used in conjunction with "module" do provide structure

25  as described in Synchronoss's opening brief. Op. Br., Ex. C, IEEE 100, THE AUTHORITATIVE

26  DICTIONARY OF IEEE STANDARDS TERMS 63, 234, 239, 267-68, 445, 529-30, 638, 703-04, 1241

27  (2000) (hereinafter "IEEE"). Defendants merely offer unsupported attorney argument that the

words "distributed," "learning," and "control," which were found to be non-structural in Williamson, are located in the IEEE dictionary. This argument lacks evidentiary support.

Defendants first conclude, without any evidence, that "the word 'module' imparts no structure," Br. at 15, effectively concluding that any element using the word "module" must be a means-plus-function limitation. This simply is not true. Defendants consistently omit quotations from the Federal Circuit's opinion in *Williamson* to imply that the Court mandated that "module" lacks structure. This too simply is not true. The Federal Circuit stated that "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs **may be used** in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore **may invoke** § 112, para. 6." *Williamson*, 792 F.3d at 1350 (emphasis added). This permissive language shows that the burden still lies with the party asserting that 35 U.S.C. § 112, para. 6 applies on establishing that "module" lacks sufficient structure. By concluding that the term "module" lacks structure without any support, Defendants attempt to shift the burden, and thus instead have failed to meet their burden. Previous attempts to shift the burden, even post-*Williamson* have similarly been denied. *See, e.g.*, *Blast Motion, Inc. v. Zepp Labs., Inc.*, 2017 U.S. Dist. LEXIS 16549, at *45-46 (S.D. Cal. Feb. 6, 2017) ("As an initial matter, Williamson does not, as Plaintiff suggests, stand for the broad proposition that the term 'module' automatically places it among terms such as 'means' and 'step for,' thus triggering a presumption that § 112(f) applies. Instead, the *Williamson* Court found that '[m]odule is a well-known nonce word that **can** operate as a substitute for "means" in the context of § 112, para. 6.'" (emphasis in original)). The court in *Blast Motion* ultimately concluded that multiple terms using the word "module" were not means-plus-function: (1) the term "initial motion recognition module" meant "hardware and/or software that receives and processes data acquired by motion sensors," (2) "data storage module" meant "hardware and/or software that stores data," and "communications module" meant "hardware and/or software capable of transmitting data between devices." *Id.* at *50, 54, 56. Defendants conveniently omit the words "can" and "may" in their citations to *Williamson*. By attempting to

SYNCHRONOSS'S REPLY CLAIM CONSTRUCTION BRIEF
*Case No. 4:16-cv-00119-HSG-KAW / Case No. 4:16-cv-00120-HSG-KAW*

shift the burden to Synchronoss, and then operating off of that shifted burden, Defendants have failed to establish that the disputed claim elements are subject to 35 U.S.C. § 112, para. 6.

In the present case, the terms "module" and "controller" themselves impart structure. As the IEEE Dictionary indicates, a "module" is "A program unit that is discrete and identifiable with respect to compiling, combining with other units, and loading; for example, the input to, or output from, an assembler, compiler, linkage editor, or executive routine." Op. Br., Ex. C, IEEE at 703-04. Accordingly, a module has structure, e.g. a compiler. Synchronoss cited the extensive list of cases finding "controller" to connote structure. Op. Br. at 15-16. As the Federal Circuit has made clear, "To help determine whether a claim term recites sufficient structure, we examine whether it has an understood meaning in the art. Technical dictionaries, which are evidence of the understandings of persons of skill in the technical arts, plainly indicate that the term 'circuit' connotes structure." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004). The Court in *Linear Tech.* recognized that the term "circuit" was structural stating:

> The Dictionary of Computing 75 (4th ed. 1996) defines "circuit" as "the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function." Thus, when the structure-connoting term "circuit" is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 P 6 presumptively will not apply. *Id.* (internal citations omitted).

In contrast, in *Williamson*, no party offered such evidence of a technical dictionary. *Williamson v. Citrix Online, LLC*, 770 F.3d 1371, 1379 (Fed. Cir. 2014) *vacated by Williamson*, 792 F.3d 1339. Thus, like in *Linear Tech.*, the structure-connoting term "module" coupled with the other structural terms "user," "identifier," "authentication," and "log-in" provides structure.

Next, none of these terms include a "for" limitation that would indicate a function (i.e. "means for [function]"). 35 U.S.C. § 112, para. 6 allows a party to claim an element "as a means or a step **for performing a specified function**," In the present case, Defendants cite to *Williamson* for the proposition that "the Federal Circuit concluded that 'distributed learning control module' was subject to § 112(6)." Br. at 11. This argument is disingenuous. In *Williamson*, the Federal Circuit relied on the syntax of the claim element, which included more

than merely "distributed learning control module." *Williamson*, 792 F.3d 1350. The Federal

Circuit specifically stated:

> We begin with the observation that the claim limitation in question is not merely
> the introductory phrase "distributed learning control module," but the entire
> passage "distributed learning control module for receiving communications
> transmitted between the presenter and the audience member computer systems
> and for relaying the communications to an intended receiving computer system
> and for coordinating the operation of the streaming data module." This passage, as
> lengthy as it is, is nonetheless in a format consistent with traditional means-plus-
> function claim limitations. It replaces the term "means" with the term "module"
> **and recites three functions** performed by the "distributed learning control
> module." *Id.* (emphasis added).

Accordingly, it was not "distributed learning control" that imparted function to the module in

*Williamson*, but instead it was the "for receiving . . . and for relaying . . . and for coordinating"

clause that did. This syntax is not used in the present disputed terms.

Finally, Defendants find fault with Synchronoss failing to identify "a single statement

from that deposition to undermine his supposedly litigation-driven opinion." Br. at 12. Dr.

Freedman offered multiple statements showing that his opinion is litigation-induced in his

desperate attempt to save his own patent from § 112, para. 6. After offering his circular opinion

that terms such as "user identifier module" and "user authenticator module" lacked structure, Dr.

Freedman was questioned about his own patent that used the term "middlebox detection

modules." Dr. Freedman immediately responded that this limitation was not a means plus

function element because "there appears to be structure in this term" despite "detection" being a

functional, descriptive term. Eskandari Decl., Ex. A at 89:7-12 ("Q. And do you believe that this

claim is a means plus function claim? A. I don't believe so, but again, I -- it appears to be

structure. I don't -- there appears to be structure in this term."). He then also offered support for

the opinion that this term was structural because his own patent recited method claims, which

made the analysis different. *Id.* at 90:15-17 ("I do not believe that the same type of means plus

function analysis is relevant to a method claim."). He then opined that adding steps that the

module performed (i.e. function) provided structure to the claim. *Id.* at 91:2-7 ("It doesn't just

say what is claimed is a system for middlebox detection modules. It talks about middlebox detection -- a method of middlebox detection modules that perform a whole bunch of steps."). Neither of these arguments are well-founded reasons to find structure in a claim element. Dr. Freedman's testimony showed that he was attempting to grasp at anything to prevent his own patent from being construed as a mean-plus-function claim element, which indicates that his litigation-induced, circular testimony is highly suspect, and at a bare minimum, fails to overcome the presumption that 35 U.S.C. § 112, para. 6 does not apply.

      **b.  "user identifier module" / "authentication module identifying a user coupled to the synchronization system" / "user authenticator module" / "user login authenticator" / "user data flow controller"[2]**

Even if the terms are purely functional, the terms are not indefinite, and Defendants' proposed construction is incorrect. The specification provides a corresponding structure for each. Dropbox's expert agreed that flow charts connote structure. *See, e.g.*, D.I. 82-6 at 18:7-9 ("Nowhere in the specification is there any algorithmic structure for implementing user identification—no formula, prose, **flow chart** or pseudocode. Nor is there any other structural guidance."). Defendants, by their proposed construction for "synchronization manager" and "synchronization agent" concede that Figures 15 and 16 show an algorithm that is structure. D.I. 92-2, Ex. B at 24-25, 28-29.

For, "user identifier module," the specification discloses a flow chart in Figure 17, that includes an "add user module 1712" and a "user log-in from the welcome screen at 1710" that are structural and associated with the function of identifying a user. '696 patent, 32:14-22.

---

[2] Synchronoss notes that Defendants improperly construed "user data flow controller" separately from the grouping with the other terms as indicated in the Joint Claim Construction and Prehearing Statement. *See* Br. at 14, section B.1.c; Br. at 19, section B.1.e. By doing so, Defendants have attempted to have the court construe eleven terms for construction, in violation of the Court's Standing Order for Patent Cases Before District Judge Haywood S. Gilliam, Jr., ¶¶ 5-6. Therefore, "user data flow controller" has become an additional term, and the Court should not construe it consistent with paragraph 6 of the Court's Standing Order. *Id.*, ¶ 6 ("If more than ten terms are submitted for construction without leave of court, the Court will construe only the first ten terms listed in the joint claim construction statement and sanctions may be imposed.").

For "authentication module," "user authentication module," and "user log-in authenticator," the specification discloses an "account authentication module 1724" that receives input from a user to authenticate the user. This is shown in the structural flow charts at Figure 15 at element 1420, '696 patent, 34:16-19 ("Once a connection is established, the connection to the management server is made at step 1420 to authenticate the user identification via the management server."), Figure 16 at element 1545, *id.* at 36:11-14 ("Upon connection to the storage server, a further connection to management server 1545 will occur to authenticate the user in the system."), and Figure 17 at element 1724, *id.* at 32:19-22 ("The 20 account authentication module 1724 receives input both directly from a user log-in from the welcome screen at 1710 and from the add device module 1714"). Accordingly, these elements are the structure that corresponds to the "authentication module," "user authentication module," and "user log-in authenticator."

For a "user data flow controller," the specification also discloses "Further information with respect to the management server and the data flow from the management server to other components of the system of the present invention will become apparent with respect to the discussion of the process flow and data flow diagrams in FIGS. 15-17. Fig. 17 shows a general depiction of the data flow and the functional specification of the management server utilized in accordance with the specification." *Id.* at 32:1-8. The '696 patent even provides pseudo code for performing this data flow. *Id.* at 34:49-35:66. And in flow chart form at Fig. 15, elements 1435, 1450-1475 and Fig. 16, elements 1555-1575.

> **c.  "synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device" / "synchronization agent"**

Defendants argue that the synchronization manager is distinct from the disclosed "management server" and that the "management server" is not the structural element that performs the function of "communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device." This is in error.

1    The Abstract explicitly states, "The management server communicates with at least one

2    interactive agent to control data migration between a computer to a network storage device."

3    Thus, the management server and the synchronization manager are the same. Accordingly, the

4    synchronization manager is the management server and should be construed the same.

5         Defendants are similarly wrong in alleging that "agent" is a nonce word. "Agent" is a

6    term of art that refers to a specific "managed nodes in a network." IEEE at 22. These are

7    structural elements. Dr. Freedman's declaration also repeatedly uses the term "agent" as a

8    structural term of art. Op. Br. at 19-20. Accordingly, "synchronization agent" is not a means-

9    plus-function term. Defendants' proposed function also makes this clear because the proposed

10   function has no basis in the claims at all.

     **d.   "versioning modules" / "versioning information"**

11

12        As noted in Synchronoss's opening brief, Defendants attempt to limit "versioning

13   information" to one disclosed embodiment. The specification makes clear that "The data package

14   transaction format may take a number of forms. One example is the following: . . . Header ::= ID

15   + DataPackID + DataPackVersion." '696 patent, 40:55-63. Accordingly, the specification does

16   not "manifest a clear intention to restrict the scope of the claims to that embodiment." *Info-Hold,*

17   *Inc. v. Applied Media Techs. Corp.*, 783 F.3d 1262, 1267 (Fed. Cir. 2015). Accordingly,

18   "versioning information" is merely the information applied to the DataPack or transaction to

19   indicate when the data has been modified to allow the system to monitor changes to data. *See*

20   '696 patent, ("Additional data packages can be maintained to permit rollback of previous

21   versions of information."); *id.* at 35:5-7 (updating the "local version number" after the data and

22   change log are transmitted in pseudo code).

23        The versioning module is likewise structural. Application of a version number is

24   described in prose, '696 patent, 13:10-16, in figures, *id.* at Fig. 9A, element 915, in pseudo code,

25   *id.* at 34:55-35:7 ("increment local version" and "Update the local version number").

26   Accordingly, the specification shows that the term is not a means-plus-function term. Further, as

27

SYNCHRONOSS'S REPLY CLAIM CONSTRUCTION BRIEF
*Case No. 4:16-cv-00119-HSG-KAW / Case No. 4:16-cv-00120-HSG-KAW*

described in Synchronoss's opening brief, "version" is itself a term of art providing structure to the claim element. Op. Br., Ex. C, IEEE at 1252.

### e. "transaction identifier module"

Defendants argue that "transaction identifier" does not impart structure, relying on *Aguayo*, 2003 WL 25787593, at *13. However, the cited case law in fact supports Synchronoss. In *Aguayo*, the Court found that the term "component identifier" lacked structure because "[u]nlike 'location indicator,' the term 'component identifier' is not defined in technical dictionaries." *Id.* As Synchronoss noted in its opening brief, "transaction_ID," "transaction," and "identifier" are located in technical dictionaries as terms for structure. Op. Br., Ex. C, IEEE at 1197. The examples cited by Dr. Freedman in his declaration only serve to highlight that "has a reasonably well understood meaning in the art." *Greenberg*, 91 F.3d at 1583. Accordingly, Defendants have failed to meet their burden of showing that the term lacks structure.

### f. "universally unique identifier"

Defendants propose an overly narrow construction based on extrinsic evidence. Synchronoss's proposed construction, however, is taken directly from the specification. '696 Patent, 38:34-35. For this reason, Synchronoss's proposed construction is the correct construction of the term "universally unique identifier."

"Universally unique identifier" as a phrase is a term of art in and of itself. Op. Br., Ex. C, IEEE Dictionary at 1237. However, there are "[v]arious versions" of UUIDs that exist and "references for generation of UUIDs abound." *Id.* Defendants have selected one version of UUID based on the Open Software Foundation standard as their chosen construction, but acknowledge that the International Telecommunications Union has issued its own standard which is slightly different. Br. at 27-28. They also acknowledge that the ITU-T standard is not "unique[] across space and time" as is in their proposed construction. Br. at 27. Neither of these standards, or indeed any other specific standard were specifically identified in the specification. Instead, the patentee defined "universally unique identifier" as proposed by Synchronoss. It is

1    inappropriate and contrary to Federal Circuit precedent to import limitations from extrinsic

2    evidence into the construction for the claim element.

3        **C. The '446 Patent**

4            **a.  "digital media file"**

5        Defendants misconstrue Synchronoss's proposed construction in an attempt to unduly

6    narrow the plain meaning of "digital media file."

7        First, by adding the word "individual" to modify file, Defendants attempt to require a

8    digital media file to be of a particular format. However, this is improper as the formatting of the

9    file is a separate issue from the term "digital media file." For example, claim 1 requires,

10   "generating a digital media file, in response to an input from the user, comprising a second

11   version of the media data **in a same format** as the first version." If the formatting of the file

12   were implied by the term "digital media file" then this limitation would be superfluous.

13   Similarly, the specification discloses that "digital media files of varying formats, and other data,

14   may be synchronized or transferred . . . ." '446 patent, 9:52-54. To require one particular format,

15   as Defendants attempt, is contrary to that principle.

16       Second, Defendants accused Synchronoss of conflating terms; however, they are the ones

17   doing so by conflating the terms "media data" and "digital media content."

18       Third, Defendants do not dispute that a digital media file can include text information.

19   Inclusion of text information is plainly contrary to their proposed construction that a digital

20   media file is "audio or video content." If a digital media file can include text, as Defendants

21   agree, then their proposed construction of "digital audio or video content" is overly limiting.

22       Fourth, and finally, Defendants do not offer any reason to provide the clarification that

23   they say the exemplary language offers. As Synchronoss has noted, "digital media files" are not

24   limited to audio or video data, thus providing exemplary language of audio and video file

25   formats would suggest to the jury that they are limited to audio and video files. As the

26   specification notes, the device engine of the disclosed embodiments "supports a wide variety of

27   vendor-unique applications and file structures." '446 patent at 10:37-39. To implicitly limit it to

1    a few listed formats would only suggest to the jury that it is limited to those formats. Further, as

2    noted above, the format of the data is a separate claim limitation. Accordingly, to import that into

3    the construction of "digital media file" is improper.

              **b.    "web browser"**

5         Defendants ironically assert that Synchronoss's proposed construction, which is taken

6    directly from the specification, is somehow "inconsistent with plain and ordinary meaning of the

7    term and the '446 patent itself" and that Synchronoss's proposed construction "finds no support

8    in the intrinsic record." Br. at 29-30. However, Synchronoss's proposed construction, "a

9    software application that allows a user access to an information store on the World Wide Web,"

10   is taken nearly verbatim from the specification. '446 patent, 7:52-54 ("In FIG. 3, a user 550

11   interacts with, for example, a browser application 100, such as a World Wide Web browser,

12   which allows the user access to an information store."). Because the intrinsic record fully

13   supports Synchronoss's proposed construction, a "web browser" is properly construed as "a

14   software application that allows a user access to an information store on the World Wide Web."

15        Defendants disingenuously assert that their construction is "taken almost verbatim" from

16   Synchronoss's proposed construction in a prior litigation and that the source of their proposed

17   construction "is Synchronoss's own construction in the *NewBay* case." Br. at 29-30. These

18   arguments are incorrect and irrelevant. Defendants' proposed construction is the defendant

19   Newbay Software, Inc.'s proposed construction verbatim, which Synchronoss disputed at that

20   time. Mandernach Decl., Ex. E (Joint Claim Construction Statement, *Synchronoss Tech., Inc. v.*

21   *NewBay Software, Inc.*, No. 11-cv-04947-FLW, D.I. 48 (D.N.J. Nov. 14, 2012)). It is no more

22   correct now than it was five years ago when proposed by NewBay. As Synchronoss pointed out

23   in its opening brief, the '446 patent shows using Internet Explorer to interact with a file system

24   and directory selection application, not a web page. '446 patent, Fig. 2 & 6:37-39 ("In the

25   example shown in FIG. 2, an explorer window view 10' of a particular file system and a directory

26   selection application, allowing access to particular file system folders via a window view 10" are

27   shown as two alternative methods of selecting media data. In window 10', a user may select one

or more of the files listed in the file system window and press a sync button 65 which may be provided on the menu bar of the window." Selection using a web page is also disclosed, but as a separate embodiment. *Id.* at 6:52-55 ("Alternate forms of selection of media data, such as, for example, those enunciated above or simply interacting with a web page enabling a sync request by clicking on a button 65 in a web page are contemplated."). Defendants offer no support for their proposed construction other than its alleged similarity to Synchronoss's proposed construction in the prior *NewBay* litigation. However, the prior proposed constructions are merely extrinsic evidence, which cannot be used to vary the clear intrinsic record cited by Synchronoss. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc).

The exemplary language proposed by Defendants is also inappropriate. In the case law cited by Defendants, exemplary language is taken directly from the specification; however, in the present case, the Internet Explorer window that is shown in the specification is referred to as "an explorer window view 10'" not as a web browser. The section of the specification that discusses the web browser, cited above, does not include the exemplary language that Defendants attempt to include. Further, the case law cited by Defendants expressly recognized that exemplary language could confuse the jury. *Apple, Inc. v. Samsung Elecs. Co.*, 2012 WL 2993856, at *4 (N.D. Cal. July 20, 2012) ("The Court recognizes Samsung's concern that including examples in the construction may lead to confusion if the jury interprets the list of examples as an additional limitation on the scope of the term."); *Tyco Healthcare Group LP v. Applied Med. Resources Corp.*, 2011 WL 13136264, at *4 (E.D. Tex. Feb. 18, 2011) ("[T]he court agrees that providing examples in a term's claim construction may not always be appropriate."). Defendants have offered no reason to include the language, and as Synchronoss indicated in its opening brief, the exemplary language is improper and would only serve to create unnecessary confusion. Opening Br. at 27. Accordingly, Defendants' proposed construction is improper.

## II. CONCLUSION

For the foregoing reasons, Synchronoss respectfully requests that the Court adopt its proposed constructions.

Dated: October 13, 2017

Respectfully submitted,

By: */s/ Sarah S. Eskandari*
Sarah S. Eskandari
**Dentons US LLP**
One Market Plaza,
Spear Tower, 24th Floor
San Francisco, CA 94105

Shailendra K. Maheshwari
Mark L. Hogge
Nicholas H. Jackson
**Dentons US LLP**
1900 K Street NW
Washington, D.C. 20006

***Attorneys for Plaintiff Synchronoss Technologies, Inc.***

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date indicated below I caused to be served the

**SYNCHRONOSS'S REPLY CLAIM CONSTRUCTION BRIEF AND DECLARATION OF SARAH S. ESKANDARI IN SUPPORT OF DEFENDANT SYNCHRONOSS'S REPLY CLAIM CONSTRUCTION BRIEF** via the Court's CM/ECF system upon all counsel of record registered to receive electronic filings as indicated on the Court's website, pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5-1.

Dated: <u>October 13, 2017</u>                              By: <u>*/s/ Sarah S. Eskandari*</u>